1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    --------------------------------x
     DUSHANNE ASHLEY,
3                    PLAINTIFF              14 CV 5559(NGG)

4    versus                                 U. S. Courthouse
                                            225 Cadman Plaza East
5    CITY OF NEW YORK, et al,               Brooklyn, New York
                                            April 1, 2019
6              DEFENDANTS.                  12:30 p. m.
     --------------------------------x
7

8            TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
              BEFORE THE HONORABLE NICHOLAS GARAUFIS
9                 UNITED STATES DISTRICT JUDGE

10                         APPEARANCES

11

     Attorney for Plaintiff:
12
     DAVID ZELMAN, ESQ.
13   612 Eastern Parkway
     Brooklyn, New York 11225
14

15   Attorneys for Defendants:

16   NEW YORK CITY LAW DEPARTMENT
     100 Church Street
17   New York, New York 10007
     BY:  BILAL HUSAIN HAIDER, ESQ.
18        ELISSA P. FUDIM, ESQ.
          RACHEL SELIGMAN WEISS, ESQ.
19

20

21   Court Reporter:
     LISA SCHMID, CCR, RMR
22   Official Court Reporter
     225 Cadman Plaza East
23   Brooklyn, New York 11201
     Phone:  718-613-2644 Fax:  718-613-2379
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.

LAVEGLIA/DIRECT/ZELMAN

```
 1              THE COURT:  All right.  Let's bring in the jury.
 2              All rise.
 3              (Jury enters.)
 4              THE COURT:  Please be seated, everyone.
 5              All right.  You may call your next witness.
 6              MR. ZELMAN:  Thank you, Your Honor.
 7              Your Honor, at this time, the plaintiff calls Chad
 8   LaVeglia.
 9              (Witness sworn.)
10              COURTROOM DEPUTY:  Please have a seat, and please
11   state and spell your full name for the record.
12              THE WITNESS:  First name is Chad, C-H-A-D; middle
13   name, Jackson, J-A-C-K-S-O-N, last name, LaVeglia,
14   L-A-V-E-G-L-I-A.
15              THE COURT:  You may inquire.
16                        DIRECT EXAMINATION
17   BY MR. ZELMAN:
18   Q    Good afternoon, Mr. LaVeglia.  How are you today?
19   A    I'm well.  Thank you.  How are you?
20   Q    Good.  Thank you.
21              Now, please tell us a little bit about yourself.
22   Where do you live?  What do you do?
23   A    I live in Merrick, Nassau County.  I'm an attorney.  When
24   I graduated from law school around 2011, I started as an
25   attorney in Brooklyn Defender Services, which is a public
```

LAVEGLIA/DIRECT/ZELMAN

1    defender organization in criminal law.

2           In 2016, I worked as an Assistant District Attorney

3    at the Nassau County DA's office, and now I'm currently

4    practicing civil law.

5    Q    Thank you.

6           Now, tell us a little bit about your knowledge on

7    how a criminal prosecution takes place in Brooklyn with

8    respect to -- an officer goes -- reports a crime to the

9    District Attorney's office.  Let's say start there.

10   A    Well, the District Attorney's office has an ECAB Unit

11   which stands for Early Case Assessment Bureau.  The ADAs in

12   that bureau are assigned with getting facts from the police

13   officer, and deciding what, if any, charges to bring.  From

14   there, if charges are brought, they send the paperwork over to

15   the court and the case is processed.

16          On the other hand, if they don't feel that there's

17   enough evidence to go forward, they would dismiss a case.

18   Q    All right.  And how does the Criminal Court Complaint

19   work?  Who drafts that?

20   A    The assistant in the ECAB drafts it, and then provides it

21   to the police officer to review and correct if there's any

22   errors, and then it's signed under oath.

23   Q    So, is it true that the reason that -- the affidavit is

24   sent to the officer to review and sign, is that right?

25   A    Yes.

LISA SCHMID, CCR, RMR

1   Q    And it actually says something on the form itself that

2   this is sworn testimony?

3   A    Yes.  There's a warning.  There's a disclaimer above the

4   signature line that says, "Any false statements made herein

5   are punishable as a Class A Misdemeanor, pursuant to the Penal

6   Law."

7              MR. ZELMAN:  All right.  At this time, I would like

8   to move into evidence the -- two of our documents, the

9   Criminal Court Complaint in the case and the ECAB scratch

10  sheet.

11             THE COURT:  Do I have your exhibits?

12             MR. ZELMAN:  I have it here, Your Honor.  (Perusing

13  documents.)  I have something like that, yeah.

14             THE COURT:  My copy?

15             MR. ZELMAN:  I have -- I gave one copy to defense

16  counsel.  I have one other copy.  I'm sorry if I was supposed

17  to bring three.

18             THE COURT:  You're supposed to follow my rules.

19             MR. ZELMAN:  I apologize for that, Your Honor.

20             THE COURT:  I'm supposed to receive a book with all

21  your exhibits you're planning to introduce.  It's in my rules.

22             MR. ZELMAN:  I do apologize, Your Honor.  I did

23  provide --

24             THE COURT:  Well, I don't have it, so why don't you

25  show it to me?

LAVEGLIA/DIRECT/ZELMAN

```
 1              MR. ZELMAN:  Okay.  (Complies.)

 2              THE COURT:  (Perusing document.)

 3         This doesn't have a number.

 4              MR. ZELMAN:  Yeah.

 5              THE COURT:  It's not marked.  It's supposed to be

 6    marked.

 7              MR. ZELMAN:  Right.

 8              THE COURT:  So -- right?  Right, what is the number?

 9              MR. ZELMAN:  Your Honor, I did mark the copy that I

10    gave to defense counsel, but I didn't know if Your Honor

11    wanted to put a sticker on each one or --

12              THE COURT:  I don't put stickers on things.  You put

13    them on.  You number them and then you put them in a book --

14    my copy, in a book.

15         What is it that you want to put in, let me just ask?

16              MR. ZELMAN:  The Criminal Court Complaint and the

17    scratch sheet.

18              THE COURT:  And the scratch sheet?

19              MR. HAIDER:  Your Honor, I would like to --

20              THE COURT:  Is there an objection?

21              MR. HAIDER:  Yes.

22              THE COURT:  What's the objection?

23              MR. HAIDER:  First --

24              THE COURT:  At sidebar.  We'll do it at sidebar.

25              (Sidebar.)
```

SIDEBAR

```
 1              (Sidebar.)

 2              THE COURT:  Yes.  I don't know what's what.  What is

 3    it that you want to put in?

 4              MR. ZELMAN:  Maybe you should take his because his

 5    has numbers on it.

 6              THE COURT:  It has numbers on it?  Doesn't have a --

 7              MR. ZELMAN:  It's listed here as -- Complaint Room

 8    Screening Sheet is number three and the Criminal Court

 9    Complaint is number six.

10              THE COURT:  What's your objection?

11              MR. HAIDER:  First, I do not believe a foundation

12    has been properly laid for either document; however, with

13    respect to the Criminal Court Complaint, since it is signed by

14    our client, Mike Civil, it is the subject of this litigation.

15    Ultimately, we're not objecting to that coming in.

16              THE COURT:  That's number six?  This is the

17    complaint?

18              MR. HAIDER:  Correct; however, with number --

19              THE COURT:  Three.

20              MR. HAIDER:  -- three, this is a screening sheet

21    drafted by an ADA that's pure hearsay.  Mr. Zelman is welcome

22    to attempt to locate that ADA or subpoena that ADA to come

23    testify, but this is hearsay.  There is no exception for it.

24              MR. ZELMAN:  This is a business record, Your Honor.

25    The District Attorney uses this ECAB scratch sheet in every
```

SIDEBAR

1    prosecution.  The officer calls the DA's office.  He provides

2    the information.

3              THE COURT:  Are you testifying?

4              MR. ZELMAN:  No.  I'm just telling you that it's a

5    business record.

6              THE COURT:  No.  But, the fact is, they're right.

7    If you want to get something in like that, you've got to call

8    the witness.

9              MR. ZELMAN:  Well, Ms. Deana Kay, the person who

10   took it, we did try to locate her.  She is no longer with the

11   DA's office.

12             THE COURT:  Yes.  Life is tough.

13             You give me something.  You haven't -- I didn't get

14   materials.

15             MR. ZELMAN:  I apologize.

16             THE COURT:  No, don't tell me that.  That's sloppy

17   work.  Okay?  You just dumping it on me.  You can't dump

18   something on a federal judge.  This is federal court.  This

19   isn't, you know, we're not playing Ponzi on the sidewalk here.

20   You know?  I have rules.  There are rules in this court.

21             You can't get something in unless it's properly

22   admitted, and this complaint is hearsay.  The source of the

23   complaint has not been established.  There's no -- the person

24   who drafted it is not available.  And I'm not going to have

25   the jury -- the jury has a right to have the proper

SIDEBAR

1    documentation.

2              MR. ZELMAN:  I think maybe I could lay a foundation

3    for the complaint.

4              THE COURT:  How do you lay a -- for the complaint?

5    He's willing to admit the complaint.  The complaint is in.

6    You can put the complaint in.  You have to give it a number.

7              Like number -- let's start with -- no, exhibit

8    number.  It has to have an exhibit number, number one.  Let's

9    start with Exhibit Number 1.  This is now Exhibit Number 1.

10             MR. ZELMAN:  Okay.

11             THE COURT:  You have to provide the Court with a set

12   of exhibits that you want to put in, starting with number one

13   and going as far as you need to go, then I'll decide when you

14   offer them, whether they should be admitted or not admitted.

15             See that book there?

16             Is that your exhibit book?

17             MR. HAIDER:  Yes.

18             THE COURT:  They read the rules.

19             MR. ZELMAN:  All right.

20             THE COURT:  So you can show, Exhibit Number 6 to the

21   jury, whatever that is.  I mean, item number six is Exhibit 1.

22   I don't know where it is.

23             MR. ZELMAN:  Judge --

24             THE COURT:  I shouldn't have to rifle through your

25   papers to find an exhibit.

SIDEBAR

```
 1              But they don't they don't object, so the complaint
 2    is in.
 3              MR. ZELMAN:  Judge, while we're -- I'm sorry.
 4              THE COURT:  The other material is not.
 5              Now what?
 6              MR. ZELMAN:  While we're here --
 7              MR. HAIDER:  Just showing the document.
 8              THE COURT:  There's stuff on the document.  Are you
 9    objecting to the handwriting on the document?  Are you
10    objecting to page six or P6 or whatever this is?
11              MR. HAIDER:  No, Your Honor.  Whichever form -- we
12    have it in two forms, whichever form --
13              THE COURT:  Well, let's just put it in the way it
14    is.
15              MR. ZELMAN:  Judge, while we're here, I'm going to
16    also seek to admit the statement notice that he was provided
17    at the --
18              THE COURT:  Who was provided?
19              MR. ZELMAN:  Him, this witness.
20              THE COURT:  What does he have to do with this case,
21    except that he's a --
22              MR. ZELMAN:  He was the criminal defense attorney on
23    this case.
24              THE COURT:  He was the criminal defense attorney?
25              MR. ZELMAN:  Right.
```

SIDEBAR

```
 1              THE COURT:  So what's this other thing?

 2              MR. ZELMAN:  This is the statement notice that he

 3    was provided, okay, at the prosecution.

 4              THE COURT:  And what is the statement notice?

 5              MR. ZELMAN:  Right.

 6              THE COURT:  What does the statement notice do?

 7              MR. ZELMAN:  The statement notice is the document

 8    that the DA serves on the defense counsel, claiming what

 9    Mr. Ashley said at the -- at the scene.

10              THE COURT:  Any objection to that?

11              MR. HAIDER:  Again, Your Honor, this -- the

12    statement notice itself, the document is hearsay.  Just

13    because he received it doesn't deem it --

14              THE COURT:  I agree.  It doesn't come in.

15              MR. ZELMAN:  And the superseding --

16              THE COURT:  There's more?

17              MR. ZELMAN:  Yeah, Judge.  I mean, there's going to

18    be more, so I don't know if you want to keep going back and

19    forth.

20              THE COURT:  No.  I want -- I want the book with the

21    material and --

22              MR. ZELMAN:  They have in their book, we have the

23    superseding Criminal Court Complaint that I think they're

24    going to want to admit, and we also --

25              MS. FUDIM:  There's no objection to that.
```

LISA SCHMID, CCR, RMR

SIDEBAR

```
 1              MR. HAIDER:  No objection.

 2              THE COURT:  You can put that in.

 3              MR. HAIDER:  Anything that -- the two documents that

 4    our officer signed under penalty of perjury, clearly, we have

 5    no objection to that.

 6              THE COURT:  Okay.  That's fine.

 7              MR. ZELMAN:  Okay.

 8              THE COURT:  That, you can put in, but you really --

 9    I mean, I'm sorry.  I've been here 19 years.  No one has ever

10    failed to give me the book of the exhibits, properly labeled,

11    as plaintiff's exhibits.  I mean, you've just got to follow

12    the rules.

13              MR. ZELMAN:  I apologize.

14              THE COURT:  You're not new to this.  You have been

15    around a long time.  You have had a lot of cases in this

16    courthouse, so obviously, you know what the rules are.

17              MR. ZELMAN:  I assure you, it won't happen --

18              THE COURT:  No, it's not acceptable.

19              MR. ZELMAN:  I personally don't try these cases.

20    That's why --

21              THE COURT:  Well, you're trying this case.

22              MR. ZELMAN:  I know.

23              THE COURT:  So the other thing is, if you have

24    got -- if you have got something you want to show to the jury

25    using a DVD player, you have to come in beforehand, before the
```

SIDEBAR

1    trial, and meet with the IT department, set it up so you know

2    what you're doing with our technology -- because every court

3    has different technology.  This court has -- uses whatever

4    this is that they use.

5            But, you know, so let's try to, between now and

6    tomorrow, to get me a book with all of the other items of

7    evidence, documentary evidence.  Mr. Reccoppa will provide you

8    with stickers starting with Exhibit Number 1, Exhibit Number

9    2, Plaintiff's Exhibit Number 2, Plaintiff's Exhibit Number 3,

10   And so forth, so we have them.  We don't have to waste any

11   time talking about it.  Okay?

12           MR. ZELMAN:  Thank you, Your Honor.

13           THE COURT:  Thank you very much.

14           (Sidebar concluded.)

15

16

17

18

19

20

21

22

23

24

25

LAVEGLIA/DIRECT/ZELMAN

```
 1              (In open court.)
 2              THE COURT:  Okay.  Let's go.
 3              MR. ZELMAN:  Yes, Your Honor.  At this time, the
 4  plaintiff would like to move into evidence the Criminal Court
 5  Complaint as Plaintiff's Exhibit 1, dated -- appears to be
 6  April 19, 2013.
 7              THE COURT:  Any objection?
 8              MR. HAIDER:  No objection, Your Honor.
 9              THE COURT:  All right.  Plaintiff's Exhibit 1 is
10  received in evidence.
11              You may publish it to the jury.
12              MR. ZELMAN:  Thank you.
13              (Plaintiff's Exhibit 1 was received in evidence.)
14              (Publishes exhibit to the jury.)
15              THE COURT:  Okay.  That's it.
16              MR. ZELMAN:  Okay.  It's a bit hard to read.  Okay.
17              THE COURT:  Do you see it, sir?
18              THE WITNESS:  Yes.  Thank you.
19  BY MR. ZELMAN:
20  Q    Okay.  Mr. LaVeglia, I'm going to direct your attention
21  to Plaintiff's Exhibit 1, which I'm attempting to show on this
22  Elmo over here.  Do you recognize that document?
23  A    Yes.
24  Q    All right.  What is that document?
25  A    That is the criminal complaint containing the charges
```

LISA SCHMID, CCR, RMR

1    against Dushanne Ashley.

2    Q    Okay.  And now that Criminal Court Complaint -- just

3    explain how does the procedure work.  After someone's

4    arrested, you receive a copy of that, is that right?

5    A    Yes.  So after they're arrested, if it's prosecuted,

6    defendant is arraigned, which means they go before a judge and

7    the judge decides whether to set bail or not.

8            As a public defender, we're given a copy of the

9    complaint and other pertinent documents, and we review them

10   and then in this case, go speak with our client.

11           So this was a document, the sum and substance of

12   what I received when I was assigned in arraignments.

13   Q    You also received a statement notice along with that

14   complaint.  Is that true?

15           MR. HAIDER:  Objection.

16           THE COURT:  Can you rephrase it?

17   BY MR. ZELMAN:

18   Q    Did you receive a statement notice along with that

19   Criminal Court Complaint at arraignments?

20           THE COURT:  You may answer.

21           THE WITNESS:  Yes.

22           MR. ZELMAN:  All right.  Your Honor, may I publish

23   this statement notice that the witness received to the jury?

24           MR. HAIDER:  Objection, Your Honor.

25           THE COURT:  Sustained.

1   BY MR. ZELMAN:

2   Q    What did the statement notice contain?

3           MR. HAIDER:  Objection.

4           THE COURT:  Sustained.

5   BY MR. ZELMAN:

6   Q    Well, were you provided information as to a statement

7   that Mr. Ashley gave at arraignments?

8   A    Yes, and as --

9           THE COURT:  That's all the question required.

10          Next question.

11  BY MR. ZELMAN:

12  Q    What was that statement?

13          MR. HAIDER:  Objection.

14          THE COURT:  Sustained.

15          MR. ZELMAN:  Judge, could we have a sidebar on this?

16          THE COURT:  No.  We just had a sidebar.

17  BY MR. ZELMAN:

18  Q    Well.  All right.  Now, when you first met Mr. Ashley,

19  where was that?

20  A    At arraignments.

21  Q    All right.  And just explain, does he call you and say, I

22  want you to be my lawyer or does -- or how does that work?

23  A    So we have a court clerk that works for -- that works for

24  BDS, and they gave out cases to each attorney.  There's about

25  three or four of us at a time.

LAVEGLIA/DIRECT/ZELMAN

```
 1              They give us the file and the file is a complaint, a
 2   number of documents.  I review them and then you go back
 3   into -- you call it the pens, which are the holding cells
 4   where the defendants awaiting arraignment are kept.  I call
 5   out a name, and then I go into a booth, and I spoke with
 6   Mr. Ashley about the case.
 7   Q    Okay.
 8   A    What he's charged with, et cetera.
 9   Q    What did he tell you?
10              MR. HAIDER:  Objection.
11              THE COURT:  Sustained.
12   BY MR. ZELMAN:
13   Q    All right.  What happened next after you met with
14   Mr. Ashley?
15   A    I went over the charges, what the allegations were
16   against him, and we discussed our defenses based on our
17   conversation, and what to anticipate at arraignment.
18              I took down his information and prepared a bail
19   argument to ask the judge to release him on his own
20   recognizance, as opposed to setting bail, and the reasons why.
21   Q    Was that done?
22   A    Excuse me?
23   Q    Was that done?  Did they release him on his own
24   recognizance?
25   A    I don't recall what the outcome was.
```

LISA SCHMID, CCR, RMR

1    Q    Okay.  Now, according to the Criminal Court Complaint,

2    what was the allegation against him?

3    A    Well, he was charged with several misdemeanors.  The crux

4    of the factual allegations which are required is, "The

5    deponent states at the above time and place, the deponent

6    observed the defendant in possession of approximately two

7    ounces of marijuana, in that, the deponent did observe the

8    defendant" -- and I can't read that part.  "Did recover

9    said" -- I'm sorry.  "Did recover said" --

10   Q    Can you make it out?

11   A    My eyes aren't as good as they used to be.

12              MR. ZELMAN:  I could give him a copy of it.

13              THE WITNESS:  "Did recover said" --

14              THE COURT:  Do you want to show it to him?

15              MR. ZELMAN:  Yes, Your Honor.  Thank you.

16              THE COURT:  You may approach.

17              MR. ZELMAN:  Thank you.

18              (Handing to witness.)

19              THE WITNESS:  Thank you.

20   A    (Peruses document.)

21              "Did recover said quantity of marijuana from the

22   floor inside of the apartment, in which the defendant was

23   sitting."

24   Q    Okay.  Now, you became -- is it true that you were now

25   assigned to be his lawyer?

```
1    A    Yes.

2    Q    Now, was he paying you for that?

3    A    No.

4    Q    How does did that work?

5    A    He's entitled to representation.  If he can't afford an

6    attorney, one is provided for you, and I was the attorney that

7    was provided for him.  I was assigned by the court.

8    Q    Now, do you recall any early discussions with the DA's

9    office about offers, how to resolve this case, et cetera?

10   A    Post-arraignment?

11   Q    Yeah.

12   A    Yes.  Yes.

13   Q    What was the sum and substance of these conversations you

14   had about offers in the case?

15            MR. HAIDER:  Objection.

16            THE COURT:  Sustained.

17   BY MR. ZELMAN:

18   Q    Well, without telling us what was said, was an offer made

19   by the District Attorney to resolve the case?

20            MR. HAIDER:  Objection.

21            THE COURT:  Sustained.

22   BY MR. ZELMAN:

23   Q    In your experience as a criminal defender, Brooklyn

24   Defender Services, how were these marijuana cases usually

25   disposed of in court?  Did they usually go to trial?  Did they
```

LAVEGLIA/DIRECT/ZELMAN

1    usually end in a plea bargain or something else?

2              MR. HAIDER:  Objection.

3              THE COURT:  Sustained.

4    BY MR. ZELMAN:

5    Q    Well, what was the next thing that you did after

6    arraignment with respect to this case?

7    A    Well, based on my conversations with Mr. Ashley, I spoke

8    with an investigator and sent him out to the location on the

9    complaint of -- forget the address.  There was video

10   surveillance, and so I sent the investigator to go get the

11   surveillance.

12   Q    How did you become aware of the video surveillance?

13             MR. HAIDER:  Objection.

14             THE COURT:  Sustained.

15             THE WITNESS:  Mr. Ashley.

16   BY MR. ZELMAN:

17   Q    Did your -- while you were -- now, just tell us in

18   general, after the arraignment, what is the first conference

19   you go to court?

20   A    It depends whether they're released or if bail is set.

21   If bail is set, then the next date is within seven days of the

22   arraignment.  If bail is not set, it's usually adjourned for

23   about a month out.

24             We always send investigators to look into whether

25   there's surveillance -- especially in this day and age -- to

LAVEGLIA/DIRECT/ZELMAN

1    investigate the case and prepare a strategy.

2    Q    And that's what did you?

3    A    That's what I did.  That's what I always do.

4    Q    How many court appearances had to transpire before you

5    got the video?

6    A    About three.

7    Q    All right.  And during those court conferences what

8    transpired in court?

9    A    Procedurally, we were -- dates were set to obtain

10   discovery from the People, and set hearing and trial dates.

11   Q    Okay.  And eventually you obtained video, correct?

12   A    Yes.

13   Q    What does the video show?

14   A    It showed the lobby of an apartment building.  It showed

15   a police officer wearing a blue jacket or dark jacket, enter

16   at around -- I believe it was 5:00 a.m., and then he was

17   followed by a team of police officers with riot shields,

18   moving into the apartment.  About 20 minutes afterwards, it

19   showed Mr. Ashley entering the apartment, contrary to what was

20   on the complaint.

21        MR. ZELMAN:  Okay.  Your Honor, at this time, I

22   would like to publish to the jury the videos and photos that

23   Mr. LaVeglia disclosed to the District Attorney's office.

24        THE COURT:  These are exhibits?

25        MR. ZELMAN:  Yes.  They're on our list.

```
 1              THE COURT:  Do they have numbers?

 2              MR. ZELMAN:  Yes, Your Honor.  They do.

 3              THE COURT:  What numbers do they have?

 4              MR. ZELMAN:  The video is number seven.

 5              THE COURT:  I'm sorry.  Exhibit Number 2, maybe?

 6              MR. ZELMAN:  Exhibit 2 is listed on our JPTO as 7.

 7              THE COURT:  Okay.  Any objection to Exhibit Number 2

 8   being admitted in evidence?

 9              MR. HAIDER:  No, Your Honor.

10              THE COURT:  All right.  All right.  Exhibit 2 is

11   received in evidence, and you may publish it to the jurors.

12              (Plaintiff's Exhibit 2 was received in evidence.)

13              (Publishes exhibit to the jury.).

14              THE COURT:  Now, I'll do it.

15              MR. ZELMAN:  Thank you, Your Honor.

16              THE COURT:  There you go.

17              MR. ZELMAN:  Thank you.

18              THE COURT:  Sure.

19   BY MR. ZELMAN:

20   Q    All right.  Now Mr. LaVeglia, I just want to show you

21   some frames.  Did you provide video or photo frames to the

22   District Attorney's office?

23   A    Both.

24   Q    Okay.  I'd like you to take a look at that.

25              MR. ZELMAN:  Whoops.  Did I do something wrong?
```

```
 1              THE COURT:  No you're good.

 2              MR. ZELMAN:  Okay.  Thank you.

 3   BY MR. ZELMAN:

 4   Q    Can you take a look at that photo and can you tell us,

 5   did you provide that photo to the District Attorney's office?

 6   A    Yes, I did.

 7   Q    What is that?  What is that still of the video shown?

 8   A    Shows the police executing the search warrant and

 9   entering the building.

10   Q    Is it time stamped?

11   A    It is time and date stamped, 4-19-2013, at 4:59, a.m., 55

12   seconds.  And the video recording system that was that set up

13   was also able to show whether it's authentic or not.  You see

14   it stamped on the bottom right hand corner, where it says

15   "authenticity."

16              (Continued on the next page.)

17

18

19

20

21

22

23

24

25
```

LAVEGLIA/DIRECT/ZELMAN

```
 1    DIRECT EXAMINATION

 2    BY MR. ZELMAN: (Continued.)

 3    Q    Approximately how many officers, according to the video

 4    were present and executed this warrant?

 5    A    I believe --

 6              MR. HAIDER:  Objection.

 7              THE COURT:  It --

 8              MR. ZELMAN:  According to the video.

 9              THE COURT:  Why don't you restate the question in

10    the proper form.

11    BY MR. ZELMAN:

12    Q    Were you able to determine approximately how many

13    officers executed the warrant at the location by viewing the

14    video?

15    A    Yes.

16    Q    How many?

17    A    Approximately eight to ten.

18              THE COURT:  So that's Exhibit 2?

19              MR. ZELMAN:  This is a series of photos that he

20    provided.

21              THE COURT:  And as a group, they are Exhibit 2?

22              MR. ZELMAN:  Correct.

23              THE COURT:  Okay.  Go on.

24              MR. ZELMAN:  This is -- okay.

25              THE COURT:  You will need to provide the hard copy
```

LAVEGLIA/DIRECT/ZELMAN

 1  of those for the jury when they deliberate, sir.

 2          MR. ZELMAN:  Thank you, Your Honor.

 3  BY MR. ZELMAN:

 4  Q    Okay.  Now, did you provide this still to the District

 5  Attorney's Office?

 6  A    I did.

 7  Q    And what does this still depict?

 8  A    It shows that on April 19th, 2013, at 5:12 in the

 9  morning, 57 seconds, it shows Dushanne -- or Mr. Ashley

10  walking outside of the building.

11  Q    Okay.  Now -- and so that's after the police arrived,

12  correct?

13  A    Correct.

14          THE COURT:  And he's walking toward the building

15  there --

16          THE WITNESS:  Yes.

17          THE COURT:  -- or away from the building?

18          THE WITNESS:  Toward the building, Your Honor.

19          THE COURT:  Go on.

20  BY MR. ZELMAN:

21  Q    And on that same day, Your Honor -- and what is this --

22  was this still provided to the District Attorney's Office?

23  A    Yes, it was.

24  Q    And what does this still show?

25  A    It shows that on April 19, 2013, at 5:13 a.m., it shows

LAVEGLIA/DIRECT/ZELMAN

```
 1   Mr. Ashley walking into the building.
 2   Q    Okay.
 3            And again, that's after the police went out -- after
 4   the police arrived?
 5   A    Yes.
 6   Q    And did you provide this still to the -- to the --
 7   withdrawn.  I'm sorry.
 8            Did you provide this still to the District
 9   Attorney's Office, if you recall?
10   A    I provided all of them, so this would have been included
11   in it.
12   Q    Do you know what's depicted in that?
13   A    I really can't recall the significance of it at this
14   time.
15   Q    Okay.
16            And finally, do you recall this -- providing this --
17   a copy of this photo to the District Attorney's Office?
18   A    Yes.  Yes, I do, and --
19   Q    What does that depict?
20   A    It shows that April 19th, 2013, at 5:30 a.m., it shows an
21   officer escorting Mr. Ashley out of the building in handcuffs
22   wearing the same color windbreaker that he had on before he
23   entered the building and when he entered the building.
24   Q    Okay.  Thank you.
25            Now, following your receipt and your providing this
```

LAVEGLIA/DIRECT/ZELMAN

```
 1    to the District Attorney's Office, what effect, if any, did it

 2    have on the case?

 3              MR. HAIDER:  Objection.

 4              THE COURT:  Sustained.

 5    BY MR. ZELMAN:

 6    Q    Well, did the -- after you provided this -- these -- this

 7    evidence to the District Attorney's Office, did you go to

 8    another court conference?

 9    A    After, yes, eventually, I did.

10    Q    Okay.  And at some future point -- well, withdrawn.

11              At some future point, you heard that the District

12    Attorney's Office was going to dismiss the Criminal Court

13    Complaint, correct?

14              MR. HAIDER:  Objection.

15              THE COURT:  Sustained.

16    BY MR. ZELMAN:

17    Q    Did the -- were you informed that the Criminal Court

18    Complaint would be dismissed?

19              MR. HAIDER:  Objection.

20              THE COURT:  Sustained.

21    BY MR. ZELMAN:

22    Q    Was the Criminal Court Complaint dismissed?

23    A    At the next court proceeding, it was superseded.  It

24    wasn't dismissed.  It was replaced by a different Criminal

25    Complaint, and that different Criminal Complaint replaced the
```

LAVEGLIA/DIRECT/ZELMAN

1    original one.

2    Q    Okay.

3              MR. ZELMAN:  Your Honor, at this time, I would like

4    to publish to the jury the Superseding Criminal Court

5    Complaint, and there's no objection to that, and it's in

6    defendant's binder.

7              THE COURT:  Does it have a number?

8              MR. HAIDER:  Yes, Your Honor.

9              THE COURT:  Let's use your number.

10             MR. HAIDER:  It's Defendant's Exhibit A.

11             THE COURT:  A?  Any objection to A?

12             MR. HAIDER:  No.

13             THE COURT:  All right.  Defendant's Exhibit A is

14   received as evidence on the plaintiff's case.

15             (Defendant's Exhibit A received in evidence.)

16             THE COURT:  It may be published to the jury.

17             (The above-referred to exhibit was published.)

18             THE COURT:  You know you can pull it out.  There's a

19   knob at the top so that we can see more of it.

20             MR. ZELMAN:  Thank you, Your Honor.  You can see a

21   little more and a little less at the same time.

22             THE COURT:  Well, you can see more.  If there's

23   something that has to be read, then it can always be -- you

24   can focus in on that.

25             Go ahead and ask your questions.

 1            MR. ZELMAN:  All right.  I may have to -- I think it

 2   might be more helpful if the witness just saw this himself.

 3            THE COURT:  That's fine.  However you want to do it.

 4   You may approach the witness.

 5            MR. ZELMAN:  (Handing.)

 6   BY MR. ZELMAN:

 7   Q    Mr. LaVeglia, after you had an opportunity to take a look

 8   at that, were you provided that second Criminal Court

 9   Complaint in court?

10   A    Yes.

11   Q    All right.  Now, with respect to that second Criminal

12   Court Complaint, was that provided before or after you

13   provided the video to the District Attorney's Office?

14   A    After I provided the video.

15   Q    Do you remember approximately how many court conferences

16   occurred on the first Criminal Court Complaint before that --

17   before that one was superseded by the one you have in your

18   possession now?

19   A    I'm sorry, can you rephrase that?

20   Q    Yes.

21            At the time that you received -- that's a

22   Superseding Criminal Court Complaint, correct?

23   A    Yes.

24   Q    At the time that you received that, how many court

25   conferences and court appearances had occurred?

LAVEGLIA/DIRECT/ZELMAN

```
 1   A     Approximately six.
 2   Q     Okay.  And approximately how much time had elapsed from
 3   the initial -- initial Criminal Court Complaint until it was
 4   superseding?
 5   A     Five to six months.
 6   Q     Okay.  Now, what happened in court when the District
 7   Attorney -- did the District Attorney announce that they were
 8   going to be superseding their Criminal Court Complaint?
 9   A     When it was provided to me, yes.
10   Q     What did they say in open court on that --
11   A     Your Honor, the People are filing superseding
12   information, I'm providing defense counsel with the copy, I'm
13   providing the Court with a copy, and they handed a physical
14   copy to myself and to the judge.
15         THE COURT:  Excuse me, what was the date of that
16   Superseding Complaint?  Can we have a date on that?
17         THE WITNESS:  April 30th -- it says April 30th,
18   2014.
19         THE COURT:  All right.  Go ahead.
20   BY MR. ZELMAN:
21   Q     Having read that date, does that refresh your
22   recollection that the Superseding Criminal Court Complaint was
23   given to you slightly more than a year after the first
24   Criminal Court Complaint?
25   A     It was less than a year.  It was just signed on
```

```
 1   April 30th, 2014.
 2   Q    Okay.  Well the date of his arrest was April 19th, 2013.
 3   A    Yes.
 4        MR. HAIDER:  Objection.
 5   A    Yes, it was about a year, yes.
 6   Q    Okay.  And does that refresh your recollection as to how
 7   many court conferences you had between the original Court
 8   Complaint and the time of the filing of this Superseding Court
 9   Complaint?
10   A    Yes.
11   Q    What was that?
12   A    At that point, it was about ten to fifteen.
13   Q    Okay.  How do you know that?
14   A    Because it's -- one, my memory, I remember all the
15   appearances we had to make on this case; and as a matter of
16   course of business, the way the courts adjourn these cases was
17   always the same, and it would be one-month to two-month
18   adjournments between each court appearance.
19   Q    Okay.  So you had appeared for approximately a year with
20   about ten to fifteen court appearances after the first
21   Criminal Court Complaint was filed but before the second one
22   was filed, correct?
23   A    Correct.
24   Q    And during each of those appearances, my client was
25   required to be there?
```

LAVEGLIA/DIRECT/ZELMAN

1    A     Absolutely.

2    Q     And how long did you typically have to wait in court to

3    be heard?

4    A     Minimal --

5              MR. HAIDER:  Objection.

6              THE COURT:  Sustained.

7    BY MR. ZELMAN:

8    Q     Well, from your experience in the case, how long was

9    Mr. Ashley in the courtroom waiting to be -- waiting for his

10   case to be heard?

11             MR. HAIDER:  Objection.

12             THE COURT:  You may answer.

13   A     Minimum, four hours, because I, as a public defender, had

14   many cases on, and also the courts were congested; and so I

15   sign him in -- sign the case in -- he was always there on

16   time, always -- and other matters get in the way, and so he

17   would always have to wait for a minimum of four hours at

18   least.

19   Q     Did he have the option not to appear?

20   A     No, he did not.

21   Q     Now, he also had another case at the same time for a

22   period of -- for some of these court conferences, he was

23   required to be there for another case as well; is that right?

24   A     Yes.

25   Q     Now, when you actually appeared in front of the judge,

Denise Parisi, RPR, CRR

1    would you handle each case separately?

2    A    No.   They were tracking together.

3    Q    What I mean is, when you went in front of the judge --

4    explain tracking.  What does that mean?  What is tracking?

5    A    So when -- for Mr. Ashley, he had two cases, there's two

6    separate docket numbers that are assigned.  Docket numbers are

7    how the Court tracks the cases.  For the convenience of the

8    Court, they put them both on at the same day and the same

9    adjournments, so it's more economical that way, and that's how

10   they're tracked together.

11   Q    So it's one -- it's two cases at -- for one appearance by

12   the Court, one appearance by the attorneys, one appearance by

13   the client.

14   A    Correct.

15   Q    What I meant to say is, when you go in front of the judge

16   and you're discussing one case versus another, those happen

17   at -- not simultaneously, but at a separate time; is that

18   right?

19   A    Yes.

20   Q    The merits of each -- if there's a motion on one, it will

21   be handled separately from the motion on the other?

22   A    Correct.  They are not the same.

23   Q    Thank you.

24        Did -- I don't think I asked this, but was

25   Mr. Ashley allowed to say, I can't make it that day, I'm busy,

1    I need to work, or something else?

2    A    No.  If he didn't make it, a bench warrant could be

3    issued.

4    Q    Okay.  How was he handling the whole process?  Do you

5    recall?

6    A    I do, because --

7         MR. HAIDER:  Objection.

8         THE COURT:  Sustained.

9    BY MR. ZELMAN:

10   Q    Well -- okay.  Now, having reviewed the two complaints,

11   can you tell us the differences between the two?

12   A    Yes.  Well, reading from Defendant's Exhibit A in the

13   second main paragraph, it says:  The deponent states that at

14   the above time and place the deponent observed the defendants

15   in possession of approximately two ounces of marijuana in that

16   the deponent entered said location and observed defendant,

17   Jose Carlos, on the floor and defendant, Dushanne Ashley, did

18   enter said location shortly thereafter and stated, in sum and

19   substance:  See, this is what happens when you let strange

20   people into our apartment, and deponent did recover said

21   quantity of marijuana from the floor.

22   Q    Okay.  Now.  Prior to receiving the superseding -- tell

23   us a little bit about how this statement process works in

24   court.  Is the District Attorney's Office required under the

25   law to provide the defense attorney with copies of any

1   statements that they intend to use against the defendant in

2   criminal court?

3              MR. HAIDER:  Objection.

4   A    Yes.

5              THE COURT:  There's an objection?  Overruled.

6   A    Yes, they are.  Within 15 days of arraignment.

7   Q    Okay.  Now, that statement that it was in the Superseding

8   Criminal Court Complaint, was it ever provided to you prior to

9   the filing of the Superseding Criminal Court Complaint?

10  A    No.  It was the first time I saw it.

11  Q    All right.  And is that a violation of the rules in

12  criminal court?

13             MR. HAIDER:  Objection.

14             THE COURT:  Sustained.

15  BY MR. ZELMAN:

16  Q    Prior to receiving this Superseding Criminal Court

17  Complaint, had you ever received any document that reflected

18  that statement, This is what happens when you let strange

19  people into our apartment?

20  A    No.  We were -- I was provided a different statement.

21  Q    All right.  And what was that?

22             MR. HAIDER:  Objection.

23             THE COURT:  I'm sorry, you have to lay a foundation.

24  BY MR. ZELMAN:

25  Q    Well, you received a statement notice at the beginning of

```
 1    the case, correct?

 2    A    Yes.

 3    Q    They alleged in that statement notice that Mr. Ashley

 4    made a statement at the time of his arrest, right?

 5    A    Yes.

 6    Q    You were provided that on paper by the District

 7    Attorney's Office at arraignment; is that true?

 8    A    Yes.  It's called 710.301, Subsection A, notice; and that

 9    refers to the statutory provision in the criminal procedure

10    law.

11    Q    All right.  What was the statement that you were provided

12    by the District Attorney's Office at the arraignment?

13    A    I'm tired of --

14              MR. HAIDER:  Objection.  Renew my earlier objection.

15              THE COURT:  I will allow it.

16              Go ahead.

17    A    I'm tired of this shit.

18    Q    Okay.  That was provided to you in writing, correct?

19    A    Yes.

20    Q    Were you -- were you provided this statement --

21              THE COURT:  Do we have the statement in writing

22    somewhere?

23              MR. ZELMAN:  Yes.  Yes, we do.  It's on our Joint

24    Pretrial Conference Order.  It's our exhibit --

25              THE COURT:  All right.  Go ahead.
```

LAVEGLIA/DIRECT/ZELMAN

1          MR. ZELMAN:  Your Honor, at this time, I would like

2    to enter into evidence the statement notice that he

3    provided -- that he was provided at arraignment by the

4    District Attorney's Office.

5          THE COURT:  I will allow it.

6          MR. HAIDER:  Objection noted for the record.

7          THE COURT:  You have your objection.

8          MR. ZELMAN:  I'm sorry, Your Honor.

9          (Pause.)

10         MR. ZELMAN:  I had it a second ago.  Sorry about

11   that.

12         THE COURT:  I'm sorry, are you putting something up

13   for the jury?  And you haven't --

14         MR. ZELMAN:  Yes, Your Honor.

15         THE COURT:  Tell me all about it.

16         MR. ZELMAN:  Yes, Your Honor.  This was the

17   statement notice, it's designated on Plaintiff's Proposed

18   Trial Exhibits, Number 4.  I guess it would be Plaintiff's

19   No. 3.

20         THE COURT:  Is there an objection to that?

21         MR. HAIDER:  No objection.

22         THE COURT:  All right.  Plaintiff's Exhibit 3 is

23   received in evidence.  You may publish it to the jury.

24         (Plaintiff's Exhibit 3 received in evidence.)

25         MR. ZELMAN:  Again, I think it might be advantageous

LAVEGLIA/DIRECT/ZELMAN

1   to just present it to him.

2           THE COURT:  That's fine.

3           MR. ZELMAN:  (Handing.)

4   BY MR. ZELMAN:

5   Q    Now, Mr. LaVeglia, is that the statement notice that you

6   were provided by the District Attorney's Office at the

7   commencement of this proceeding following this April 19, 2013,

8   arrest?

9   A    Yes, it is.

10  Q    What statement does it say on that document that the

11  police alleged Mr. Ashley said at the scene?

12  A    I'm tired of this shit.

13  Q    Okay.  Now, were you also provided a statement -- a new

14  statement notice on April 30th or approximately --

15  approximately April 30th, 2014, that alleged a new and

16  different statement that was not previously provided to you?

17  A    No.  It was because it was in the Complaint they didn't

18  provide any statement notice, I don't believe.

19  Q    Okay.  Well, let me just see it --

20          MR. ZELMAN:  May I approach, Your Honor, to refresh

21  his recollection?

22          MR. HAIDER:  Objection.

23          THE COURT:  No.

24          You may.  Go ahead.

25  BY MR. ZELMAN:

LAVEGLIA/DIRECT/ZELMAN

```
1   Q     I just ask you to take a look at that document.
2              (Pause.)
3   A     I'm done reading it.
4   Q     All right.  Does that refresh your recollection as to
5   whether or not you were provided a new statement notice by the
6   District Attorney's Office contemporaneously with the
7   Superseding Criminal Court Complaint?
8   A     Yes, it does.
9   Q     All right.  Now --
10             MR. ZELMAN:  Your Honor, at this time, I would like
11  to enter into evidence the notice pursuant to CPL 710.301(a),
12  and it is -- does not appear to be dated.
13             THE COURT:  What notice is that?
14             MR. ZELMAN:  This is the second notice statement
15  that the District Attorney's Office provided.
16             THE COURT:  That's the one you just showed to the
17  witness?
18             MR. ZELMAN:  I just showed it to him.
19             THE COURT:  It's not dated?
20             MR. ZELMAN:   There is a date, Judge.  It says
21  annexed on 5/7/14, so I guess that's how they date it.
22             THE COURT:  Do you recall receiving this document.
23             THE WITNESS:  I do now.  It was served on the 30th
24  of 2014.
25             THE COURT:   All right.  Does it have a number?
```

Denise Parisi, RPR, CRR

LAVEGLIA/DIRECT/ZELMAN

1           MR. ZELMAN:  Yes, Your Honor.  That will be
2   Plaintiff's 4.
3           THE COURT:  Plaintiff's Exhibit Number 4.
4           Any objection?
5           MR. HAIDER:  No, Your Honor.
6           THE COURT:  Plaintiff's Exhibit 4 is received in
7   evidence and may be published to the jury.
8           (Plaintiff's Exhibit 4 received in evidence.)
9           MR. ZELMAN:  Thank you, Your Honor.
10           THE COURT:  Sure.
11   BY MR. ZELMAN:
12   Q    Reviewing that document, can you tell us -- when the
13   District Attorney's Office provided you with a Superseding
14   Criminal Court Complaint and the notice, what did that new
15   notice state?
16   A    The new -- so the --
17           THE COURT:  About what?
18           MR. ZELMAN:  I apologize.
19           THE COURT:   Let's be more specific, please.
20           MR. ZELMAN:  Yes.
21   BY MR. ZELMAN:
22   Q    At the time that the Superseding Criminal Court Complaint
23   was filed, there was an allegation of a new statement by
24   Mr. Ashley made at the scene of the criminal -- of the arrest,
25   correct?

LAVEGLIA/DIRECT/ZELMAN

```
 1    A     Correct.
 2    Q     What was the -- according to the notice that you have in
 3    front of you that you said you received on April 30th, 2014,
 4    what statement did they now allege Mr. Ashley stated at the
 5    scene of his arrest?
 6    A     That the defendant is tired of this shit and further, the
 7    defendant did blurt out, in sum and substance, This is what
 8    happens when you apprehended other, Charles Patrick, let
 9    strange people into our apartment.
10    Q     Again, just for clarity, you had not received that notice
11    prior to April 30th, 2014?
12    A     I did not.
13    Q     Now, following the filing of this second Criminal Court
14    Complaint in court, what is the next steps that happens in
15    court after the first Complaint is dismissed and the new one
16    is filed?
17    A     The defendant is arraigned on the superseding
18    information.
19    Q     Okay.  Do you recall having him arraigned on that date?
20    A     Yes.
21    Q     And then after the arraignment -- well, what is an
22    arraignment, just for the benefit of the jury?
23    A     An arraignment is where the person accused of the crime
24    goes in front of the judge and the judge reviews various
25    factors to decide whether bail is to be set to ensure the
```

LAVEGLIA/DIRECT/ZELMAN

1   defendant's return to court or whether they're going to

2   release the defendant on his or her own recognizance, which

3   means without bail.  The prosecutor gets to make an

4   application and the defense attorney gets to make an

5   application, and, again, there's several factors that are

6   covered and argued in court.

7   Q    Okay.  And how many court appearances occurred following

8   the filing of the second Criminal Court Complaint?

9   A    Until when?

10  Q    Until the case was dismissed, if you know.

11  A    I don't really recall.

12  Q    All right.  Do you recall if it was more than two?  More

13  than three?

14  A    More than three, less than five.

15  Q    Okay.

16         THE COURT:  Can we ascertain when it was dismissed?

17  That might help.

18         MR. ZELMAN:  Yes.

19         THE COURT:  That's actually the question.

20         THE WITNESS:  Oh, yes.  July 18th, 2014.

21         THE COURT:  All right.  The superseding information

22  was April 30th, 2014?

23         THE WITNESS:  Yes, Your Honor.

24         THE COURT:  And it was dismissed July --

25         THE WITNESS:  -- 18th.

LAVEGLIA/DIRECT/ZELMAN

1           THE COURT:   July 18th.  So that would be May, June,

2    July, so it might have been three or four additional court

3    appearances.

4           THE WITNESS:  Yes, Your Honor.

5           THE COURT:  Next question.

6           MR. ZELMAN:  Thank you, Your Honor.

7    BY MR. ZELMAN:

8    Q    Now, you were present at the time that the case was

9    dismissed, correct?

10   A    Yes, I was.

11   Q    Can you tell us how that transpired?

12          MR. HAIDER:  Objection.

13          THE COURT:  Sustained.

14   BY MR. ZELMAN:

15   Q    Well, did you make an application to the Court to have

16   the case dismissed?

17   A    Yes.  On July 15th, 2018, I moved to dismiss the

18   Complaint.

19   Q    All right.

20          MR. ZELMAN:  Your Honor, we actually have a copy of

21   the minutes of the conferences on July 15th and July 18th.

22   It's listed in the JPTO.  We would like to offer it into

23   evidence so that the witness can refer to it.  It's a

24   court-transcribed -- court-transcribed of the --

25          THE COURT:  You don't want to admit it, you just

```
 1    want him to look at it?

 2              MR. ZELMAN:  I would like to have him look at it,

 3    authenticate it, and admit it.

 4              THE COURT:  He's going to authenticate it?

 5              MR. ZELMAN:  Well, he can testify that he was there

 6    and he was present --

 7              THE COURT:  You can ask him the questions about it

 8    and if he doesn't remember, he can look at it.

 9              MR. ZELMAN:  Okay.

10              THE COURT:  Let's not get a lot of extra stuff in

11    the record that can be resolved by a question and an answer.

12    I bet he can answer the questions if you give it to him and

13    he's -- why don't you just give him the transcript, ask him

14    the questions, and he can refer to the transcript if he

15    doesn't remember.

16              MR. ZELMAN:  Thank you, Your Honor.

17              THE COURT:  All right?  So we can move along.  Thank

18    you.

19    BY MR. ZELMAN:

20    Q    Just take a look at that and let me know when you are

21    done reviewing it, okay?

22              (Pause.)

23    A    I'm done.

24    Q    Okay.

25              Having reviewed that and based upon your
```

LAVEGLIA/DIRECT/ZELMAN

1   recollection, you testified earlier that you moved to dismiss;
2   is that right?
3   A    Correct.
4   Q    Now, how does that work?  Did you make a written
5   application to the Court?  An oral application to the Court?
6   Something else?
7   A    I made an oral application to the Court asking that the
8   Court dismiss the Complaint and they gave the reasons why.
9   Q    Okay.  What was your application?  What was it based on?
10  A    It was based on the allegations in the second Complaint:
11  Failed to make out a prima facie case; failed to establish the
12  elements of the crime in which he was charged with; and
13  essentially, the reasons why is that in the first -- the
14  allegations were that the police went to the apartment and saw
15  marijuana on the floor next to Jose Carlos.  Mr. Ashley walked
16  into the apartment afterwards and has no nexus or ties to that
17  marijuana, he can't possess it, he wasn't there, it wasn't
18  around him; and as such, there was no probable cause tending
19  to establish the element of possession.
20            MR. HAIDER:  Objection.
21            THE COURT:  That was the argument?
22            THE WITNESS:  Yes, that was the argument.
23            THE COURT:  Next question.
24            That's overruled.
25            Next question.

1    BY MR. ZELMAN:

2    Q    Now, the DA opposed the application, correct?

3    A    Correct.

4    Q    What did they argue?

5              THE COURT:  Oh, no.

6              MR. ZELMAN:  Okay.

7              THE COURT:  I don't want to -- we are not going to

8    relive the oral argument in Brooklyn criminal court.  Next

9    question.

10   BY MR. ZELMAN:

11   Q    What was the ruling from the judge based upon your

12   recollection and also the document you have in front of you?

13             THE COURT:  Is there an objection to that?

14             MR. HAIDER:  Yes.

15             THE COURT:  Well, good.  Sustained.

16             What was the outcome?

17             THE WITNESS:  The outcome was it was adjourned three

18   days later to July 18th.

19             THE COURT:   And then what happened next?

20             THE WITNESS:  The judge dismissed the superseding

21   information.

22             THE COURT:  Next question.

23   BY MR. ZELMAN:

24   Q    Did the judge explain on the record why -- was it a male

25   judge or female judge?

LAVEGLIA/DIRECT/ZELMAN

1   A     Female judge.

2   Q     Did the female judge explain why she was dismissing the

3   case on the record?

4   A     Yes.

5   Q     What did she say?

6           MR. HAIDER:  Objection.

7           THE COURT:  Sustained.

8           MR. ZELMAN:  Judge, at this point, we have the

9   certified -- all right.  Withdrawn.

10  BY MR. ZELMAN:

11  Q     I presented to you a copy of the minutes of those

12  conferences had before the Court, correct?

13  A     Yes.

14  Q     Have you had a chance to review it?

15  A     Yes.

16  Q     Do they accurately transcribe the discussions that were

17  had between the attorneys and -- I'm sorry -- between the

18  attorneys and the Court on the issue of the Complaints -- the

19  Complaint that was pending against Mr. Ashley?

20  A     Yes.

21  Q     All right.

22          MR. ZELMAN:  Judge, at this time, I would like to

23  enter into evidence the transcribed minutes that are listed on

24  our JPTO as -- actually as Number 2, but it would now be

25  Plaintiff's Exhibit Number 5, and I believe it's --

```
 1    BY MR. ZELMAN:

 2    Q     How many pages is it there?

 3    A     Four for the July 15th.  You also gave me the July 18th.

 4    Q     How many are in the July 18th?

 5    A     July 18th is seven pages.

 6              MR. ZELMAN:  All right.  Consisting of 11 pages,

 7    Your Honor.

 8              THE COURT:  Is there any objection?

 9              MR. HAIDER:  In part, Your Honor, and may we address

10    that at sidebar?

11              THE COURT:  All right.  A quick sidebar.

12              (Sidebar.)

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25
```

SIDEBAR

```
 1   (Sidebar conference held on the record out of the hearing of

 2   the jury.)

 3             THE COURT:  Did you provide that document?

 4             MR. ZELMAN:  Yes.  We provided it in discovery in

 5   the case, Your Honor.

 6             THE COURT:  You didn't give it to me, though.

 7             MR. ZELMAN:  I have a copy.

 8             THE COURT:   You know, I'm not -- I'm not

 9   clairvoyant.

10             MR. ZELMAN:  Right.

11             THE COURT:  So what's your objection, if any?

12             MR. HAIDER:  Judge, the minutes itself we are not

13   objecting to; however, just prior to the earlier question,

14   this witness stated that he moved -- that it didn't have

15   probable cause for the arrest, which is his basis for

16   moving --

17             THE COURT:  I'm going to -- that's got to come out.

18   No, I'll strike that.  I'll strike that because that's not the

19   issue in this case.

20             MS. FUDIM:  We would like an instruction.

21             THE COURT:  You will get it.

22             But you have no objection to the actual minutes?

23             MR. HAIDER:  No.

24             THE COURT:   Then that's fine.  That's great.  Thank

25   you.
```

LAVEGLIA/DIRECT/ZELMAN

1              (In open court.)

2         THE COURT:  The exhibit number of the transcript?

3         MR. ZELMAN:  Plaintiff's 5 at this point.

4         THE COURT:  Plaintiff's 5?

5         MR. ZELMAN:  Yes.

6         THE COURT:  Plaintiff's 5 is received in evidence

7    without objection.

8              (Plaintiff's Exhibit 5 received in evidence.)

9         THE COURT:  Members of the jury, prior to that,

10   there was an answer that had to do with the argument that

11   counsel had made in state court about the issue of -- in state

12   court -- probable cause to make an arrest.  That is not an

13   issue in this case.  There is no issue of probable cause to

14   make the arrest, it's not going to be presented to you, I'm

15   striking that part of the answer from the record, and you are

16   to disregard it completely, and of course the witness didn't

17   know what the questions were in this case, so he was answering

18   a question about something in the state case which is not part

19   of our case here.  So having said that, you are so instructed.

20         Next question.

21         MR. ZELMAN:  Thank you, Your Honor.

22         At this time -- okay.  Thank you, Your Honor.

23   BY MR. ZELMAN:

24   Q    Taking a look at Plaintiff's Exhibit 5, which is now in

25   evidence, your argument to the Court -- and leaving aside the

LAVEGLIA/DIRECT/ZELMAN

```
1    issue of probable cause --
2            THE COURT:  Why are you talking about probable
3    cause?  I just said it's not an issue in this case.  Now
4    you've repeated the issue of probable cause.  Probable cause
5    is not the subject of this case.  The jury is to disregard it,
6    and you are not to mention it ever again between now and the
7    time we have a verdict.
8            MR. ZELMAN:  I just wanted to make sure the witness
9    didn't mention it.  That's what I was doing.
10           THE COURT:  This witness is intelligent.
11           MR. ZELMAN:  Okay.
12           THE COURT:  He heard a judge say something.
13           MR. ZELMAN:  Okay.
14           THE COURT:  He's going to follow the judge's
15   instruction.  He doesn't need any help from you, sir.
16           MR. ZELMAN:  Thank you, Your Honor.
17           THE COURT:  But you mentioned it again, and it's not
18   in this case, and unless you want me to set aside this case
19   and declare a mistrial, you won't mention it again.
20           MR. ZELMAN:  Yes, Your Honor.
21           THE COURT:  Next question.
22   BY MR. ZELMAN:
23   Q    With respect to the argument that you made in court, what
24   did the judge -- initially on July 15th, you made the argument
25   to dismiss, correct?
```

1    A     Yes.

2    Q     But you made it orally, right?

3    A     Yes.

4    Q     What was the judge's, on the record, response to your

5    motion at that time?

6    A     She said it was --

7              MR. HAIDER:  Objection.  The document speaks for

8    itself.

9              THE COURT:  The document speaks for itself.  Do you

10   want to put the document up and read from it, Counsel, that's

11   fine.  I just admitted it in evidence; the jury will have it

12   in the jury room.  If there's something that you need to ask

13   the witness about that's not in the document, go ahead.

14             MR. ZELMAN:  The document itself is a little hard to

15   understand, so that's why I'm asking him to explain it because

16   you can't really understand -- it doesn't --

17             THE COURT:  I don't want a talking objection.  Just

18   ask your questions.  You haven't provided the document to the

19   jury.  You can put the document on the screen.

20             Is there any member of the jury who can't read?

21             No hands have gone up.  Put it on the screen, show

22   them the document, and they'll read it.  Please.

23             MR. ZELMAN:  Okay.

24   BY MR. ZELMAN:

25   Q    Now, I'm showing you page 3 of 4 on the July 15th

1    conference; is that correct?

2    A    Yes.

3    Q    Now, that paragraph is the Court's response to your

4    motion; is that correct?

5    A    At the top, yes.

6    Q    The jury can read it, but I would like you to try to

7    explain it to the jury to the best of your ability.

8              MR. HAIDER:  Objection.

9              THE COURT:  Sustained.

10             MR. ZELMAN:  All right.

11   BY MR. ZELMAN:

12   Q    Well, when the judge said, This is facially insufficient,

13   can you explain to the jury, what does that mean?

14             MR. HAIDER:  Objection.

15             THE COURT:  Are you the judge?

16             THE WITNESS:  I am not.

17             THE COURT:  Sustained.

18   BY MR. ZELMAN:

19   Q    What does facially insufficient --

20             MR. HAIDER:  Objection.

21             THE COURT:  Sustained.

22   BY MR. ZELMAN:

23   Q    The next thing the judge wrote is:  I cannot dismiss it.

24   Can you explain what that means?

25             MR. HAIDER:  Objection.

```
 1              THE COURT:  Are you the judge?
 2              THE WITNESS:  I am not.
 3              THE COURT:  Sustained.
 4              MR. ZELMAN:  Okay.
 5    BY MR. ZELMAN:
 6    Q    So the judge put her reaction to your motion on the
 7    record, correct?
 8    A    Yes.
 9    Q    And following that, what happened next?
10    A    It was adjourned for the People to file another
11    superseding information, and it was adjourned to July 18th for
12    that to occur.
13    Q    All right.  That's three days later; is that right?
14    A    Correct.
15    Q    All right.  Now, you said it was adjourned for the People
16    to file a third Criminal Court Complaint?
17    A    Yes.
18    Q    Okay.  Does that mean that the judge found that the
19    second Criminal Court Complaint could not proceed with the
20    litigation?
21              MR. HAIDER:  Objection.
22              THE COURT:  Is it in this record?
23              MR. ZELMAN:  Yes.
24              THE COURT:  Well, show us.
25              MR. ZELMAN:  It's in that paragraph.
```

```
 1   BY MR. ZELMAN:

 2   Q    How about this --

 3          THE COURT:  Why don't you underline what you are

 4   talking about.  Put your finger on the screen and underline.

 5   No, no.  Put your finger on the screen and underline.

 6          MR. ZELMAN:  (Indicating.)  And here (indicating).

 7          THE COURT:  Or make a circle on it, whatever you can

 8   do.  On the screen.  Not with that, no, no.  With your finger.

 9          THE WITNESS:  On the computer screen.

10          THE COURT:  On the computer screen.  On the computer

11   screen that's next to the -- on the computer.

12          THE WITNESS:  Like that.

13          Sorry, Judge.

14          THE COURT:  Not on the document.  There's a computer

15   screen next to --

16          MR. ZELMAN:  I don't know what you mean, Judge.

17          THE COURT:  Is it there?

18          MR. ZELMAN:  I see this, yes.

19          THE COURT:  Circle it.

20          MR. ZELMAN:  Oh.

21          THE COURT:  Oh, gosh --

22          MR. ZELMAN:  I apologize.

23          THE COURT:  Well, you are not used to it.

24          MR. ZELMAN:  No, I'm not.

25          THE COURT:  Go ahead.  We'll get there.  So show us
```

LAVEGLIA/DIRECT/ZELMAN

```
1     on the computer screen.
2              MR. ZELMAN:  Whoops.  How do I erase that?
3              THE COURT:  All right.  Is that what you are talking
4     about?
5              MR. ZELMAN:  Yeah, I'm trying to talk about that.
6              THE COURT:  All right.  Let's read it.
7              MR. ZELMAN:  All right.
8     BY MR. ZELMAN:
9     Q    Can you read that statement that's in evidence?
10             THE COURT:  Go ahead, you can read it.
11             I'll let the witness read it.
12             Go ahead.
13    A    The Court:  It doesn't matter about the statement.  Just
14    because it is your home, you cannot control what people bring
15    into your home, and obviously they said they see somebody with
16    the stuff and he comes in subsequently.  Superseding
17    information facially insufficient.  People can supersede if
18    they want to.
19             THE COURT:  Okay.  Next question.
20             MR. ZELMAN:  Thank you, Your Honor.
21    BY MR. ZELMAN:
22    Q    So after that point, was it your understanding that the
23    second Criminal Court Complaint was dismissed?
24    A    No.
25    Q    Okay.  So what was your understanding of what that
```

1   statement that the judge made, what does it mean?

2   A    It means that instead of going through motion practice

3   and forcing us to -- forcing me to write a motion to dismiss

4   for facial insufficiency, she was giving the People another

5   opportunity to provide a sufficient Criminal Complaint, and

6   she gave them three days to do that.

7   Q    Okay.  So the Court, in essence, found the second

8   Criminal Court Complaint insufficient.

9   A    Correct.

10  Q    Now, three days later, you appeared again; is that right?

11  A    Yes.

12  Q    Okay.  Let me take those from you at this time.

13          THE COURT:  Was it the same judge?

14          THE WITNESS:  Yes, Your Honor.

15  BY MR. ZELMAN:

16  Q    Now, at the July 18th conference, did you -- what was

17  addressed at that conference?

18  A    To see whether the People had a superseding information.

19  Q    Okay.  Did they -- did they bring -- did they file a

20  third Criminal Court Complaint?

21  A    They did not.

22  Q    Okay.  And the judge also again gave a statement about

23  why she was dismissing the case; is that true?

24  A    Yes.

25  Q    All right.

LAVEGLIA/DIRECT/ZELMAN

1              MR. ZELMAN:  And now, Your Honor, I would like to

2   publish this to the jury with my new knowledge of the system

3   here.

4   BY MR. ZELMAN:

5   Q    Just if you can read that to the jury.

6   A    The Court:  You guys are going to have to appeal this.

7   This is dismissed.  No way, first of all, even when you are in

8   a car, there is no presumption of marijuana.

9   Q    And then it just continues there.

10  A    Are in the house, somebody is in your house, they bring

11  marijuana into your home in the bathroom, use using the -- it

12  says bats room.  I think bathroom -- and drop marijuana on the

13  floor and somebody you just met at a bar drinks or whatever, I

14  don't know the circumstances.  The police come in there and

15  then they see the person closer to it.  They see him come in

16  after the fact and yet because it is his place and that is why

17  we have a lot of these search warrant cases where you have --

18  the last time I did arraignments, they must have had a party,

19  twenty people in the house, target was target A, twenty people

20  arrested and the majority of those cases got dismissed.  Yet

21  alone twenty people were arrested.  The person that was the

22  target, of course, the people proceed with that case.  Just

23  because somebody is in your home with something that is why I

24  said clean it up.  This statement was, that is why you cannot

25  let strangers into your house and you shouldn't.

LAVEGLIA/DIRECT/ZELMAN

```
1    Q    Okay.
2              THE COURT:  Okay.
3    BY MR. ZELMAN:
4    Q    Now, according to this document, there was then an
5    off-the-record conversation, correct?
6    A    Yes.
7    Q    And then the Court continued with this statement on the
8    top.  Could you read that?
9    A    Yes.
10             THE COURT:  Top of page 5 of the proceedings on
11   July 18th, 2014, correct?
12             THE WITNESS:  Correct, yes, sir.
13   A    At the top first paragraph, it says on line one:  The
14   Court:  I want to be clear and state this on the record.  I am
15   dismissing it because it says here that I am going to read the
16   Complaint, the deponent states at the above time and place the
17   deponent observed the defendant in a possibility of two ounces
18   of marijuana in that the deponent entered said location and
19   observed the defendant Jose Carlos on the floor and defendant
20   Dushanne did enter said location shortly thereafter.  And
21   then, deponent and then the defendant says:  This is what
22   happens when you let strange people into our apartment.  So I
23   asked the People and they gave a response to supersede.  Stay
24   sealing 30 days.
25             (Continued on the following page.)
```

LAVEGLIA/DIRECT/ZELMAN

```
 1              (In open court.)

 2    DIRECT EXAMINATION

 3    BY MR. ZELMAN (continuing):

 4    Q    Now, what does state sealing 30 days mean?

 5    A    It means that she was giving the people an opportunity to

 6    appeal within 30 days.  Otherwise, it would have been sealed

 7    and they would not have a chance to challenge the ruling.

 8    Q    So in that statement, is it true that the judge dismissed

 9    the case?

10    A    Yes.

11    Q    All right.  And the judge explained on the record why she

12    was dismissing the case?

13    A    Correct.

14    Q    Okay.  Now, did this case take -- withdrawn.

15              Due to the fact that there was a criminal court

16    complaint, then it was withdrawn and a superseding criminal

17    court complaint was issued, did that cause more conferences

18    in -- court appearances in the case, the fact that there was a

19    withdrawal and a superseding criminal court complaint?

20              MR. HAIDER:  Objection.

21              THE COURT:  Sustained.

22    Q    Well, you said before that the superseding criminal court

23    complaint, the defendant needed to be arraigned on that,

24    right?

25    A    Yes.
```

MICHELE NARDONE, CSR -- Official Court Reporter

LAVEGLIA/DIRECT/ZELMAN

```
1   Q    And then you would have to go through a discovery process

2   on the new complaint; is that right?

3   A    Because it was the same case, the discovery was the same.

4   Q    Okay.  How many court appearances occurred -- well, you

5   already answered this.

6          You said there was a possibility four court

7   appearances after the second criminal court complaint,

8   correct?

9   A    I believe so, yes.

10  Q    Would those four appearances be needed if the criminal

11  court complaint -- if there was no second criminal court

12  complaint filed?

13  A    I'm sorry.  Can you rephrase?

14  Q    Sure.  The second criminal court complaint, the

15  superseding criminal court complaint --

16  A    Yes.

17  Q    -- there was four appearances that were related solely to

18  that criminal court complaint, right?

19  A    Correct.

20  Q    The first complaint, when it's superseded, is gone,

21  right?

22  A    Yes.

23  Q    It's dismissed?

24  A    Yes.

25  Q    So my question is:  Those four appearances, would they be
```

MICHELE NARDONE, CSR -- Official Court Reporter

LAVEGLIA/DIRECT/ZELMAN

```
 1   necessary if there was no superseding criminal court complaint

 2   filed?

 3   A    No.

 4   Q    Okay.  Just to be clear for the purposes of the jury, the

 5   crim -- the court appearances that occurred after the

 6   superseding criminal court complaint, are they of the same

 7   nature and quality of -- as the court appearances of before,

 8   in that Mr. Ashley is required to appear, he must attend the

 9   conferences, and they take approximately the same amount of

10   time, et cetera?

11   A    Yes.

12   Q    All right.  Now, to your knowledge, if you recall, was

13   Mr. Ashley also appearing on another case after the

14   superseding criminal court complaint?

15   A    Yes, he was.

16   Q    Well, let's take another look, because I think if you

17   could take a look at this July 18, 2014.  Take a look at that.

18   A    I'm done.

19   Q    All right.  Does that refresh your recollection --

20            THE COURT:  What was the question, the original

21   question?

22   Q    After the superseding criminal court complaint was filed

23   was Mr. Ashley appearing in court on one case or two cases?

24   A    Two cases.

25   Q    So when was it that he was only appearing on one case?
```

MICHELE NARDONE, CSR -- Official Court Reporter

LAVEGLIA/DIRECT/ZELMAN

1   A     July 23, 2014.

2   Q     Okay.  Thereafter?

3   A     That was the last date of all criminal proceedings

4   against Mr. Ashley.

5   Q     Okay, but there was a period of time when he was only

6   appearing on one case, correct?

7   A     Yes.

8   Q     When was that?

9   A     November 12, 2013 up until April 19, 2013.

10  Q     Okay.  Those criminal court appearances were only

11  attributed to this arrest on April 19, 2013, correct?

12  A     From April 19 onward, yes.

13  Q     Okay.  Stated differently, there would be -- withdrawn.

14        Now, the case was ultimately dismissed and sealed

15  against Mr. Ashley, correct?

16  A     Yes.

17        MR. ZELMAN:  Your Honor, at this time I would like

18  to publish the certificate of disposition, which is listed in

19  our JPTO as Exhibit 1.  I guess it would be Plaintiff's

20  Exhibit 6, the official court record of dismissal.

21        THE COURT:  Any objection?

22        MR. HAIDER:  No objection.

23        THE COURT:  Exhibit 6 may be received in evidence.

24  You may publish it to the jury.

25        MR. ZELMAN:  Thank you, Your Honor.

1              (Plaintiff's Exhibit 6 so marked.)

2   BY MR. ZELMAN:

3   Q    I don't know if you would have received that, but does

4   that appear to be a certificate of disposition that the court

5   issues following a dismissal of a case?

6   A    It does.

7   Q    It indicates the date that it was dismissed?

8   A    Yes.

9   Q    And it indicates the charges, correct?

10  A    Correct.

11  Q    Now, the charges in this case, it was not a charge of

12  selling marijuana, it was a charge of possessing marijuana; is

13  that true?

14  A    Yes.

15  Q    And that was a misdemeanor charge?

16  A    Yes.

17  Q    So the maximum amount of time that Mr. Ashley could have

18  received in jail, had this ended in a conviction, would have

19  been one year; is that true?

20  A    Yes.

21  Q    Okay.  Now, just comparing again, the criminal court

22  complaint that was originally filed alleged that Mr. Ashley

23  was in the room, right?

24  A    Yes.

25              THE COURT:  We have been through this.

LAVEGLIA/DIRECT/ZELMAN

1              MR. ZELMAN:  Okay.

2              THE COURT:  We have been through this.  I don't want

3     you to ask the same questions again.

4              MR. ZELMAN:  I'm just leading up to something,

5     judge.

6              THE COURT:  You better get there soon.

7              MR. ZELMAN:  I will.

8     Q    The second criminal court complaint, how was that -- what

9     was different about what the people needed to prove with

10    respect to the second criminal court complaint versus the

11    first criminal court complaint?

12             MR. HAIDER:  Objection.

13             THE COURT:  Sustained.

14    Q    Well, there was a different --

15             THE COURT:  He is not an expert witness here.  So he

16    is a fact witness.

17             MR. ZELMAN:  Yes.

18             THE COURT:  So you didn't qualify him as an expert.

19    He is a fact witness.

20             MR. ZELMAN:  He is the defendant's on the case.

21             THE COURT:  No.  The answer is objection is

22    sustained.  Next question.  You have established everything

23    that needs to be established with this witness about what

24    happened in the case, and that's where we stop.

25             So if you have something else that he can answer as

```
 1    a fact witness and not an expert witness, please proceed.
 2              MR. ZELMAN:  All right.
 3    BY MR. ZELMAN:
 4    Q    The allegation that Mr. Ashley made a statement that we
 5    have shown to the jury, that this is what happens when you let
 6    strange people into our apartment, what legal effect does that
 7    have on the case?
 8              MR. HAIDER:  Objection.
 9              THE COURT:  Sustained.
10    Q    All right.  The allegation that Mr. Ashley said this is
11    what happens when you let strange people into our apartment,
12    does that have a legal effect on the allegations in the
13    complaint?
14              MR. HAIDER:  Objection.
15              THE COURT:  Sustained.
16              MR. ZELMAN:  Just a moment, Your Honor.
17              (Pause.)
18              MR. ZELMAN:  I have nothing further at this time,
19    Your Honor.
20              THE COURT:  How much do you have?
21              MR. HAIDER:  Fifteen minutes, twenty minutes, Your
22    Honor.
23              THE COURT:  Is there any reason why the jury
24    couldn't stay an extra 15 minutes?  Just raise your hand if
25    you have to leave to pick up a child, or dinner.
```

LAVEGLIA/CROSS/HAIDER

```
 1              I think I'm going to ask the jury if they will stay
 2    so we can finish with this witness.  All right.  Go ahead.
 3              THE WITNESS:  Thank you.
 4              THE COURT:  Thank you very much, members of the
 5    jury.  I'm sure that the witness also appreciates it.
 6              THE WITNESS:  Thank you.
 7    CROSS-EXAMINATION
 8    BY MR. HAIDER:
 9    Q    Good afternoon, Mr. LaVeglia.
10    A    You got it.  Good afternoon.
11    Q    My name is Bilal Haider, and I represent the Defendant
12    Mike Civil in this matter.  I just want to clear something up
13    because I know the dates were a little confusing.
14              Just to be clear, your former client, Dushanne
15    Ashley, had a separate criminal case, correct?
16    A    Yes.
17    Q    Okay.  And that criminal case started before the
18    April 19, 2013 arrest, correct?
19    A    Correct.
20    Q    So he had made court appearances before that arrest,
21    correct?
22    A    Correct.
23    Q    And then after the April 19, 2013 case was dismissed, he
24    still made another appearance on that unrelated case, correct?
25    A    One more appearance, yes.
```

MICHELE NARDONE, CSR -- Official Court Reporter

LAVEGLIA/CROSS/HAIDER

1    Q    Just to be clear, he made appearances before and after

2    the case involving the arrest at issue in this litigation,

3    correct?

4    A    Yes.

5    Q    And on that separate case, it was -- he made one more

6    appearance, correct?

7    A    Yes.

8    Q    And that case was not dismissed, correct?

9    A    Correct.

10   Q    It ended because he pleaded guilty to that case, correct?

11   A    It ended -- he did plead guilty to a violation, but it

12   ended because the judge was going to dismiss it and told the

13   people to offer the violation, and they offered it and it was

14   ended.

15           MR. HAIDER:  Objection, Your Honor, to that last

16   portion as to what the judge said.

17           THE COURT:  What the judge said is stricken from the

18   record.  Everything else is in.  Go ahead.

19   Q    Just to be clear, he pleaded guilty to charges that day

20   when it ended?

21           THE COURT:  To a violation; is that right?

22           THE WITNESS:  Yes.

23           THE COURT:  Which is, members of the jury, a

24   violation is the lowest form of -- it's the lowest charge you

25   can plead to in criminal court.  It's not a crime.

MICHELE NARDONE, CSR -- Official Court Reporter

LAVEGLIA/CROSS/HAIDER

```
 1              THE WITNESS:  Correct.
 2              THE COURT:  All right.  It's like -- it's like a
 3  traffic infraction.
 4              THE WITNESS:  Yes, Your Honor.
 5              THE COURT:  Go ahead.  Just to make it clear to the
 6  jury.  Go ahead.
 7  BY MR. HAIDER:
 8  Q    Do you recall being asked a question about whether
 9  Mr. Ashley had bail set in this case?
10  A    Yes.
11  Q    You stated that you did not recall, correct?
12  A    Correct.
13  Q    Would reviewing the criminal court file for that case
14  refresh your recollection?
15  A    Yes, it would.
16              THE COURT:  Which case, the other case?
17              MR. HAIDER:  No, this matter.
18              THE COURT:  This matter.  All right.  Let's just be
19  careful about which case we are talking about.
20              MR. HAIDER:  Sure.  May I approach?
21              THE COURT:  Yes.
22              MR. ZELMAN:  I don't know if I was given a copy of
23  that.
24              MR. HAIDER:  For the record --
25              THE COURT:  You can show it to the other side.
```

MICHELE NARDONE, CSR -- Official Court Reporter

1          MR. HAIDER:  Sure, but for the record it was

2     produced in discovery.

3          THE COURT:  Just show it to him.  I don't want a lot

4     of discourse here.

5          (Pause.)

6          MR. ZELMAN:  The first one?  Judge, there seems to

7     be a page missing from this.  Where is 24?  There is a page

8     missing.

9          MR. HAIDER:  Judge, I'm just asking him to refresh

10    his recollection with the first page.

11         THE COURT:  It's not being shown to the jury.  You

12    can show it.  Did you see it?

13         MR. ZELMAN:  Yes, Your Honor.

14         THE COURT:  Before did you see it?

15         MR. ZELMAN:  I have it.

16         THE COURT:  You have it?

17         MR. ZELMAN:  I have it.  I didn't know what document

18    he was proposing.

19         THE COURT:  Okay.  Thank you.  Go ahead.  All right.

20    Ask your question.

21         THE WITNESS:  I have reviewed it.

22    BY MR. HAIDER:

23    Q    You reviewed that document?

24    A    I did.

25    Q    So it's true that bail was not set in the case for the

1    April 19, 2013 arrest, correct?

2    A    That is correct.

3    Q    He was ROR, correct?

4    A    Yes.

5    Q    What does ROR mean?

6    A    It means he was released on his own recognizance, and

7    bail was not set.  He was free to leave without paying any

8    money to the court.

9    Q    Which means that after arraignment he left the court on

10   his own, correct?

11   A    Yes.

12   Q    On that first page there wasn't any note of any travel

13   restrictions, correct?

14   A    Correct.

15   Q    The only thing he had to do after that arraignment was to

16   appear to the next court date, correct?

17   A    Correct.

18   Q    Now, we talked at length about the superseding

19   information that was filed, correct?

20   A    Yes.

21   Q    And that was filed in 2014, correct?

22   A    Yes.

23   Q    And that superseding information corrected the error in

24   the original complaint about when Dushanne Ashley, the

25   plaintiff, was in the apartment, correct?

LAVEGLIA/CROSS/HAIDER

1    A    No.

2    Q    It did not?

3    A    It did not.

4    Q    The original complaint stated that he was inside,

5    correct?

6    A    The original complaint stated he was inside.  I showed

7    them the video in this complaint, and it then says he came

8    after, just like the video.  So I wouldn't call it a

9    correction.  There was a whole different set of facts.

10   Q    So you wouldn't call that a correction?

11   A    Not at all.

12   Q    So you provided the video, correct?

13   A    Yes.

14   Q    And then the words in the superseding information was

15   consistent with the video you provided, correct?

16   A    Strikingly consistent, yes.

17   Q    So to be clear, the superseding information corrected

18   that error, correct?

19   A    No.  It wasn't an error.  It was --

20   Q    So you are taking issue with the word "error"?

21   A    I am.

22   Q    The superseding information did clarify and state

23   correctly when plaintiff went to the apartment, correct?

24   A    No.  It provided a whole different set of facts than the

25   first one.

LAVEGLIA/CROSS/HAIDER

1   Q    So your testimony here today is that the superseding

2   information was not correct as to when plaintiff entered the

3   apartment?

4   A    My testimony is that the first complaint said he was

5   inside the apartment with Jose Carlos.  The superseding a year

6   later said that he came to the apartment shortly thereafter.

7   Those are two very different things.

8   Q    Mr. LaVeglia, that was not my question.  My question was

9   specifically related to the superseding information.

10  A    Okay.

11  Q    Okay.  That superseding information was correct as to

12  when he entered the apartment, right?

13  A    As far as shortly -- insofar as shortly thereafter, yes.

14  Q    Now, just to be clear, when the superseding was filed, as

15  you stated, that just replaced the original criminal court

16  complaint, correct?

17  A    Correct.

18  Q    And the DA could have just dismissed the case instead of

19  filing a superseding information, correct?

20          MR. ZELMAN:  Judge, objection as to what the DA

21  could or could not have done.

22          THE COURT:  Sustained.

23  Q    The district attorney did not dismiss the criminal

24  complaint, correct?

25  A    Correct.

MICHELE NARDONE, CSR -- Official Court Reporter

LAVEGLIA/CROSS/HAIDER

1   Q      In fact, as you stated on direct, after the superseding
2   information was filed, the case continued for a couple of
3   months, correct?
4   A      Yes.
5   Q      For four more court appearances, correct?
6   A      Yes.
7   Q      Now, you had mentioned before that there were court
8   appearances when Plaintiff Dushanne Ashley was appearing on
9   two cases, both the April 19, 2013 arrest and the unrelated
10  arrest, correct?
11  A      Yes.
12  Q      And on those occasions, plaintiff would appear in the
13  same courtroom, correct?
14  A      Yes.
15  Q      He would appear before the same judge, correct?
16  A      Yes.
17  Q      And when the case is on the record, typically it would be
18  less than five minutes, correct?
19  A      Yeah, generally.
20  Q      And in fact that happened on 11 of the 14 court
21  appearances that plaintiff made, correct?
22  A      Sounds about right.  Yes.
23  Q      To be clear, after the superseding information was filed,
24  right, that was in April of 2014, correct?
25  A      Yes.

1   Q    All of his appearances after that date he would have been

2   in criminal court for that other case, correct?

3   A    Yes.

4   Q    Because, as you stated, those two cases were tracking,

5   correct?

6   A    Correct.

7   Q    So even if Defendant Detective Mike Civil didn't arrest

8   Dushanne Ashley on April 19, 2013, Dushanne Ashley still had a

9   pending criminal court case, correct?

10  A    Yes.

11  Q    Now, just to be clear, you referred this case -- and I'm

12  talking about Dushanne Ashley's civil case, the one we are

13  here for -- to David Zelman yourself, correct?

14  A    No.

15  Q    You didn't reach out to him to let him know about this

16  incident?

17  A    I told Dushanne to look at the Brooklyn Bar Association

18  website for an attorney that handles these matters.  That gave

19  him a list.  He hired Mr. Zelman, and Mr. Zelman contacted me;

20  and I provided him with the documents that he needed.

21  Q    Was David Zelman on that list?

22  A    I don't know.  Mr. Ashley printed it out, so.

23  Q    But you provided him that list?

24  A    I provided a link to the bar association.  I don't refer

25  anybody to clients.

```
1    Q    Is it your testimony here today that you did not

2    recommend this case to David Zelman?

3    A    Yes.

4    Q    We just talked about the -- or you just testified about

5    the video that you claim you sent your investigators, correct?

6    A    I'm not claiming.  I did send the investigators, yes.

7    Q    So it wasn't the plaintiff himself that got that video,

8    correct?

9    A    Correct.

10   Q    So if the plaintiff was speaking on that video, that

11   couldn't happen, correct?

12   A    I'm sorry.  Could you rephrase?

13   Q    In what form did you get that video?

14   A    We copied it onto a DVD directly from the DVR system.

15   Q    So it wasn't a cell phone video of the recording?

16   A    No.

17   Q    Did you produce that video to Mr. Zelman?

18   A    I don't -- I believe I did electronically.

19   Q    You testified about the time stamp on that video,

20   correct?

21   A    Yes.

22   Q    You don't know if that's accurate, do you?

23   A    I do because as a prosecutor and as a defense attorney

24   all these internal systems have a check on whether it's

25   authentic using a sum hash or a large series of numbers.  So
```

LAVEGLIA/CROSS/HAIDER

```
 1   it authenticates itself.  So based on the algorithm that it
 2   ran and said authentic, then it's accurate.
 3   Q    Were you running the system?
 4   A    Nah.
 5   Q    Is that a no?
 6   A    Correct.  I was not running the system.
 7   Q    Are you aware of what is known as Daylight Savings Time?
 8   A    I am.
 9   Q    Are you aware of when we, quote, spring forward?
10   A    Recently it happened, yeah.
11   Q    It's usually about April, correct?
12   A    Yeah, yes.
13   Q    Which would have been prior to this April 19, 2013
14   arrest, correct?
15   A    I don't know.
16   Q    You mentioned your experience as a criminal defense
17   attorney.  You were a defense attorney for approximately six
18   years; is that correct?
19   A    No, five.
20   Q    Five years as a criminal defense attorney?
21   A    Roughly, yes.
22   Q    Then you were a prosecutor in Nassau?
23   A    Correct.
24   Q    How long were you a prosecutor there?
25   A    Three years.
```

LAVEGLIA/CROSS/HAIDER

1   Q    And you handled narcotics search warrant cases on both

2   sides, I presume.

3   A    Yes, much more on the prosecution side.

4   Q    Isn't it true that most of the narcotic search warrants

5   are executed at 6:00 a.m., not 5:00 a.m.?

6   A    Generally, yes.

7   Q    So would you be surprised to hear that this search

8   warrant was actually executed at 6:00 a.m. and not 5:00?

9   A    I would, because if you could show exigent circumstances

10  then you can execute it at any time of the date or night; and,

11  considering they came in -- the police came in with riot gear,

12  I consider that perfectly normal.

13  Q    So you believe there may have been exigent circumstances

14  for this search warrant, correct?

15  A    I believe that based on the application to the judge, a

16  judge determined that there might have been exigent

17  circumstances.

18  Q    You reviewed the search warrant in this case, correct?

19  A    I reviewed the judge's order.  I didn't get to see the

20  actual application.

21  Q    During the criminal case, you did obtain some files from

22  the DA's office, correct?

23  A    Yes.

24  Q    I assume you received the arrest report.  Correct?

25  A    I did.

MICHELE NARDONE, CSR -- Official Court Reporter

LAVEGLIA/CROSS/HAIDER

1   Q    You received the arresting officer's memo book, correct?

2   A    Eventually, yes.

3   Q    And a memo book is something that officers have to take

4   notes of that day while they are working on their jobs,

5   correct?

6   A    According to the patrol guide, yes.

7   Q    This is general practice, these are notes that officers

8   take on a daily basis, correct?

9   A    They are supposed to be, yes.

10  Q    And you actually received Detective Mike Civil's memo

11  book, correct?

12  A    I did.

13  Q    And in that memo book it did list a statement attributed

14  to Plaintiff Dushanne Ashley, yes or no?

15  A    Yes.

16  Q    So you did receive statements from Dushanne Ashley in

17  forms other than that statement he was referring to earlier,

18  correct?

19  A    Yes, but that's not valid.

20  Q    You wouldn't use a memo book in a criminal case?

21  A    I'm saying you have to file a 710.30 procedure.  You have

22  to give official written statement --

23  Q    Mr. LaVeglia, if there was a trial with an officer,

24  withdrawn.

25        I'm presuming you have handled criminal trials

MICHELE NARDONE, CSR -- Official Court Reporter

```
 1   before, correct?

 2   A      Yes.

 3   Q      Both on the criminal defense side and the prosecutor

 4   side, correct?

 5   A      Yes.

 6   Q      And officers take the stand, correct?

 7   A      Yes.

 8   Q      Do you use that memo book to question officers?

 9   A      On the defense side, yes.

10   Q      So you use the words that are in the memo book to

11   cross-examine the officers, correct?

12   A      Sometimes, yes.

13   Q      The same way I'm cross examining you right now, correct?

14   A      Correct.

15   Q      And so you have read Detective Mike Civil's memo book,

16   correct?

17   A      I did.

18   Q      And in that memo book he did list a statement, correct?

19   A      He did.

20   Q      In fact, he listed two statements?

21   A      He did, yes.

22   Q      One statement was from the other individual arrested,

23   Jose Carlos, correct?

24   A      Yes.

25   Q      And that statement was listed at 6:05 a.m., correct?
```

LAVEGLIA/CROSS/HAIDER

```
 1   A     I don't -- sounds right, about.

 2   Q     Then there was a second statement, correct?

 3   A     Yes.

 4   Q     And that was from -- made by your client, Dushanne

 5   Ashley, correct?

 6   A     It was written down that it was made by my client.

 7   Q     It was written down by Detective Mike Civil, correct?

 8   A     At some point, yes.

 9   Q     Is that correct, that it was written down by Detective

10   Mike Civil?

11   A     At some point, yes.

12   Q     In that statement it said --

13            MR. ZELMAN:  Objection, Your Honor.

14            THE COURT:  Sustained.

15            MR. HAIDER:  Your Honor, I'm not asking for the

16   actual statement.

17            THE COURT:  All right.  Go ahead.  Ask your

18   question.

19            (Continued on the next page.)

20

21

22

23

24

25
```

```
 1    (Continuing.)

 2    BY MR. HAIDER:

 3    Q    You read that statement, correct?

 4    A    Yes.

 5    Q    And that statement was consistent with what's in the

 6    superseding information, yes or no?

 7    A    Yes.

 8    Q    And to be clear, the superseding information, as you

 9    testified earlier, had the statement, "I told you, don't let

10    strangers in our apartment," correct?

11    A    Yes.

12    Q    Now, I want to talk to you about the Criminal Court

13    Complaint document itself, and the superseding information.

14         You just stated that as a criminal defense attorney,

15    you conduct trials, correct?

16    A    Yes.

17    Q    And also the prosecutor, correct?

18    A    Correct.

19    Q    Now, at these trials as a prosecutor, these documents

20    don't go into evidence, correct?

21    A    Correct.

22    Q    What matters is what the witness actually states,

23    correct?

24    A    Yes.

25    Q    So the only purpose of this document is to lay out the
```

1  charges, correct?

2  A    And give him notice of -- yes, to lay out the charges.

3  Q    It lays out the charges and the basis for the charges,

4  correct?

5  A    Yes.

6  Q    I presume you have drafted numerous criminal court

7  complaints yourself?

8  A    I have.

9  Q    And in your -- approximately how many have you drafted in

10  your career?

11  A    Fifty to a hundred.

12  Q    So in these a hundred criminal court complaints, do you

13  list every detail in those criminal complaints, yes or no?

14  A    No.  No.

15  Q    The only purpose is to lay out the charges, correct?

16  A    And to provide the defendant with notice of the facts

17  underlying those charges, so he or she can prepare a defense.

18  So I put the pertinent facts in the complaint.

19  Q    But you do leave out facts as well, correct?

20  A    Not that are relevant to the elements of the charge.

21  Q    Speaking of facts that are relevant, you are aware that

22  defendant, Mike Civil, had encountered your client twice

23  before April 19, 2013, correct?

24  A    I knew there were other instances.  I don't know what his

25  involvement in those were.

LAVEGLIA/CROSS/HAIDER

```
 1   Q    But you are aware that your client was arrested twice in
 2   that same apartment prior to April 19, 2013, arrest?
 3   A    Yeah, and two of them were dismissed and he got a
 4   violation on the other, so --
 5   Q    So that's three prior cases?
 6   A    Three cases of -- two of them, again, were dismissed, and
 7   he got a violation on one.
 8   Q    And all of these arrests occurred inside the apartment,
 9   correct?
10   A    I believe so.  Not three of them, two of them.
11   Q    And it was made by a team that consisted of defendant,
12   Detective Mike Civil, correct?
13   A    I don't recall if he was on the team for the other two.
14   Q    But if he was on that team, it would have been relevant
15   to his interaction with plaintiff on April 19, 2013, correct?
16   A    I can't really speculate as to what his state of mind is
17   or would be.
18   Q    Those facts weren't in the Criminal Court Complaint,
19   correct?
20   A    Which one?
21   Q    The one for April 19, 2013.
22   A    Those -- what facts?
23   Q    The facts of how Mike Civil knew your client, Dushanne
24   Ashley.
25   A    No, because that's propensity.  It's not allowed.
```

LAVEGLIA/CROSS/HAIDER

```
1    Q    It's not allowed, correct?

2    A    Yes.

3    Q    So had the judge seen that in the document, it might have

4    changed her decision?

5              MR. ZELMAN:  Objection, Judge.

6              THE COURT:  Sustained; argumentive.  That's

7    argument.  Let's move on.

8    BY MR. HAIDER:

9    Q    Now, you stated that you estimated that the plaintiff had

10   to wait approximately four hours on each court appearance?

11   A    Yeah.

12   Q    That's partly because as of a public defender, you were

13   quite busy at the time, correct?

14   A    Yes.

15   Q    You had to attend other clients' conferences that day?

16   A    I did.

17   Q    But as you just stated previously, Dushanne Ashley, his

18   cases were only on the record for approximately five minutes,

19   correct?

20   A    Yes.

21   Q    And --

22   A    It's like the DMV, though.  You get a number.  You might

23   there for two seconds, but you have to wait for two hours.

24   Q    But if you have a hired attorney, you show up right away,

25   you could get called right away?  Yes?
```

LISA SCHMID, CCR, RMR

```
 1   A     If you get your own attorney.  Sure.
 2           THE COURT:  How much more do you have?
 3           MR. HAIDER:  If I could have a brief moment to speak
 4   with counsel?
 5           THE COURT:  Okay.
 6           MR. HAIDER:  (Confers with co-counsel.)
 7           Just a couple more questions, Your Honor.
 8   BY MR. HAIDER:
 9   Q     You mentioned earlier on direct that when Dushanne Ashley
10   appeared, there is a sign-in sheet, correct?
11   A     Yes.
12   Q     And that sign-in sheet would indicate what time this
13   case -- or you signed him up, correct?
14   A     No.
15   Q     How would that work?
16   A     Very informal.  There's a legal pad and you put in
17   client's name, and the court officers try to call it in the
18   order in which it's signed in.
19   Q     So if there is a list of names, it would still be written
20   in chronological order, correct?
21   A     Yes.
22   Q     Do you have a copy of those sign-in sheets?
23   A     No.
24   Q     Those sign-in sheets would be helpful to know in what
25   order plaintiff appeared that day, yes or no?
```

1    A    Wait.  Could you rephrase that question?

2    Q    If we had those sign-in sheets, it would be helpful to

3    learn or to know when plaintiff actually appeared on his court

4    dates, correct?

5            MR. ZELMAN:  Objection, Your Honor.

6            THE COURT:  Overruled.

7            THE WITNESS:  Yes.

8            THE COURT:  Are those informal sheets that they just

9    use to move things along?

10           THE WITNESS:  Yes, Your Honor.  The court officers

11   have control over it, and they use it to run a daily count.

12           THE COURT:  I see.  All right.

13           Anything else?

14           MR. HAIDER:  Nothing further, Your Honor.

15           THE COURT:  Anything else from you, Mr. Zelman?

16           MR. ZELMAN:  Very briefly, Your Honor.

17           THE COURT:  Very briefly.

18           MR. ZELMAN:  Yes, Your Honor.

19                      REDIRECT EXAMINATION

20   BY MR. ZELMAN:

21   Q    I just wanted to follow up.  I think you explained it

22   well, but you said that the second criminal court complaint

23   was strikingly consistent with the video, if I understood you

24   correctly?

25   A    Yes.

1  Q     What do you mean by that?

2  A     It was tailored exactly to what the video showed.  Almost

3  literally exactly, whereas before, there was no mention of him

4  coming in after.  There's no mention of his statement.  It was

5  as though it was prepared to be consistent with what the

6  actual evidence was.

7  Q     And with respect to these other cases that Mr. Ashley

8  had, you indicated that two were dismissed including this one,

9  and one, he received a violation, right?

10  A     Yes.

11  Q     All right.  What's a violation?

12  A     A violation is not a crime.  As Your Honor discussed,

13  it's like a traffic infraction.  It gets sealed off the record

14  and it's not a crime.

15  Q     And also, if you know, an ROR case, when somebody's

16  required to come back to court on their own recognizance,

17  meaning that -- what does that mean, exactly?

18  A     That means that they have to appear on their own merit or

19  without having bail held over their head.

20  Q     All right.  If they don't appear, what's the

21  consequences?

22  A     A bench warrant could be issued.

23  Q     Okay.  Typically, would the court note on the record if

24  there is a travel restriction with respect to that needing to

25  appear?

LAVEGLIA/REDIRECT/ZELMAN

```
 1              MR. HAIDER:  Objection.

 2              THE COURT:  Sustained.

 3              MR. ZELMAN:  Nothing further.

 4              MR. HAIDER:  Your Honor, I just have one question.

 5   I'll just ask it from here.

 6              THE COURT:  Go ahead.

 7                      RECROSS-EXAMINATION

 8   BY MR. HAIDER:

 9   Q    You just testified that plaintiff, Dushanne Ashley, only

10   pleaded to a violation, correct?

11   A    Yes.

12   Q    What was he charged with?

13              MR. ZELMAN:  Objection, Your Honor.  That's

14   according to your ruling.

15              THE COURT:  You may answer.

16              THE WITNESS:  He was charged with criminal

17   possession of a controlled substance in the 7th degree, which

18   is a Class A Misdemeanor.

19   BY MR. HAIDER:

20   Q    And what is the controlled substance -- what is the

21   controlled substance he was alleged to have?

22   A    Little bit of cocaine residue on a razor blade, inside of

23   a shoebox covered with CDs and various assortments.

24              THE COURT:  Okay.  That's it?

25              MR. HAIDER:  Nothing further.
```

LAVEGLIA/REDIRECT/ZELMAN

1          THE COURT:  I just one other question.  Between the

2    time you provided the video to the People, which is the

3    District Attorney -- that's the People in the state court --

4    and the time of the superseding information, how much time

5    transpired, if you remember?

6          THE WITNESS:  I do.  I provided it in about July of

7    2013, and so from July 2013 to April 20th, 2014.

8          THE COURT:  Was it the subject of the monthly or

9    bimonthly status conferences in the case?

10         THE WITNESS:  It was brought up to the judge, yes.

11         THE COURT:  Every time?

12         THE WITNESS:  Yes.

13         THE COURT:  Okay.  Thank you.  The witness is

14   excused.  You may stand down.

15         THE WITNESS:  Thank you, Your Honor.

16         THE COURT:  Have a nice day.

17         THE WITNESS:  Pleasure.  You, too.

18         THE COURT:  All right, members of the jury.  First

19   of all, the Court's deep appreciation for staying past the

20   appointed hour, so we can move the case along.

21         And I'm going remind you not to discuss the case

22   with anyone.  Don't discuss it among yourselves.  Don't read,

23   watch or access on the interest any discussions of the case.

24   Do not attempt any research about the case.  Do not visit any

25   locations mentioned during the course of testimony.

PROCEEDINGS

1  Q    Now, you mentioned earlier that Brooklyn South has been

2  disbanded.  Is that what you said?

3  A    I never said that.

4  Q    You said it doesn't exist any longer?

5  A    I said Organized Crime Control Bureau.  It's been

6  absorbed.  It's all under the Detective Bureau now, so I never

7  said that.

8  Q    You're not with them anymore?

9  A    I'm not with what?  I'm sorry.

10 Q    Brooklyn South?

11 A    No, I work at the Gun Violence Suppression Division.

12 Q    When did you leave Brooklyn South?

13 A    2016.

14 Q    Sir, this is not the first time you have been sued before

15 by people alleging misconduct as a police officer, is it?

16         MS. FUDIM:  Objection.

17         THE COURT:  Sustained.

18         MR. ZELMAN:  Well, Judge, could we have a sidebar?

19         THE COURT:  Yes.  Okay.

20         (Sidebar.)

21

22

23

24

25

LISA SCHMID, CCR, RMR

PROCEEDINGS

```
 1              (Sidebar.)

 2              THE COURT:  What's the objection?

 3              MS. FUDIM:  Your Honor, this is, first of all,

 4    prejudicial.

 5              Second of all, counsel gave on his -- it is an

 6    exhibit to one of the letters that he filed -- a list of prior

 7    lawsuits, all of which resulted in either settlements or

 8    dismissals.  So allegations don't establish anything.  This is

 9    unduly prejudicial.  It has nothing to do with this case in

10    terms of relevance, Your Honor.

11              MR. ZELMAN:  What I'm trying to establish is, Judge,

12    is a lack of mistake and a pattern of conduct that results in

13    lawsuits that the city then -- I'm not going to say the

14    city -- but are then settled with the plaintiffs.

15              And that this is not, you know, their defense in

16    this case is that this is an isolated mistake, and it was an

17    error.  But the list of cases tends to show that there's a

18    pattern of conduct and there's a lack of mistake and a plan.

19              THE COURT:  I see.

20              MS. FUDIM:  And Your Honor, those cases, those other

21    lawsuits have nothing to do with the allegations like this

22    lawsuit, a fabrication of evidence.

23              So if he is getting into that, then we're going to

24    have to start digging into what the allegations were in each

25    one of those cases and have to start presenting defenses.
```

PROCEEDINGS

```
 1              THE COURT:  I understand your point.

 2              We're not going into any of that, unless there's

 3    some substantiated -- there is some substantiated misconduct,

 4    you can't go into it, and it's got to be relevant

 5    substantiated misconduct.  That is not part of this case.  It

 6    is too late to bring it up.  And so the objection is

 7    sustained.

 8              MS. FUDIM:  I would also want to raise one thing for

 9    the record that in most -- might not be all -- but most of the

10    other cases where there were settlements, Detective Civil was

11    not the only defendant, as well.  There were other defendants.

12    And so when settlements are negotiated, it's a settlement for

13    the case.  Sometimes there's other officers involved and

14    allegations against other officers.

15              THE COURT:  We're not trying any other case here.

16              MS. FUDIM:  Thank you.

17              (Sidebar concluded.)

18

19

20

21

22

23

24

25
```

LISA SCHMID, CCR, RMR

PROCEEDINGS

```
1              (In open court.)
2   BY MR. ZELMAN:
3   Q    Well, have you ever been disciplined by the NYPD?
4              MS. FUDIM:  Objection.
5              THE COURT:  Sustained.
6   BY MR. ZELMAN:
7   Q    You said on direct that when Mr. Ashley arrived, he
8   appeared to be confused, right?
9   A    Correct.
10  Q    Did he seem like -- what do you think confused him?
11  A    Police presence in his apartment.
12  Q    It's your testimony that you asked Patrick for Dushaine's
13  number, but he didn't have it, right?
14  A    I did.
15  Q    Did you ask Carlos for his number?
16  A    I don't recall asking.  I don't recall if I did or didn't
17  ask.
18  Q    The reason you asked Patrick for his number is you wanted
19  to call Ashley, right?
20  A    Correct sir.
21  Q    You couldn't arrest Ashley before he arrived because he
22  wasn't there, right?
23  A    That is not correct.
24             MR. ZELMAN:  Again, page 73, 22, Mr. Civil's
25  deposition, page 74, line 7.  I will not speak the objection,
```

LISA SCHMID, CCR, RMR