```
 1    A    He came for it the next day.

 2    Q    The next day?

 3    A    Uh-hum (affirmative response).

 4              MR. ZELMAN:  Okay.  Thank you.  Nothing further.

 5              THE COURT:  Cross-examination?

 6              MS. FUDIM:  No questions, Your Honor.

 7              THE COURT:  All right.  The witness is excused.  You

 8    may stand down.

 9              MR. ZELMAN:  I'll call another quick witness.

10              THE COURT:  Very well.

11              (Witness sworn.)

12              COURTROOM DEPUTY:  Please have a seat and please

13    state and spell your full name are the record.

14              THE WITNESS:  Tammy, T-A-M-M-Y, Harris, H-A-R-R-I-S.

15              THE COURT:  All right.  You may inquire.

16                          DIRECT EXAMINATION

17    BY MR. ZELMAN:

18    Q    Good afternoon, Ms. Harris.  Can you tell us a little bit

19    about yourself, where you're from --

20              THE COURT:  Excuse me.  He's right there, the other

21    side.

22              THE WITNESS:  Okay.

23    BY MR. ZELMAN:

24    Q    A little bit about yourself, where you're from, where you

25    live, et cetera?
```

1   A    I live in Brooklyn, and I'm from New York.

2   Q    Okay.  You work?

3   A    Yes, I work --

4   Q    What do you do?

5   A    -- for 1199 SCIU for 26 years.

6   Q    Okay.  What do you do there?

7   A    I'm a secretary.

8   Q    What is your address?  Where do you live?

9   A    240 East 18th Street.

10  Q    Okay.  Now, back in 2013 -- withdrawn.

11          Do you see the individual sitting here at this table

12  with the black shirt?

13  A    Yes.

14  Q    Do you know who that is?

15  A    Yes.

16  Q    What's his name?

17  A    Dushanne Ashley.

18  Q    Okay.  When did you first meet him?

19  A    Back in 1990.

20  Q    Okay.  1990, a long time?

21  A    Uh-hum (affirmative response).

22  Q    All right.  And did you end up having a relationship with

23  him?

24  A    Yes.

25  Q    Okay.  Describe your relationship from 1990 up until

```
 1    2013?
 2    A    It was fairly fine, like every relationship, has its ups
 3    and downs.
 4    Q    Okay.  Do you have any kids?
 5    A    No.
 6    Q    Okay.  Back in 2013, April 19, 2013, you remember that
 7    morning?
 8    A    Yes.
 9    Q    All right.  What's the first thing that you remember
10    about that morning?
11    A    I was woke up.  I was about to go to work, and Dushanne
12    was in my house and his phone rang, and it was his friend,
13    said, "Come and get the dog.  The police are here."
14         Then a second later, an officer got on the phone and
15    said, this is police officer -- I can't recall his name --
16    come and get the dog or we're going to impound the dog.
17         So I said to Dushanne, "Dushanne, don't go down
18    there, because they're going to lock you up."  So he said he's
19    going to go because he didn't want the dog to get impounded
20    and he went there, and he got arrested.
21    Q    All right.  Did you hear that -- did you hear that over
22    the phone yourself?
23    A    Yes.
24    Q    Okay.  Now, so he was at your apartment that night, is
25    that right?
```

HARRIS/DIRECT/ZELMAN

```
 1    A      Yes.
 2    Q      Would he usually get out of bed at 5:00 a.m. to go
 3    anywhere?
 4    A      No.
 5    Q      When did he usually get up?
 6    A      Me.
 7    Q      No, him.
 8    A      About six, three.
 9    Q      Six?
10    A      Six.
11    Q      Okay.  I thought I heard a three in there.  What is that,
12    3:00 a.m.?
13    A      Oh, you're talking about in the morning time?
14    Q      Yeah.  What time he usually gets up?
15    A      Oh, about ten.
16    Q      Ten?  Okay.  All right.  And how long had he been
17    living -- staying with you at your apartment, if you remember,
18    back in -- before April 19, 2013?
19    A      Since like January.
20           MR. ZELMAN:  Okay.  Thank you you.  I have nothing
21    further.
22           THE COURT:  Cross-examination?
23                        CROSS-EXAMINATION
24    BY MS. FUDIM:
25    Q      Good afternoon, Ms. Harris.
```

LISA SCHMID, CCR, RMR

HARRIS/CROSS/FUDIM

1   A    Hi.

2   Q    Plaintiff is your boyfriend?

3         THE COURT:  I'm sorry.  Please introduce yourself

4   and who you represent.

5   BY MS. FUDIM:

6   Q    My name is Elissa Fudim, and I represent the defendant,

7   Detective Civil.  Good afternoon.

8   A    Good afternoon.

9   Q    Plaintiff is your boyfriend?

10  A    Yes.

11  Q    And he's been your boyfriend for 17 years, correct?

12  A    Yes.

13  Q    You want to help him in giving testimony here today?

14  A    Yes.

15  Q    Now, you live at 240 East 18th Street, Apartment 3H, is

16  that accurate?

17  A    Yes.

18  Q    You rent that apartment?

19  A    Yes.

20  Q    You've rented it for 43 years?

21  A    Yes.

22  Q    And you said a moment ago that Mr. Ashley was living with

23  you for several months prior to April 19th of 2013.  Is that

24  what you just testified to?

25  A    Yes.

HARRIS/CROSS/FUDIM

```
1    Q    You gave a deposition in this case, correct?

2    A    Yes.

3    Q    You were under oath in that deposition?

4    A    Yes.

5    Q    And at that deposition, you were asked a series of

6    questions and you gave a series of answers, is that correct?

7    A    Yes.

8    Q    And isn't it true that when you were deposed, you said

9    that plaintiff moved in with you in 2003. Do you recall giving

10   testimony to that effect?

11   A    Yes.

12   Q    And then he continued to live with you continuously until

13   about 2015, is that correct?

14   A    Yes.

15   Q    And during 2015, just so we're clear, that was when you

16   were deposed correct?

17   A    Yes.  Excuse me.  What is deposed.

18   Q    You attended -- you went into a conference room and you

19   answered questions under oath, correct?

20   A    Yes.  Yes.

21   Q    There was an attorney present who asked those questions?

22   A    Yes.

23   Q    And there was a court reporter who took down your

24   answers?

25   A    Yes.
```

HARRIS/CROSS/FUDIM

```
1    Q    At the time you were deposed, you said he had lived with
2    you continuously from 2003 to 2015, correct?
3    A    Yes.
4    Q    In fact, you claimed that he continued to live with you
5    thereafter, isn't that correct?
6    A    Yes.
7    Q    Now, during those 12 years that he lived with you, his
8    name was never added to your lease, isn't that correct?
9    A    Correct.
10   Q    And at the time, you were paying about $950 a month for
11   rent?
12   A    Yes.
13             MR. ZELMAN:  Objection.
14             THE COURT:  Sustained.
15   BY MS. FUDIM:
16   Q    You claimed that Mr. Ashley split the rent with you,
17   correct?
18   A    Yes.
19   Q    But he always paid you with cash, correct?
20   A    Yes.
21   Q    So you have no record that he was contributing towards
22   rent at your apartment, correct?
23   A    No.
24   Q    And you claim that he gave you money for expenses like
25   gas, cable, electric?
```

```
 1   A     Yes.
 2              MR. ZELMAN:  Objection, Your Honor.
 3              THE COURT:  Overruled.
 4   BY MS. FUDIM:
 5   Q     You claimed that he gave you about 50 percent towards
 6   those expenses, correct?
 7   A     Yes.
 8   Q     And again, those -- it was always in cash, is that
 9   accurate?
10   A     Yes.
11   Q     There's no record of any of those payments?
12   A     No.
13   Q     And as his girlfriend, you're aware that for a period of
14   about a year, around April 19 of 2013, Mr. Ashley was
15   unemployed, correct?
16   A     Yes.
17   Q     But somehow, he always still had money, always had cash
18   to still give you, is that correct?
19   A     Uh-hum (affirmative response).
20   Q     Is that a yes?
21   A     Yes.
22   Q     Now, in spite of the fact that you claimed that
23   Mr. Ashley was living with you, you actually have referred to
24   your apartment as -- 240 East 18th Street as your apartment,
25   isn't that correct?
```

```
 1  A    Yes.
 2  Q    In fact, in November of 2014, when you claimed plaintiff
 3  was living with you, you filed a complaint with police that he
 4  broke into your apartment, isn't that correct?
 5  A    Yes.
 6  Q    And you claim that plaintiff was with you in the early
 7  morning hours of April 19th, 2013?
 8  A    Yes.
 9          MR. ZELMAN:  Judge, could we have sidebar or this?
10          THE COURT:  No.
11  A    Yes.  Wait.  Retrack your question back up.
12  BY MS. FUDIM:
13  Q    April 19th, 2013, when you received a phone call, you
14  gave testimony about it?
15  A    Before that.  Before that.
16          MS. FUDIM:  If there was a question that we need
17  read back by the court reporter, we can have a testimony read
18  back to the jury, but I'm not going to -- Your Honor, I would
19  ask that I don't have to read the last question that I asked.
20          THE COURT:  Go ahead.
21  BY MS. FUDIM:
22  Q    You claim you received a phone call on that morning,
23  correct?
24  A    Yes.
25  Q    And that it was someone by the name of Charles Patrick?
```

1   A     Yes.

2   Q     And he was asking if plaintiff could go get his dog or it

3   was going to be impounded?

4   A     Yes, sir.

5   Q     Now, all plaintiff said was he was going to go get the

6   dog, and he left the apartment, correct?

7   A     Yes.

8   Q     And the dog was a pit bull named Roscoe?

9   A     Yes.

10  Q     Plaintiff actually had just gotten Roscoe a few weeks

11  earlier, correct?

12  A     Correct.

13  Q     After plaintiff got Roscoe, he brought him to his

14  apartment at 125 East 18th Street, isn't that correct?

15  A     Yes.

16  Q     And the reason -- withdrawn.

17        And that apartment at 125 East 18th Street was, in

18  fact, the plaintiff's apartment, isn't that correct?

19  A     Yes.

20  Q     Now, the last time you were at 125 East 18th Street, that

21  was in about December 2012?

22  A     Okay.

23  Q     Is that accurate?  When was the last time, Ms. Harris,

24  that you were in that apartment?

25  A     I can't remember.  If I said December, yes.

HARRIS/CROSS/FUDIM

```
 1   Q    And when you walked in the door of that apartment, there
 2   was the kitchen.  There was a bathroom, correct?
 3   A    Yes.
 4   Q    And Mr. Patrick had a room?
 5   A    Yes.
 6   Q    And then there was a living room area that was sort of
 7   set up like a bedroom, is that correct?
 8   A    Yes.
 9   Q    When I say set up like a bedroom, I mean there was a bed,
10   right?
11   A    Yes.
12   Q    A dresser?
13   A    Yes.
14   Q    Closet?
15   A    No.
16   Q    A freestanding like wardrobe thing to hang stuff up?
17   A    Yes.
18   Q    A television?
19   A    Yes.
20            MR. ZELMAN:  Judge, all beyond the scope.
21            THE COURT:  Overruled.
22   BY MS. FUDIM:
23   Q    And as far as you know, the bed that was in that living
24   room area, that was plaintiff's bed?
25   A    Yes.
```

HARRIS/CROSS/FUDIM

```
 1   Q     And plaintiff had clothing in the apartment?
 2   A     Yes.
 3   Q     And a week before plaintiff was arrested, that week of
 4   April 19th, plaintiff did not send every night at your
 5   apartment, isn't that correct?
 6   A     Say that again?
 7            THE COURT:  Yes.  Repeat the question, please.
 8   BY MS. FUDIM:
 9   Q     The night of April 19th, so the prior night before the
10   18th into the 19th, plaintiff was staying with you?
11   A     Right.
12   Q     That's what you testified?
13   A     Yes.
14   Q     But that week, if you go back seven days, he wasn't
15   staying with you the entirety of that week, isn't that
16   correct?
17   A     I can't recall.
18   Q     And in fact, you believed he was staying at 125 East 18th
19   Street some of those days, isn't that correct?
20   A     Yes.
21   Q     After plaintiff left to get his dog on April 19, you
22   didn't see him again until two days later?
23   A     Correct.
24   Q     And you saw him when he came to your house to get the
25   dog?
```

1    A     No.  He didn't bring his dog to my house.

2    Q     I'm sorry.  I'm not saying he brought his dog, but that

3    you saw him when he -- excuse me.  I withdraw the question.  I

4    poorly stated it.

5          You saw him again two days later when he came to

6    your house, is that correct?

7    A     Yes.

8    Q     And he told you that he was arrested?

9    A     Yes.

10   Q     And he told you that he gave the dog to his neighbor at

11   125 East 18th Street, correct?

12   A     Correct.  Yes.

13   Q     Not to Charles Patrick, his neighbor?

14   A     No.

15   Q     To his neighbor?

16   A     Right.

17              MS. FUDIM:  Nothing further, Your Honor.

18              MR. ZELMAN:  Nothing further.

19              THE COURT:  All right.  The witness is excused.  You

20   may stand down, ma'am.

21              THE WITNESS:  Thank you.

22              THE COURT:  You're welcome.

23              MR. ZELMAN:  Okay.  Judge, now we're ready.

24              THE COURT:  All right.  We're going to take a five

25   minute break to set up the IT equipment.  This will be our

 1   afternoon break.

 2           All rise for the jury.

 3           (Jury exits.)

 4           THE COURT:  Who's your next witness?

 5           MR. ZELMAN:  I have a defense attorney outside.  His

 6   name is Chad.

 7           THE COURT:  All right.  We're going to take a five

 8   minute break.  We're going to set up the IT equipment.

 9           You know how to use it, I take it.

10           MR. HAIDER:  Your Honor, before we take a break, I

11   would request an offer of proof with respect to this criminal

12   defense attorney as we are concerned that he may be eliciting

13   either opinion testimony or hearsay from the prosecutor,

14   and/or the criminal court judge.

15           It's our understanding he's supposedly going to

16   support the Declaration of Liberty, I presume, that is, that

17   plaintiff made court appearances.

18           THE COURT:  Well, be careful.  If he's going to talk

19   about what the judge said or what the prosecutor said, that's

20   going to be hearsay, and -- but I'll take it

21   question-by-question.

22           MR. ZELMAN:  Thank you, Your Honor.

23           THE COURT:  All right.  We'll take a five minute

24   break.

25           (Recess.)

JURY CHARGE CONFERENCE

```
1              MR. ZELMAN:  Exactly.  And that's why it doesn't
2    make any sense to call in about someone who is unknown.
3              THE COURT:  You can tell the jury that.  There's
4    nothing more I can do.  The law permits it.
5              MR. ZELMAN:  Okay.
6              THE COURT:  Anything else for today before I -- it's
7    almost 6:30.
8              MR. ZELMAN:  Oh, yeah.  I think the last thing is,
9    throughout the entire case, they put in -- they provided
10   redacted memo book and we objected to the entirety of the memo
11   book.  But they -- as an out-of-court statement that --
12   out-of-court records that's just used after the fact.
13             There's many courts that we cite in our papers about
14   why memo books and this other type of documentation that's
15   produced after the arrest is only bolstering the in-court
16   testimony and shouldn't be permitted.
17             THE COURT:  Well, are you going to try to enter a
18   memo book?
19             MS. FUDIM:  The issue with the memo book, again,
20   falls into that third category.  It's not in evidence-in-chief
21   and it's not per se an impeachment.
22             But plaintiff has already opened the door and
23   insinuated that -- in his opening statements that Detective
24   Civil made up this statement after the fact, and accordingly,
25   we have to put in evidence showing that it existed in paper
```

JURY CHARGE CONFERENCE

1    form prior to when he's willing fabrication and that's how the

2    statement comes in.

3           With respect to redactions, when we originally

4    produced the document in response to initial disclosures and

5    it contains the arrest information, the names, the NYSID and

6    the arrest of Jose Carlos and Charles Patrick.  And at that

7    time, we didn't know whether those were sealed, were they not

8    sealed.  These were third-party names.  We redacted their

9    names out, which is proper.

10          In the course of discovery, plaintiff's counsel

11   produced to us an unredacted copy of the memo book with these

12   individuals' names, and it came up during the course of

13   discovery who these individuals were.  The cat's out of the

14   bag.  We all know it.  So we put on the JPTO the unredacted

15   one that contains Mr. Patrick's name and Mr. Carlos' name,

16   because at this point, we all know what their names were.

17          But that's why it was originally redacted because

18   that's our obligation at the beginning of a litigation to

19   redact other people's -- arrestees.  The statement itself was

20   never redacted.  That was produced in the document from the

21   outset.  So the different between the two documents that he is

22   complaining about is just the names of the other two

23   individuals.

24          THE COURT:  Well, are you arguing that the statement

25   that was in the superseding information was not

JURY CHARGE CONFERENCE

```
 1   contemporaneously placed in the memo book?  Is that the
 2   argument?  At the time --
 3             MR. ZELMAN:  Yes?
 4             THE COURT:  -- of the arrest?
 5             MR. ZELMAN:  That's one of our arguments, yes.
 6             THE COURT:  Well, that's the argument I think we're
 7   talking about.  So your position is that it was a fabrication
 8   after the fact?
 9             MR. ZELMAN:  Yes.
10             THE COURT:  And if it's in the memo book, at that
11   point, you would say, it was put there afterwards.
12             MR. ZELMAN:  And I think that that's the testimony
13   that we got even today from defense counsel that he was not
14   provided that statement when he was supposed to be, and
15   Defendant Civil could have put that in his memo book whenever
16   he so chose, and that's the issue.
17             By the way, I just want to point out with respect to
18   redactions, it's not only about nonparties.  They also
19   redacted other items.
20             THE COURT:  What exhibit is the memo book?
21             MS. FUDIM:  I forget the number.  It should be the
22   second to last.  I think it might be DD or -- EE or DD, I
23   don't recall.
24             MR. HAIDER:  EE.
25             MS. FUDIM:  EE, Your Honor.
```

JURY CHARGE CONFERENCE

```
 1              MR. ZELMAN:  Just so Your Honor --

 2              THE COURT:  Where in the memo book is this page here

 3    that seems not to have lines on it?

 4              MS. FUDIM:  So the way the memo books open, Your

 5    Honor, are they open longways like this.  The bottom pages are

 6    all lined.  The top pages, which is the back of the line pages

 7    are not, and they're called fly pages.

 8              And the Detective Civil will testify that that is

 9    very customary, that officers use both sides of the page, even

10    though one side has lines and one side doesn't.  When they

11    flip the page open, they very often use the unlined side as

12    well to put in information pertaining to the arrest.

13              Now, if plaintiff's counsel wants to cross him on

14    whether that was added after the fact, I mean, I think that's

15    a fair avenue of cross that he can explore.

16              THE COURT:  Yes.

17              MS. FUDIM:  But I don't think we can or should be

18    precluded from offering evidence that this was not a statement

19    that was fabricated a year later, that there is evidence,

20    whether the jury chooses to believe it, not believe it, what

21    they want to do is up to the jury.  But there was evidence

22    that this statement was written down contemporaneous to the

23    arrest.

24              THE COURT:  That's an issue in the case, brought up

25    as an issue by the plaintiff.  So I'm going to allow the memo
```

JURY CHARGE CONFERENCE

1    book in.  And you can cross-examine the defendant on it, and

2    raise whatever question about whether this was a

3    contemporaneous writing at the time of the arrest, 6:15 in the

4    morning, on April --

5            MS. FUDIM:  Nineteenth.

6            THE COURT:  Nineteenth, 2013.

7            Okay.  All right.  We'll see you tomorrow, 9:30, but

8    please get me those IOUs this evening.

9            MR. HAIDER:  Yes, Your Honor.

10           THE COURT:  Thank you.  Have a good night.

11        (Trial adjourned to April 2, 2019, at 9:30 a. m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ASHLEY/DIRECT/ZELMAN

```
1    he was arrested or not, but he was -- there was some kind of
2    domestic dispute, I don't think he was arrested.
3              (Jury enters.)
4              THE COURT:  Please be seated.
5              Good morning, members of the jury.
6              All right.  You may call your next witness.
7              MR. ZELMAN:  Thank you, Your Honor.  At this time,
8    the plaintiff calls Mr. Ashley.
9              (Witness takes the stand.)
10             (Witness sworn.)
11             THE COURTROOM DEPUTY:  Please have a seat.  Please
12   state and spell your full name for the record.
13             THE WITNESS:   Dushaine Ashley, D-U-S-H-A-I-N-E,
14   last name Ashley, A-S-H-L-E-Y.
15             THE COURT:  All right.  You may inquire.
16   D U S H A I N E   A S H L E Y, called as a witness, having
17   been first duly sworn/affirmed, was examined and testified as
18   follows:
19   DIRECT EXAMINATION
20   BY MR. ZELMAN:
21   Q    Good morning.
22   A    Good morning.
23   Q    Good morning, Mr. Ashley.  How are you today?
24   A    Good.  Good morning, Mr. Zelman.
25   Q    Please tell us a little bit about yourself.  Where are
```

ASHLEY/DIRECT/ZELMAN

```
1    you from?  Where do you live?  What kind of work do you do?
2    What kind of family life do you have?
3    A    First of all, I'm from Flatbush, Brooklyn, lived there
4    all my life, 1809 Albermarle Road with my grandmother, my
5    sister -- me, my sister, my grandmother, and my mother.
6    Construction work, just got recently laid off, doing
7    construction for the last five years.  Went to school.  Went
8    to Erasmus High School.
9    Q    Do you have kids?
10   A    Yes, I do.  I got a 17-year-old daughter, and my son
11   would have been 24, passed away six years ago.
12   Q    Sorry about that.
13            You said you live on Albermarle Road?
14   A    Albermarle Road.
15   Q    Okay.  You live there currently?
16   A    Yes.
17   Q    Who is Tammy Harris?
18   A    That's my girlfriend.
19   Q    How long has she been your girlfriend?
20   A    Over ten years.
21   Q    Okay.  Going back to April 19th, 2013, where were you
22   living?
23   A    I was living with her.
24   Q    All right.  Where was that?
25   A    240 East 18th, Brooklyn, New York.
```

ASHLEY/DIRECT/ZELMAN

```
 1   Q     How far is that from your address?
 2   A     Right down the block.
 3   Q     Okay.  How far is that from 125 East 18th?
 4   A     Right down the block.
 5   Q     All right.  When you say right down the block, five
 6   minute walk?  Less?
 7   A     Five minute, maybe.  Depends on the walker.  Five-minute
 8   walk.  For me, it would be about five -- five minutes,
 9   five-minute walk.
10   Q     How long had you been living with Tammy back in 2013?
11   A     Back and forth, back and forth.
12   Q     All right.  Do you remember how many months?
13   A     I was living with her for the last couple of months, but
14   I was back and forth.
15   Q     Back and forth between what?
16   A     Between my house, her house, and the house that I was in.
17   Q     Albermarle or 125?
18   A     Albermarle.
19   Q     What?
20   A     Albermarle.
21   Q     Albermarle.
22         Did you ever live at 125 East 18?
23   A     Yes, I did.
24   Q     When?
25   A     Approximately January -- the beginning of -- middle of
```

ASHLEY/DIRECT/ZELMAN

```
 1   January to the ending of December.
 2   Q    What year?
 3   A    2012.
 4   Q    Okay.  And who was paying rent there?  Whose apartment
 5   was that?
 6   A    Charles Patrick.
 7            THE COURT:  I'm sorry?
 8            THE WITNESS:  Charles Patrick.
 9            THE COURT:  One question at a time.
10            MR. ZELMAN:  Okay.
11            THE COURT:  You asked two questions.  Please just
12   ask the one question.  You can follow up with another
13   question.
14            Mr. Ashley, can just -- a little further back from
15   the microphone.
16            THE WITNESS:  Okay.
17            THE COURT:  Yes, let's see how that works.  We are
18   getting a little bit of interference.
19            THE WITNESS:   Hello?
20            THE COURT:   Little too close.  That's good.  You
21   can be heard.
22            MR. ZELMAN:  Thank you, Your Honor.
23   BY MR. ZELMAN:
24   Q    Whose apartment was that?
25   A    Charles Patrick.
```

ASHLEY/DIRECT/ZELMAN

```
 1   Q    Did he allow you to stay there?  Is that why you were
 2   there, or you paid rent yourself, or something else?
 3   A    No.  Met him through a mutual friend and he was renting
 4   out a room.
 5   Q    And you rent a room from him.
 6   A    Yes, I did.
 7   Q    And that was in 2012.
 8   A    2012, middle of January.
 9   Q    Now, you said you left in the end of 2012.
10   A    December.
11   Q    Now, where did you go at that time?
12   A    Went back to my girlfriend's house.
13   Q    Tammy?
14   A    Yes, sir.
15   Q    And did you leave some stuff at East 18th Street?
16   A    Yeah.  Left -- I had a air pillow mattress; I had a
17   dresser; like, a little fence thing you hang your clothes; and
18   one of those small component (sic) -- like, a small little
19   stand.
20   Q    Any pets?
21   A    I had my cat there; and at the time, I had a dog that I
22   brought from Jersey.
23   Q    All right.  Now, when did you bring the dog into that
24   house?
25   A    I brought that dog -- my son passed away March 29th, I
```

ASHLEY/DIRECT/ZELMAN

```
 1    buried my son April, that following Friday, and -- I came from
 2    Maryland, I stopped in Jersey, I brought that dog from Jersey
 3    to New York, and that was about approximately two weeks prior
 4    to April 19th.
 5    Q    And why did you bring it to 125 East 18th?
 6    A    Because the friend Jose that I had that was staying
 7    there, whose real name was Noel, but he was staying there and
 8    he liked the dog because the dog got -- passed as a doorbell,
 9    he liked the breed specifically, so I brought this Blue
10    Nose -- it was a young Blue Nose that my sister's husband gave
11    me.
12    Q    Would you go by and visit at times?
13    A    Yes.  My cat was there, so I had to go there.  He was
14    taking care of my cat so that was one of the reasons why I
15    kept on constantly coming back in the house, coming to check
16    on the cat, making sure he had litter changes, give him food,
17    stay with him for a couple minutes, and then I go back to
18    Tammy's house.
19    Q    Now, who was paying for that room after you left in
20    December?
21    A    After I left?  I was still paying rent.
22    Q    When did you pay rent through?
23    A    I paid rent.  I was working.
24    Q    What was that?
25    A    When I paid rent due?
```

ASHLEY/DIRECT/ZELMAN

```
 1   Q     No, no, no.
 2              Did you pay rent in January 2013?
 3   A     What do you mean, Did I pay rent in January 2013?
 4   Q     You said you were renting a room --
 5   A     I was giving him rent.
 6   Q     When did you stop giving him rent?
 7              THE COURT:  Wait for him to finish and then ask him
 8   another question that way the court reporter can get
 9   everything down, please.
10              MR. ZELMAN:  Thank you, Your Honor.
11              THE COURT:  Thank you.
12   BY MR. ZELMAN:
13   Q     When did you stop paying rent?
14   A     When did I stop paying rent?
15   Q     If you remember.
16   A     I left, but I was still giving the rent because my cat
17   was still there so I was giving him rent because he was still
18   watching my cat.
19   Q     Did you sleep at 125 East 18th Street after
20   December 2012?
21   A     No.
22   Q     Now, on April 19th -- April 19th, 2013, tell us what --
23   the first thing you remember for that day.
24   A     On that day -- I remember it was a Friday, maybe about a
25   quarter to 5:00, the phone rings, my friend Noel, he calls me,
```

Denise Parisi, RPR, CRR

ASHLEY/DIRECT/ZELMAN

```
 1   I'm like, What happened?
 2              There's police in our apartment.
 3              I said, What you mean police in our apartment?
 4   Before he could even say anything, a police officer got right
 5   on the phone and he basically said, Listen man, if you don't
 6   come down and get the dog, we're going to impound the dog.
 7   Q    All right.  Now, were you with Tammy at the time?
 8   A    Yes, sir.
 9   Q    And could she hear the phone?
10   A    Yes, she could.
11   Q    It was on speaker?
12   A    No, but she was right next to me.  We was laying in the
13   bed together.
14   Q    Okay.  And what did you say?
15   A    After what?
16   Q    When he said, If you don't come down here right away --
17   A    I told Tammy, I said, I'm about to go get the dog, and
18   she pleaded with me not to go.
19   Q    Did she say why?
20   A    She just said, Don't go down there, they're going to lock
21   you up, they're trying to lure you down there.
22   Q    All right.  So how long did it take you to get out of
23   bed, get dressed and get over there?
24   A    Between putting on my clothes and everything, probably
25   ten minutes about the time -- so about ten to eight minutes
```

ASHLEY/DIRECT/ZELMAN

1    between the clothes and then walking down there, about that.

2    Q    Now, I'm waiting on the computer, but you saw the photos

3    that we published with your defense counsel, right?  Chad

4    Harris?  I'm sorry, Chad LaVeglia.  Do you remember those

5    photos?

6    A    Yes, I do, very clear.

7    Q    Now, were those photos of you coming into the house?

8    A    Yes, sir.

9    Q    Okay.  I will try to bring them up.

10            And that was -- the time on the photo was

11   approximately the time that you were coming into the house?

12   A    Exact time.  Exact.

13   Q    Now, just tell us when you -- what floor did you -- what

14   floor was at 125 East 18th?

15   A    Fifth floor.

16   Q    Did you take an elevator?  Did you walk?

17   A    Took an elevator.

18   Q    What happened when you got up there?

19   A    I got off the elevator, as I walk and come out the

20   elevator, you gotta make a left -- a right, I mean.  So when I

21   walked out, there was an officer sitting outside smoking a

22   cigarette.  I immediately asked him, I got a phone call from

23   one of your centers.  I came to pick up the dog.  He said, Go

24   inside, and so I went inside.

25   Q    Okay.  And what happened then?

```
 1   A     When I went inside, straight in the apartment, you seen a
 2   couple officers walking back and forth like scamming through
 3   the apartment, and one particular offer said, What are you
 4   doing here?  And I said, What you mean what I'm doing here?  I
 5   just spoke to one of your fellow officers outside, they called
 6   me to come pick up the dog.  And then he said, What are you
 7   doing in police business?  And just caught a attitude and
 8   turned around and locked me up.  Told him lock me up.  The
 9   same officer that told me to go in, he told him to lock me up.
10   Q     Did they tell you why they were locking you up?
11   A     No, he didn't.
12   Q     Did you ask?
13   A     Yes, I did.
14   Q     Did they respond?
15   A     No, he didn't.
16         THE COURT:  You have to tell me what it is you are
17   putting up.
18         MR. ZELMAN:  Yes, Your Honor.  I'm putting up a
19   photo that was previously published to the jury.
20         THE COURT:  I'm sorry, it's exhibit what?
21         MR. ZELMAN:  It's Exhibit 2.
22         THE COURT:  2A?  B?  C?  Let me look at it.
23         MR. ZELMAN:  I believe it's 2B, Your Honor.
24         THE COURT:  I'm sorry, I don't see it up.
25         MR. ZELMAN:  Yeah, it's loading.
```

ASHLEY/DIRECT/ZELMAN

```
 1              THE COURT:  What's that?
 2              MR. ZELMAN:  It's still loading.  It's going to take
 3    a second.  It's very, very slow.  Let me move on and I'm sure
 4    it will come up.
 5    BY MR. ZELMAN:
 6    Q    Okay.  Now, who was there in the apartment when you got
 7    there?
 8    A    I couldn't remember the officers exactly, but I knew it
 9    was three officers inside and the one officer that was
10    standing outside in front --
11    Q    All right.
12    A    -- the apartment.
13    Q    When you got to the apartment --
14              MR. ZELMAN:  Here it is, Your Honor.  That's --
15    well -- let me see if that one's -- Judge, that's actually
16    just one frame before the one I have on 2B.  Your Honor, if
17    you don't mind, I would like to publish this one to the jury
18    at this time, or I can open up the other one.
19              THE COURT:  Is there any objection?
20              MR. HAIDER:  No objection.
21              THE COURT:  We'll make that 2D.
22              (Plaintiff's Exhibit 2D received in evidence.)
23              (The above-referred to exhibit was published.)
24    BY MR. ZELMAN:
25    Q    Mr. Ashley, is that you coming in?
```

```
 1   A     Yes, sir.

 2   Q     Do you see the time there on the photo?

 3   A     Oh, yeah, 5:13.  5:13.  Yes, sir, I see it.

 4   Q     Does that refresh your recollection as to the time?

 5   A     Yes, sir.

 6   Q     Okay.  Now, when you got to the apartment, was the dog

 7   there?

 8   A     Dog was upstairs.

 9             MR. ZELMAN:  All right.  Your Honor, at this time --

10   at this time, I would like to show the witness a photo of the

11   dog, which is in our JPTO.  It was not previously published to

12   the jury.

13             THE COURT:  Is it in here?

14             MR. ZELMAN:  It's not in there yet because it was

15   not entered into evidence yet but it's in the JPTO.

16             THE COURT:  Could I see it?

17             MR. ZELMAN:  Yes.  I could pull it up on the

18   computer.

19             THE COURT:  Go ahead.  And the other side can see

20   it, too.

21             We will get to any objection once I see this, okay?

22             MR. HAIDER:  Yes, Your Honor.

23             THE COURT:  Thank you.

24             MR. ZELMAN:  I might not have it.  I will pass on

25   it, Judge.  I'm sorry.
```

ASHLEY/DIRECT/ZELMAN

```
 1              THE COURT:  All right.  Go ahead.
 2   BY MR. ZELMAN:
 3   Q    Now, when you got up there, was your dog there?
 4   A    Yes, sir.
 5   Q    Where was the dog?
 6   A    Well, I don't really know.  He was inside.  I didn't get
 7   a chance to go all the way in the apartment.  I got probably
 8   by the door before the officers said anything, so he was
 9   inside the apartment door for a fact.
10   Q    Were you ever sitting in the apartment?
11   A    Was I sitting in the apartment?  No.
12   Q    What kind of dog was it?
13   A    It was a Blue Nose.
14   Q    All right.  And how old?
15   A    Couple months.
16   Q    Okay.  Now, did you ask about your dog when you got to
17   the apartment?
18   A    No, I didn't.  Honestly, when I got to the apartment, I
19   was basically upset that I -- when I got in the apartment and
20   when the -- the officer locked me up and I was questioning
21   what was I being arrested for, so I wasn't really stressing
22   the dog until after when I got out the apartment and they
23   handcuffed me and that's when I was worried about the dog.
24   Q    So what did you start -- did you talk about the dog?
25   A    When we was coming down handcuffed, we was coming down --
```

Denise Parisi, RPR, CRR

ASHLEY/DIRECT/ZELMAN

```
 1   the officer that was bringing us down, I asked him, you know,

 2   I said, Listen, what you gonna do with my dog?  I was very

 3   stressed.

 4           Do you have somewhere we could take the dog at?

 5   We was coming out, and Lisa, the lady that live next door at

 6   145, she so happened to be outside, and I told him he could

 7   leave the dog with her.

 8   Q    Did you see her take the dog?

 9   A    I seen when they gave her the dog -- the police officers.

10   Q    What was her name?

11   A    Lisa.

12   Q    Is she the one who came and testified here --

13   A    Yesterday.

14   Q    -- yesterday?

15   A    Mm-hmm.

16           THE COURT:  Is that a yes?

17           THE WITNESS:   Yes, sir.

18           THE COURT:  Say yes or no to answer.

19   BY MR. ZELMAN:

20   Q    How do you know her?

21   A    I know her from being in the neighborhood.

22   Q    Okay.  And did you end up picking up your dog from her?

23   A    Yes.

24   Q    When was that?

25   A    The next day.
```

ASHLEY/DIRECT/ZELMAN

1  Q    Now, how long was it before -- just tell us, what

2  happened next?

3  A    After I got arrested?

4  Q    Yes.

5  A    We got arrested, and what happened was, they raided also

6  another building across the street, so they brought people

7  from that building and me, Charles Patrick, and Noel Perez --

8  his real name is Noel -- brought us down, took us in the van,

9  drove us around for, like, two and a half hours before they

10 brought us to the precinct.  Just two and a half hours just

11 driving us around in the van, the van has no back windows, put

12 us in the cage, driving us around.

13         So they finally take us to the precinct.  I'm very

14 upset now.  You know what I mean?  I just buried my son.  So

15 I'm telling the officers this:  What am I being charged with?

16 I just buried my son -- I'm asking the officers, Could I speak

17 to a supervisor?  And nobody said nothing, I didn't hear from

18 nobody.  I didn't find out my charges until I went in front of

19 my lawyer, Chad.  That's when I was revealed what charges I

20 had, so all that time, I didn't know what I was being arrested

21 for.

22 Q    Did they bring you to the precinct?

23 A    Yes.

24 Q    What happened at the precinct?

25         MR. HAIDER:  Objection.

Denise Parisi, RPR, CRR

ASHLEY/DIRECT/ZELMAN

```
1    A    I --

2              THE COURT:  Sustained.  Stop.  Sustained.

3    BY MR. ZELMAN:

4    Q    What happened next?

5    A    I went --

6              MR. HAIDER:  Objection.

7              THE COURT:  Sustained.

8              MR. ZELMAN:  Sidebar, Your Honor?

9              THE COURT:  No.  Keep going.

10             MR. ZELMAN:  All right.

11   BY MR. ZELMAN:

12   Q    At some point, you were taken from the precinct to the

13   central booking?

14   A    Yes, sir.

15   Q    All right.  And what happened when you got to central

16   booking?

17   A    I got to central booking, I seen my lawyer, he explained

18   the charges -- told me the charges, what I was being charged

19   with, and I went in front the judge.

20   Q    Okay.  And how long was that process at central booking?

21             MR. HAIDER:  Objection.

22             THE COURT:  Read that back, please.

23   (Record read.)

24             THE COURT:  Sustained.

25   BY MR. ZELMAN:
```

```
 1    Q     You saw the judge.

 2    A     Yes, sir.

 3    Q     Before you saw the judge, you saw your lawyer, right?

 4    A     Yes, sir.

 5    Q     What did you tell your lawyer?

 6               MR. HAIDER:  Objection.

 7               THE COURT:  Sustained.

 8    BY MR. ZELMAN:

 9    Q     What happened after you spoke to the lawyer?

10    A     Said, I'm gonna get you out of here.

11    Q     Did you go in front of the judge?

12    A     Yes, sir.

13    Q     And what happened when you went in front of the judge?

14    A     Went in front the judge.  I think the District Attorney,

15    they put their case out.  Chad, he said what he said, gave me

16    ROR, released me on my own recognizance.

17               THE COURT:  You have to go slower.  Just slow down

18    and give it a moment and then answer, but answer more slowly,

19    otherwise we won't get a true transcript and we need to have

20    everything recorded here, okay?

21               THE WITNESS:  Yes, sir.

22               THE COURT:  Thank you very much.

23    Go ahead, Mr. Zelman.

24               MR. ZELMAN:  Thank you.

25    BY MR. ZELMAN:
```

ASHLEY/DIRECT/ZELMAN

```
 1   Q     Okay.  So they released you; is that right?
 2   A     Yes, sir.
 3   Q     And where did you go?
 4   A     Went home.  I went and got my dog.
 5   Q     Okay.  And did you go back -- where did you go back home
 6   to?
 7   A     I went to Lisa's house.
 8   Q     Now, at that time, approximately around that time, were
 9   you working?
10   A     Yes, I was working off the books.
11   Q     Okay.  What kind of work were you doing?
12   A     Construction.
13   Q     Did you miss any work as a result of the arrest?
14   A     No, I'm not going to say I missed work.  The only time I
15   missed work was when I went to court.
16   Q     Okay.  Now, speaking of going to court, do you remember
17   how long it was that you had to go back to court on this case?
18   A     Yes, sir.
19   Q     How long was it?
20   A     About a year and a half.
21   Q     No.  What I mean is, how long was it from the time you
22   got arrested until the first time that you had to go back into
23   court on this case?
24   A     On this case?  Yeah, about 14 times.
25   Q     Let me try again.
```

ASHLEY/DIRECT/ZELMAN

```
 1              From the time you got arrested until you had to
 2    appear in court in front of a judge the next time with Chad
 3    next to you, okay --
 4    A     From the time of April 19?
 5    Q     Right.  When was the next time?
 6    A     Oh, about 30 days.
 7    Q     Okay.
 8    A     Thirty days, yeah.
 9    Q     How many of those did you go to?
10    A     Year and a half, yeah.
11    Q     How much time was spaced between each one?
12    A     Three weeks, three and a half weeks maybe each time.
13    Q     Right.
14    A     About a month.  Three and a half weeks to a month.
15    Q     Now, some of those times you were responding to another
16    case; is that right?
17    A     Yes, sir.
18    Q     And there were some of the times that you were not
19    responding to another case; is that right?
20    A     Yes.
21    Q     Do you remember how many times you were not -- you had to
22    be there solely because of the April 19th arrest?
23    A     How many times did I go to court?
24    Q     Only on this arrest.
25    A     On this case, about a year, yeah.
```

ASHLEY/DIRECT/ZELMAN

```
1    Q    What I'm saying is, you had two cases at the time, right?
2    Correct?
3    A    Yes, sir.
4    Q    There were some court appearances where you only had to
5    be there because of the April 19th arrest, correct?
6    A    Yes.
7    Q    Do you remember how many times that was?
8    A    About four times.
9    Q    Okay.
10   A    Four times, yes.
11   Q    All right.  Now, for each one of these times, how long --
12   what time would court meet in the morning?
13   A    I think it start about ten o'clock, 9:30 -- between 9:30
14   and 10:00.
15   Q    And how long would you wait until you get called by the
16   judge?
17   A    Depends.  Depends on my lawyer.
18   Q    All right.  Were you able to work those days?
19   A    No.
20   Q    Would you otherwise have worked those days?
21   A    Yes.
22   Q    How much would you have made had you worked those days?
23   A    I make $80 a day.
24   Q    How did you get to court?  To court and back from court.
25   A    Train.  Public transportation.
```

ASHLEY/DIRECT/ZELMAN

1   Q    Okay.  Now, when you were appearing in court, did you

2   realize that you could go to jail for that crime?

3   A    Yes.

4   Q    Now, at some point, did they make you an offer to plead

5   guilty?

6   A    Yes, they did.

7   Q    What was that offer?

8   A    They told me I couldn't cop out, I had to cop out -- I

9   couldn't cop out to one charge, I had to cop out to two

10  charges.

11  Q    So you weren't allowed to just plead guilty to one case;

12  is that right?

13  A    Yes.

14  Q    Did you plead guilty?

15  A    Plead guilty to violation.

16  Q    All right.  Was that on the other case?

17  A    No, not that I remember.  Which case are you talking

18  about?

19  Q    You had two cases going on at the time.

20  A    Yes.

21  Q    The April 19th case?

22  A    Yes.

23  Q    And what was the date of the arrest on the other case?

24  A    I can't remember.

25  Q    All right.  It was the other case that got the violation;

```
 1   is that right?
 2   A    Yes.
 3   Q    As a result of that violation in that other case, did you
 4   have to do anything?
 5   A    No.  They gave me a violation and dismissed the other
 6   case.
 7   Q    All right.  I'm talking about the violation case.  Did
 8   you have to do community service?
 9   A    No.
10   Q    Did you have to pay a fine?
11   A    No.
12   Q    You didn't have to do anything --
13   A    No.
14   Q    -- is that right?
15        Now, this case -- the April 19th case was dismissed;
16   is that right?
17   A    Yes, sir.
18   Q    Now, at some point, you were able to obtain video of this
19   foyer area of you coming in to the apartment, right?
20   A    Yes, sir.
21   Q    And you also got video of the police coming in.
22   A    Yes, sir.
23   Q    How did you get that?
24   A    I knew the super of the building, so -- I got locked up
25   that Friday and on Saturday evening, I automatically came, I
```

ASHLEY/CROSS/HAIDER

1   went to the super, told him, I need to see your video from the
2   cameras of the building, and he told me to come down.
3   Q    All right.  And that's the -- that photo that I showed
4   you was part of that video; is that right?
5   A    Yes, sir.
6   Q    Okay.  When you got to the apartment, did you make any
7   statement that, This is what happens when you let strange
8   people into our apartment?
9   A    No, sir.
10  Q    Do you know what -- what that means?
11  A    I don't know what -- I don't know what that means.
12        MR. ZELMAN:  Thank you, Your Honor.  Nothing
13  further.
14        THE COURT:  Cross-examination.
15        MR. HAIDER:  May I inquire, Your Honor?
16        THE COURT:  Yes, you may.
17  CROSS-EXAMINATION
18  BY MR. HAIDER:
19  Q    Good morning.
20  A    Good morning.
21  Q    Just a moment ago, you testified about retrieving the
22  video, correct?
23  A    Yes, I did.
24  Q    And you stated that you knew the super of that building,
25  correct?

```
1   A      Yes, sir.
2   Q      You went to the building and got the video.
3   A      Yes, sir.
4   Q      Now, you were here yesterday when your criminal defense
5   attorney testified, correct?
6   A      Yes, sir.
7   Q      He stated that he sent his investigator to get the video,
8   correct?
9   A      Yes, sir.
10  Q      But that video that we saw, or the photos that we saw,
11  was actually taken by you, correct?
12  A      Yes, sir.
13         Could I explain that?
14  Q      Sure.
15  A      Yes.  When I got the video, I told my lawyer that I
16  called him and I explained to him, I said, I think there's
17  something very interesting that you would like to see.  He
18  sent his private investigator, so I gave him -- the
19  information to the super, his private investigators went to
20  the super and they retrieved it.  I kept that video for my
21  personal -- he had his own, because his personal investigators
22  went and they retrieved it from the super from me giving him
23  the super's information.
24  Q      So you never got the original video from your criminal
25  defense attorney?
```

ASHLEY/CROSS/HAIDER

```
1    A    No.  I had the original video.  He went on his own and
2    got -- it was private investigators.
3    Q    You never got the copy that your defense attorney --
4    A    No.  I had the video already on my phone.
5    Q    No, I understand you had your version.  I'm just asking
6    or clarifying that your criminal defense attorney didn't give
7    you his version of the video.
8    A    No, he didn't.
9    Q    And you didn't provide that to your attorney, correct?
10   A    No.
11   Q    Now, you just stated that at some point you lived at 125
12   East 18th Street, Apartment 5I prior to your April 19th, 2013,
13   arrest, correct?
14   A    Say it again.
15   Q    You just stated that you lived at 125 East 18th Street,
16   Apartment 5I prior to your April 19th, 2013, arrest.
17   A    Yes, mm-hmm.
18   Q    And you just stated that you moved out in December of
19   2012; is that correct?
20   A    Yes, sir.
21   Q    And that you actually lived there for the entirety of
22   2012; is that true?
23   A    Yeah.  From the beginning of January -- like, the
24   beginning -- middle of January to the ending of December of
25   2012.
```

Denise Parisi, RPR, CRR

ASHLEY/CROSS/HAIDER

```
1   Q     And during that time period that you lived there, Charles
2   Patrick was your roommate, correct?
3   A     He was the owner of the apartment.
4   Q     You shared --
5           THE COURT:  I'm sorry, he was the owner of the
6   apartment?
7           THE WITNESS:  Well, it was his apartment --
8           THE COURT:  I just want you to repeat what you said.
9   You said he was the owner of the apartment?  Whatever you
10  said, just --
11          THE WITNESS:  Yeah, he was the owner of the
12  apartment.
13          Go ahead.
14  BY MR. HAIDER:
15  Q     You lived there with him, correct?
16  A     Yes.  I was renting the room.
17          THE COURT:  You have to sit back just a little
18  otherwise there will be interference.
19          Go ahead.
20  BY MR. HAIDER:
21  Q     You had no other roommates other than Charles Patrick,
22  correct?
23  A     Nope.
24  Q     And you actually lived in the living room portion of the
25  apartment, correct?
```

1    A     Yes, sir.

2    Q     And would you describe that as a makeshift bedroom?

3    A     No.  It was honestly a living room that just basically

4    put into a bedroom.  It didn't have no door, but we had a

5    sheet.

6    Q     So you had a sheet to, kind of, create --

7    A     Yeah, for protection --

8              THE COURT:  You have to wait for him to finish the

9    question.

10             Go ahead, finish your question.

11   BY MR. HAIDER:

12   Q     So you had a sheet hung up for privacy in that room,

13   correct?

14   A     Yes, sir.

15   Q     And in that room, as you said on direct, you had the air

16   pillow mattress, correct?

17   A     Yes, sir.

18   Q     You had the dresser, correct?

19   A     Yes, sir.

20   Q     You had a fence to hang clothes, too, right?

21   A     What do you mean?

22   Q     You had a fence to hang -- I think you -- well, you said

23   you had something to hang the clothes on, correct?

24   A     Yes, sir.  It was --

25   Q     Just a pole?

ASHLEY/CROSS/HAIDER

```
1    A    Yeah, a pole.

2    Q    I'm assuming you had clothes hanging on that, correct?

3    A    Yes, sir.

4    Q    Now, you previously testified that you actually moved out

5    of that apartment in August of 2012, didn't you?

6    A    No, I didn't.  Not that I remember.

7    Q    So is that a no, you didn't or --

8    A    No.

9    Q    So do you recall testifying previously at a deposition

10   that you moved out in August of 2012?

11   A    Nope.  Not that I remember.

12   Q    So it's your testimony that you were there for the entire

13   year of 2012?

14   A    I was there from January to December of 2012.

15   Q    And you also had a pet cat in 2012, correct?

16   A    Yes, sir.

17   Q    And that pet stayed with you at that apartment, correct?

18   A    Yes, sir.

19   Q    And I want to focus now particularly on November and

20   December of 2012 for these next questions.

21   A    Yes, sir.

22   Q    During that time period, again, the only people that

23   lived in that apartment were you and Charles Patrick, correct?

24   A    Yes, sir.

25   Q    And on November 18th, 2012, you were living in that
```

Denise Parisi, RPR, CRR

ASHLEY/CROSS/HAIDER

1  apartment, correct?

2  A    Yes, sir.

3  Q    In that makeshift bedroom.

4  A    Yes, sir.

5  Q    With the sheet covering for privacy, correct?

6  A    Yes, sir.

7  Q    And on that morning, NYPD officers executed a search

8  warrant, correct?

9  A    When?

10  Q    On November 18th, 2012.

11  A    I wasn't there.

12  Q    So you were not in the apartment on --

13  A    No, I was I wasn't.

14  Q    -- November 18th, 2012?

15  A    No, I wasn't.

16  Q    But you were living in that apartment --

17  A    Yes, I was.

18  Q    At that time period, you were living at that Apartment

19  5I, correct?

20  A    Yes, sir.

21  Q    You just weren't there when the officers were executing

22  the warrant.

23  A    I wasn't there.

24  Q    But you were arrested that day, correct?

25  A    Later on.

Denise Parisi, RPR, CRR

ASHLEY/CROSS/HAIDER

```
 1   Q     In the apartment?

 2   A     When I came to the apartment, I got arrested.

 3   Q     So similar to this case, you just happened to walk in

 4   when the search warrant was --

 5             MR. ZELMAN:  Objection, Your Honor.

 6             THE COURT:  Sustained.

 7             Rephrase the question.

 8   BY MR. HAIDER:

 9   Q     So it's your testimony that you walked into the apartment

10   while the officers were already there, correct?

11   A     Yes, sir.

12   Q     And this was sometime after 6:00 a.m., correct?

13   A     That's the evening.

14   Q     In the evening?

15   A     6:00 -- you said 6:00 a.m.  No, 6:00 in the afternoon.

16   It wasn't no morning.  They came -- when they came, it was in

17   the evening time.  They came to the apartment on November -- I

18   don't even know if it was November.  I think it was October.

19   When they came, it was in the evening time.  They did not come

20   in the morning.

21   Q     You're not sure if it was October or November, though?

22   A     It was October or November.  That day -- which day we're

23   talking about, I remember clear as day because I came to the

24   apartment and they already arrested Charles Patrick and the

25   other two guys and it was in the evening time.  It was about
```

ASHLEY/CROSS/HAIDER

```
 1   six or seven o'clock at night.
 2   Q    But you were arrested, correct?
 3   A    After I came to the apartment.
 4   Q    But that's yes, you were arrested?
 5   A    Yes.
 6   Q    As your criminal defense attorney stated yesterday, you
 7   were arrested for possession of crack cocaine, correct?
 8   A    No, I wasn't.
 9   Q    It's your testimony you weren't arrested for crack
10   cocaine --
11   A    I wasn't.
12            MR. ZELMAN:  Objection, Your Honor.
13            THE COURT:  Asked and answered.
14   BY MR. HAIDER:
15   Q    What were you arrested for?
16   A    I told you, when I got to the apartment, what happened
17   was, they arrested Charles Patrick.  He had two friends, and
18   one of the friends had prescription medication that didn't
19   have his name on it, so they assumed that it was pills he was
20   selling or whatever, they locked both of them up -- three
21   friends got locked up.
22            THE COURT:  If you don't sit further back and --
23            THE WITNESS:  Okay.
24            THE COURT:  Take your hand off the microphone and
25   just speak normally and everyone will hear you.
```

ASHLEY/CROSS/HAIDER

```
 1   A    I came to the apartment and Charles Patrick and his two
 2   friends was already arrested -- was already locked up and they
 3   locked me up.  I never even seen a judge when I came to that
 4   case.  I seen a judge and they gave me -- told me -- I forgot
 5   what they -- particularly happened that day, but I didn't even
 6   see a lawyer and --
 7   Q    Just to be clear, I want to make sure we are talking
 8   about the same arrest.  We will take a step back for a moment.
 9   A    Yes.
10   Q    Yesterday your criminal defense attorney testified that
11   you had an open criminal case before your April 19th arrest,
12   correct?
13   A    Yes, sir.
14   Q    And, in fact, you just said the same thing when you were
15   questioned by your attorney, correct?
16   A    Yes.
17   Q    That criminal case resulted from your November 2012
18   arrest, correct?
19   A    No, it doesn't.  I got arrested in -- you are getting --
20   obviously, you are getting the cases confused because he told
21   you yesterday, if you listened to him, he said it was three
22   times I got arrested.  So I think you are getting it confused.
23   The case where you're talking about with the residue, that was
24   the first time I ever got arrested in the apartment.  The
25   other two times I was never in the apartment.
```

Denise Parisi, RPR, CRR

ASHLEY/CROSS/HAIDER

1    Q    What month was that?

2    A    That was -- the first time was in maybe the end of

3    October going into November, and then the second one was in

4    December because I remember that well because I think in

5    December they had a situation in Connecticut where some kids

6    had got killed.  December 12th there was a shooting, and I

7    remember that clear as day.  It was December.  That was the

8    only time that I was in the apartment and that was when they

9    found the residue.  That is what my lawyer told you --

10   explained to you yesterday.

11   Q    So you are referring to the arrest that you had on

12   December 13th, 2012, correct?

13   A    Yes, sir.

14   Q    And on that day, you were inside of the apartment,

15   correct?

16   A    That was the only day I was inside the apartment.

17   Q    Well, you were inside the apartment in November when you

18   were arrested, weren't you?

19   A    I came after.

20   Q    Where did you come to?

21   A    I came to 125.

22   Q    Inside the apartment, correct?

23   A    No.  I came to the apartment and got arrested.

24   Q    When you say come to the apartment, that means you walked

25   into the apartment, correct?

ASHLEY/CROSS/HAIDER

```
 1  A     Yes, sir.
 2  Q     So you were in the apartment in November of 2012,
 3  correct?
 4  A     I wasn't in the apartment.  Like I said, I came to the
 5  apartment and got arrested.  That's what I said.  I wasn't in
 6  the apartment.  When he had a search warrant, I was not in the
 7  apartment.  The only time I was in the apartment was in
 8  December like I just explained to you.  That was the only
 9  time.
10  Q     Perhaps my question isn't clear.  My only question to you
11  is this:  That in order for you to come to the apartment and
12  be arrested on November 12th, you had to enter the apartment,
13  correct?
14  A     Yes.
15  Q     So you were in the apartment when you got arrested,
16  correct?
17  A     All right.  Yeah, I guess so.  I don't -- I'm not
18  understanding what you mean about --
19  Q     I will rephrase it one more time.
20  A     Confusing.
21  Q     When handcuffs were placed on you on November 18th, 2012,
22  they were placed on you when you were inside of Apartment 5I.
23  A     Yeah, I was -- when I was in here, all right, yes.
24  Q     And then again on December 13th, 2012, you just happened
25  to be at the apartment again when officers entered, correct?
```

ASHLEY/CROSS/HAIDER

```
 1   A     That time I was in the apartment.  I was in -- when they
 2   rushed -- when they came into the apartment, I was there in
 3   the apartment.  The other two incidents, I was never in the
 4   apartment.
 5   Q     And that was at 6:00 a.m., correct?
 6   A     Yes, sir.
 7   Q     When you were in the apartment, you were sleeping?
 8   A     Yes.
 9   Q     In the air bed you talked about earlier.
10   A     Yes, sir.
11   Q     And you were wearing clothes that you normally wear when
12   you're sleeping, correct?
13   A     I don't understand what you mean by that.
14   Q     You were in your sleeping clothes.  You weren't in your
15   going out -- you weren't in a winter coat, correct?
16   A     No.
17   Q     And on that day, you were also arrested, correct?
18   A     Yes, sir.
19   Q     And it's your testimony that the crack cocaine that your
20   criminal defense attorney talked about was for the December
21   arrest, correct?
22   A     Yes, sir.
23   Q     And are you sure about those two dates?
24   A     Positive.
25   Q     Would reviewing the Criminal Court Complaint from the
```

ASHLEY/CROSS/HAIDER

```
 1   November arrest refresh your recollection as to what you were
 2   charged with?
 3   A    Yes, sir.  Like I said, the December case I know for a
 4   fact that case was -- they found residue in Charles Patrick
 5   room and they charged me with that.
 6             October/November case, that was the case where they
 7   found -- Charles's friend had medication, he had pills, he
 8   didn't have his name on the pills, he got arrested, him and
 9   his friends.  I came to the apartment later on and got
10   arrested.  That was the one that was six o'clock at night,
11   seven o'clock at night.  That was the first time he enters the
12   apartment, that -- that one case right there.  That was the
13   first time, then the second time was in December, third time
14   was in April.  So like my lawyer --
15   Q    Just to be clear --
16             THE COURT:  Wait.  Let him finish.  Let him finish.
17             MR. HAIDER:  I apologize.
18   A    Like my lawyer said to you yesterday, he explained to you
19   the situation yesterday when he spoke to you yesterday.
20   Q    And so just to be clear, those three arrests that you
21   just referred to, you were placed in handcuffs every time
22   inside of the apartment --
23             MR. ZELMAN:  Judge, objection.
24             THE COURT:  Overruled.
25             You may answer.
```

1    A    Yes.

2    Q    Now, let's move on to April 19, 2013.  You stated by that

3    point you had moved out, correct?

4    A    Yes, sir.

5    Q    But as you said on direct examination, you still left

6    some of your belongings at Apartment 5I, correct?

7    A    Yes, sir.

8    Q    You left your air pillow mattress, correct?

9    A    Yes, sir.

10   Q    You left your dresser?

11   A    Yes, sir.

12   Q    You left that pole that you hung your clothes on,

13   correct?

14   A    Yes, sir.

15   Q    And you also left your cat there, correct?

16   A    Yes, sir.

17   Q    And you moved, you claim you moved into your girlfriend's

18   apartment; isn't that true?

19   A    Yes.

20   Q    But you didn't bring your cat with you, did you?

21   A    Nope.

22   Q    Isn't it true that your girlfriend also has a cat in her

23   apartment?

24   A    Yes, she does.

25   Q    But you still kept your cat in Apartment 5I, correct?

ASHLEY/CROSS/HAIDER

```
 1  A    Yes, sir.
 2  Q    And despite having all your belongings and your cat
 3  there, you want the jury to believe that you moved out --
 4          MR. ZELMAN:  Objection, Your Honor, as to all his
 5  belongings.
 6          THE COURT:  Sustained.
 7          You may answer.
 8  BY MR. HAIDER:
 9  Q    Should I repeat the question for you?
10          THE COURT:  Please do.
11  A    Yes.
12  Q    So despite leaving your personal belongings, your
13  clothes, and your cat, you want the jury to believe that you
14  moved out in December of 2012.
15  A    I did move out because, like I said, it was -- the air
16  bed wasn't -- there was no air in it, it was only a TV stand.
17  The clothes that I had, it was clothes that I wasn't wearing.
18  The only reason I proceeded to go back and forth to the
19  apartment was because my cat was there and we had a verbal
20  agreement that I would take care of my cat, I would go up
21  there and visit my cat, change his litter when I needed to.  I
22  stay up there with him for a little bit and make sure he was
23  all right and I proceeded to go to my girlfriend's house after
24  that.  This was on an everyday basis.  I was doing this all
25  the way to April 19th, taking care of my cat.  I was not
```

ASHLEY/CROSS/HAIDER

```
 1   living in the apartment.
 2   Q    So this agreement you had, I think you mentioned earlier,
 3   you paid some rent for that agreement?
 4   A    Yes, sir.
 5   Q    How much?
 6   A    I was giving him $80.
 7   Q    That's $80 per week?  Per month?
 8   A    It was $80 a week.
 9   Q    And it was part of the agreement that you would also have
10   keys to the apartment so you could see your cat?
11   A    Yes, sir.
12   Q    And you would go to that apartment every day and see your
13   cat?
14   A    Yes, sir.
15   Q    I assume you would feed the cat?
16   A    Yes, sir.
17   Q    Does the cat have a litter box?
18   A    Yes, sir.
19   Q    And you would take care of that as well, correct?
20   A    Yes, sir.
21   Q    And you also testified that -- I believe it was early
22   April you got a dog, correct?
23   A    Like I explained, I brought that dog -- when I buried my
24   son, I brought that dog from New Jersey to New York for a
25   friend of mines that was staying at the apartment.
```

ASHLEY/CROSS/HAIDER

```
 1    Q    Sorry for your loss with respect to your son.
 2             You got the dog, roughly, first or second week of
 3    April, correct?
 4    A    I got it that week I buried my son.  My son died
 5    March 29th.  That following Friday -- my son got -- March 29th
 6    was a Friday.  That following Friday I buried my son.
 7    Saturday I came -- I went to Jersey, Saturday I came back, so
 8    I can't remember -- it was about a week after I buried my son.
 9    That dog must have been in New York about two weeks.
10    Q    And this was a Blue Nose pit bull?
11    A    Blue Nose pit.
12    Q    You said, I believe, it was approximately four months
13    old.
14    A    Yeah, it was a couple months old.
15    Q    So it was a puppy.
16    A    Yes, it was.
17    Q    And you brought that dog straight to your Apartment 5I,
18    correct?
19    A    I brought it to my friend and he took the dog to the
20    apartment.
21    Q    Your friend was Noel Perez?
22    A    Yes, sir.
23    Q    Otherwise known as --
24    A    -- Jose.
25    Q    Just to be clear, that was the other individual that was
```

ASHLEY/CROSS/HAIDER

```
 1   arrested on April 19th, correct?
 2   A     Yes, sir.
 3   Q     When you brought him the dog, where did you meet him to
 4   bring him the dog?
 5   A     Met him outside.  Outside.
 6   Q     Outside of 125 East 18th Street?
 7   A     No.  Just outside in the street.
 8   Q     Where?
 9   A     Outside where I be at on the street.  I can't remember
10   five years ago.  I was outside.  I wasn't by 125, but it was
11   outside when I brought the dog and I gave it to him.
12   Q     Did you have to pay additional rent to now keep the dog
13   at this apartment?
14   A     No.
15   Q     Someone had to feed the dog, correct?
16   A     Yes, sir.
17   Q     Someone had to the walk the dog.
18   A     Yes, sir.
19   Q     Multiple times a day, correct?
20   A     Yes, sir.
21   Q     Did you, on occasion, feed the dog?
22   A     No.  He was feeding the dog.  I brought the dog for him,
23   for my friend.
24   Q     So you actually didn't take care of the dog.
25   A     I took care of the dog after he got -- he got arrested,
```

ASHLEY/CROSS/HAIDER

1    he had an immigration warrant, so he couldn't come out, so I

2    had to take care of the dog and my cat.

3    Q    So it's your testimony that you got a dog from someone

4    from Maryland, correct?  Or New Jersey.

5    A    I buried my son in Maryland.  I stopped from Maryland to

6    New Jersey, my sister's brother-in-law gave me that dog, and I

7    brought the dog from New Jersey to New York.

8    Q    So your sister's brother-in-law gave you the dog --

9    A    My sisters husband's -- my sister's husband, my

10   brother-in-law.

11   Q    So your brother-in-law.

12   A    Yes.

13   Q    So your brother-in-law gave you the dog in New Jersey,

14   correct?

15   A    Yes.

16   Q    And you took that dog.

17   A    Took the dog, right, brought the dog back to New York.

18   Q    But you weren't keeping it for yourself.

19   A    No, I wasn't.

20   Q    The whole plan was just for you to bring this dog to

21   Brooklyn for Noel.

22   A    Yes, sir.

23            THE COURT:  So the dog was a gift for Noel?

24            THE WITNESS:  Well, what it was was he was a

25   dog-lover.  He had a -- it's a pit dog -- it's alligator

Denise Parisi, RPR, CRR

ASHLEY/CROSS/HAIDER

```
 1   bloodhound, it's a rare kind of breed dog, so I just brought
 2   the dog because he was just a dog-lover.  It was just --
 3               THE COURT:  So it was his job to take care of this
 4   dog and raise this dog?
 5               THE WITNESS:  Yes, sir.
 6               THE COURT:  So it wasn't really your dog; you gave
 7   it to him.
 8               THE WITNESS:  Gave it to him.
 9               THE COURT:  I see.
10               Go ahead.
11   BY MR. HAIDER:
12   Q    Your brother-in-law didn't know Noel, did he?
13   A    No, he didn't.
14   Q    Excuse me, you said, No, he didn't, correct?
15   A    No.
16   Q    So your brother-in-law was actually giving the dog to
17   you, though, correct?
18   A    No.  He basically told me -- well, you know, it was a
19   thing where they was giving the dog away and I called my
20   friend and I asked him, Do you want the dog?  I told him I
21   would bring the dog for him.
22   Q    Isn't it true that the reason the dog lived in Apartment
23   5I was because you still lived in Apartment 5I?
24   A    No.  I wasn't living in Apartment 5I.
25   Q    Now, you testified a moment ago with your attorney about
```

```
 1   the timing of the search warrant on April 19th, 2013, correct?
 2   A    Yes, sir.
 3   Q    And you said it was -- you showed up some time after
 4   5:00 a.m.; is that right?
 5   A    Say it again.
 6   Q    You arrived at the apartment after 5:00 a.m., correct?
 7   A    Yes.
 8   Q    And that was the exact time, according to you on direct
 9   examination.
10   A    Yes, sir, exact.
11        MR. HAIDER:  Your Honor, I just request that the
12   copies of the photos that we got is black and white, I'm just
13   requesting plaintiff's counsel to display one of the photos, I
14   believe it's 2C, which would be when plaintiff is exiting the
15   apartment.
16        MR. ZELMAN:  Okay.  This one?
17        THE COURT:  Is that it?
18        MR. HAIDER:  Yes.
19        Your Honor, can we please publish that?
20        THE COURT:  Sure.  That's Plaintiff's 2C.
21        (The above-referred to exhibit was published.)
22        THE COURT:  Okay.
23   BY MR. HAIDER:
24   Q    Can you see the --
25   A    Yes, I do.
```

ASHLEY/CROSS/HAIDER

```
 1    Q      -- the photo that's on your screen?  That's 2C.  That's
 2    you being taken out of the building, correct?
 3    A      Yes, sir.
 4    Q      After you were arrested.
 5    A      Yes, sir.
 6    Q      You can see through the front door because the front door
 7    has glass windows, correct?
 8    A      Yes, sir.
 9    Q      Is that a yes?
10    A      Yes, I could see.
11    Q      And you could see a car parked on the sidewalk in front
12    of the building?
13    A      It's not on the sidewalk, but it looks like it's on
14    the -- yeah, right there, mm-hmm.
15    Q      Correct, it's not on the sidewalk, but a car parked next
16    to the sidewalk, right?
17    A      Yes, sir.
18    Q      And you can actually see the sunlight, correct?
19    A      Yes, sir.
20    Q      Now, the timing of that photo is 5:30 a.m., correct?
21    A      Yes, sir.
22    Q      So it's your testimony that that time is exact.
23    A      What, the time that this -- right here?
24    Q      Yes.
25    A      Listen, I don't know -- that's what they got on there.  I
```

```
 1   know it was about maybe, like, a quarter to six, about that
 2   time.
 3   Q    So it's your testimony that on April 19th at 5:45 a.m.
 4   there was sun out.
 5   A    I didn't say that.  I said I got a call at about a
 6   quarter to five.  I didn't testify -- I said a quarter to
 7   five.
 8   Q    I want to talk to you specifically about what's going on
 9   in this photograph.
10   A    Mm-hmm.
11   Q    Do you recall being taken out of the apartment?
12   A    Yes, sir.  That's me coming out the apartment right there
13   with the officer.
14   Q    This photo -- I mistakenly marked on it -- hold on one
15   second.
16           (Pause.)
17           THE COURT:  I'm sorry, what are you trying to do?
18           MR. HAIDER:  I cleared it.  Thank you, Your Honor.
19           THE COURT:  You mean here (indicating)?
20           MR. HAIDER:   Yes.  Thank you.  I just accidently
21   marked it, but I cleared it.
22           THE COURT:  Okay.
23   BY MR. HAIDER:
24   Q    The time on the time stamp there says 5:30 a.m., correct?
25   A    Yes, sir.
```

ASHLEY/CROSS/HAIDER

```
 1    Q    Is that time stamp correct?

 2    A    Most likely because, like I said, it turns -- for the

 3  most part, it gets light about this time.  I know when I left

 4  the apartment, it was dark.  It was midnight and it was dark.

 5    Q    So your testimony, when you left the apartment, what do

 6  you mean left the apartment?

 7    A    When I left my apartment -- Lisa's apartment to come down

 8  here, it was dark.

 9    Q    But when you exited the building --

10    A    Dark.

11    Q    -- after you were arrested, it was light, correct?

12    A    Turned into light, yeah.

13    Q    So your testimony is that at 5:30 a.m. it was light

14  outside?

15    A    That's what it says right there.

16    Q    Today's date is April 2nd, correct?

17    A    Yes, sir.

18    Q    And this morning, the sun came out at approximately

19  6:30 a.m., correct?

20    A    Yes, sir.

21    Q    So isn't it more likely that this time is an hour off and

22  you were actually leaving the apartment at 6:30 a.m.?

23    A    Well, I know what time I came.  Like I said, when I left

24  Lisa's house to come to 125, it was dark.  There was not a bit

25  of light out.  This is completely right.  When I left out of
```

ASHLEY/CROSS/HAIDER

1    the apartment, it was light outside.

2    Q    So you are sticking to your story that this all happened

3    at sometime --

4    A    Like, quarter to five.  Like, a quarter to five.  It

5    happened right about a quarter to five.  I got the phone call,

6    I came, it was dark, then when I came out, this is exactly how

7    it was, it was light, because when I came out, like I said,

8    there was already police officers outside and they were

9    bringing people from the other building.  Guy must have went

10   into another building and he was bringing people out of that

11   building.  I remember clear as day.

12   Q    And to be clear, this happened all before 6:00 a.m.,

13   correct?  According to you.

14   A    Me coming downstairs?

15   Q    Yes.  This entire event.  You going --

16   A    Yes.  Yes.  Yep, this happened before 6:00 a.m.

17   Q    You are certain of that?

18   A    I'm certain.

19   Q    Now, you testified on direct about working construction

20   at some point, correct?

21   A    Mm-hmm.

22   Q    Isn't it true that for about a year prior to April 19,

23   2013, you hadn't worked.

24   A    No, it's not true.  I hadn't -- I wasn't working

25   legitimately on books, but I was working off the books.

Denise Parisi, RPR, CRR

ASHLEY/CROSS/HAIDER

```
 1    Q    So it's your testimony here today that for a year prior
 2    to April 19th, 2013, you were working?
 3    A    I was working.  I was off and on working, I was working
 4    with a contractor.  My friend is a general contractor.
 5    Q    You sat for a deposition discussing this case prior to
 6    trial, correct?
 7    A    Yes, sir.
 8    Q    And at that deposition, you were asked questions and you
 9    gave answers, correct?
10    A    Yes, sir.
11    Q    Your lawyer, Mr. Zelman, was with you that day, correct?
12    A    Yes, sir.
13    Q    And you were under oath that day.
14    A    Yes, sir.
15    Q    That oath meant you were supposed to tell the truth,
16    correct?
17    A    Yes, sir.
18              MR. HAIDER:  I would like to direct the Court and
19    plaintiff's counsel attention to Exhibit E, which is in
20    defendant's binder.  This is the plaintiff's deposition dated
21    September 11th, 2015 --
22              THE COURT:  All right.
23              MR. HAIDER:  -- and I'm directing you specifically
24    to page 23, lines 1 through 5.
25              MR. ZELMAN:  Judge, I ask that he read a little
```

Denise Parisi, RPR, CRR

ASHLEY/CROSS/HAIDER

```
 1    further --
 2            THE COURT:  Excuse me.
 3            MR. ZELMAN:   -- to be complete.
 4            THE COURT:  Just wait a minute.
 5            Are you going to give him the section or should I?
 6            MR. HAIDER:  Your Honor, I just intended on reading
 7    it into the record.
 8            THE COURT:  Page 23, lines 1 through 5?  Is that
 9    what you are going to read?
10            MR. HAIDER:  Yes.
11            THE COURT:  Go ahead.
12    BY MR. HAIDER:
13    Q    Question:  Were you employed on April 19th, 2013?
14            Answer:  No.
15            Question:  Prior to April 19th, 2013, when was the
16    last time you were employed?
17            Answer:  Probably a year prior to that.
18            Do you recall giving those questions and giving
19    those answers?
20    A    I can't remember, but I remember state -- they asking me
21    the question.
22    Q    Okay.  Were you walking -- when was the last time you
23    worked on the books?
24    A    Say it again.
25    Q    You said you do construction off the books.
```

Denise Parisi, RPR, CRR

ASHLEY/CROSS/HAIDER

```
1   A     I just -- last year.

2   Q     Okay.  When was the last time you had an on-the-books

3   job?

4   A     Last year.

5   Q     What was your on-the-books job?

6   A     Working for Markel.

7   Q     But when you've done construction --

8             THE COURT:  For whom?

9             THE WITNESS:  Markel.

10            THE COURT:  The paper company?

11            THE WITNESS:  No.  This -- how can I say it?  It's a

12  group -- they deal with construction.  They deal with -- I

13  can't even explain it.  It's a company.

14            THE COURT:  What did you do for them?

15            THE WITNESS:  Worked in construction.

16            THE COURT:  What did you do for them?  Construction

17  is a very big area.

18            THE WITNESS:  Maintenance, controlling the building,

19  throwing out garbage, maintaining the building.

20            THE COURT:  Is that construction or is that

21  maintenance?

22            THE WITNESS:  Maintenance; construction, too.  It's

23  also part of building 'cause they also putting up buildings,

24  so I was basically doing --

25            THE COURT:  So when they put up the buildings, what
```

ASHLEY/CROSS/HAIDER

```
1    did you do for them in putting up buildings?
2              THE WITNESS:   Doing everything:  Sheetrocking
3    (sic), cleaning -- what you call it?  Sheetrock, fibers --
4    doing everything that was needed, maintaining the building,
5    throwing out trash.
6              THE COURT:  Okay.  Thank you.
7              Go ahead.
8    BY MR. HAIDER:
9    Q    To be clear, the job you discussed -- just discussed was
10   on the books, correct?
11   A    This job, yeah.
12   Q    When did you start working there?
13   A    About two years ago.
14   Q    This is obviously after April 19th, 2013?
15   A    This is way after.
16   Q    You didn't have an on-the-books job before April 19,
17   2013.
18   A    Working off the books.
19   Q    You mentioned working off the books paid you -- you
20   stated on direct -- $80 a day, correct?
21   A    About $80 a day, yeah.
22   Q    So if you worked -- if you happened to work five days a
23   week, that would be approximately $400 a week, correct?
24   A    460, 480, something like that.
25   Q    And that would be approximately somewhere between 1600
```

ASHLEY/CROSS/HAIDER

1   and 1700 a month, correct?

2   A     Yeah, but I -- what?  You talking about, what, in all?

3   Q     Yeah.

4   A     Yes.

5              (Continued on the following page.)

ASHLEY/CROSS/HAIDER

```
 1   (Continuing.)

 2   BY MR. HAIDER:

 3   Q    But at the time, you were paying rent on two apartments,

 4   weren't you?

 5   A    I wasn't paying rent for two apartments.  I wasn't paying

 6   rent, because at the time when I lost my son, you know, my

 7   girlfriend, she basically just told me, you know, to just

 8   fallback.  I was just trying to -- I wasn't paying rent for

 9   her apartment at that time.

10   Q    Well, let's focus on February of 2013.  At that time,

11   your son hadn't passed away, correct?

12   A    Yes.  Uh-hum (affirmative response).

13   Q    And at that time, you were paying $80 a week at Apartment

14   5I, correct?

15   A    Uh-hum (affirmative response).

16   Q    Is that a yes?

17   A    Yes.

18   Q    And that was for the cat, correct?

19   A    That was for the cat, yes.

20   Q    And $80 a week comes out to roughly or exactly $320 a

21   month, correct?

22   A    Uh-hum (affirmative response).

23   Q    So you spent $320 a month for rent for your cat, correct?

24   A    Yes, sir.

25   Q    You also paid rent to your girlfriend, correct?
```

ASHLEY/CROSS/HAIDER

```
 1   A    Yes.
 2   Q    In fact, as she stated yesterday, you split the rent,
 3   correct?
 4   A    Uh-hum (affirmative response).
 5   Q    Is that a yes?
 6   A    Yes.
 7   Q    You split utilities, correct?
 8   A    We didn't split the rent.  I basically paid for the
 9   utilities and the cable.  She paid the rent by herself.  I
10   paid the cable bill.  I paid the gas bill and I paid the
11   lights.  I helped her with the lights.  She paid the rent.
12   Q    You were here yesterday when your girlfriend testified,
13   correct?
14   A    She might not remember.  I know what I paid.  I was
15   paying the utilities, the cable and the gas bill, and she paid
16   the rent.
17   Q    That's your testimony here today that your girlfriend
18   doesn't remember or remembered incorrectly that you --
19   A    Incorrectly, yes.
20   Q    Now, on direct examination, you talked about the time you
21   had to go to court for this April 19th arrest.  Do you recall
22   that?
23   A    Yes, sir.
24   Q    And you stated you had to appear in court 15 times,
25   correct?
```

LISA SCHMID, CCR, RMR

ASHLEY/CROSS/HAIDER

```
 1   A     About that, 14, 15 times.
 2   Q     But the 15 times includes the first time you saw the
 3   judge, correct?
 4   A     What, April 19th?
 5   Q     Yes?
 6   A     Yes.
 7   Q     So after you were arraigned -- when you first heard about
 8   your charges -- you only actually appeared 14 additional times
 9   in this case, correct?
10   A     Yes.
11   Q     And as you stated on direct and as your criminal defense
12   attorney stated yesterday, for 11 of those times, you were
13   also appearing in court for other criminal charges, correct?
14   A     Yes.
15   Q     And those other criminal charges was the crack cocaine
16   arrest you discussed earlier today, correct?
17   A     Yes.
18   Q     So in other words, for those 11 court appearances, you
19   had to be in court anyway, correct?
20   A     Yes.
21   Q     So even if on April 19th, 2013, Detective Mike Civil did
22   not arrest you --
23              MR. ZELMAN:  Objection, Your Honor.
24              THE COURT:  You may finish your question.
25              MR. HAIDER:  Thank you.  I'm sorry.
```

LISA SCHMID, CCR, RMR

ASHLEY/CROSS/HAIDER

```
 1    BY MR. HAIDER:
 2    Q    So even if Detective Mike Civil had not --
 3              THE COURT:  I'm sorry.  Is there a problem?
 4              MR. ZELMAN:  There was something -- there was a
 5    piece of dust in my area --
 6              THE COURT:  Yes.  Well --
 7              MR. ZELMAN:  -- in the air.
 8              THE COURT:  Don't flick at dust when it looks like
 9    you're flicking an object.
10              MR. ZELMAN:  Judge --
11              THE COURT:  Excuse me.
12              MR. ZELMAN:  I'm sorry, Your Honor.
13              THE COURT:  Sidebar.
14              (Sidebar.)
15
16
17
18
19
20
21
22
23
24
25
```

SIDEBAR

```
 1                (Sidebar.)

 2           THE COURT:  First of all, I want you to sit up

 3  straight when you're sitting in my courtroom.  That's number

 4  one.

 5           Second of all, I don't very much like perjury in my

 6  courtroom, and that's what I think I'm getting here from this

 7  witness.

 8           Now, I didn't -- I want you to find out what the

 9  time of the sunrise was on that date.  I just figured it out

10  with a quick search on Google, that it was 6:30 if morning.

11  And this guy is saying that at 5:30 in the morning on that

12  date, it was dark out.

13           MR. ZELMAN:  Well --

14           THE COURT:  Excuse me.  When the light, when it's

15  clear, there's light out.

16           MR. ZELMAN:  The jury can hear you, Judge.

17           THE COURT:  I'm going to take --

18           MR. ZELMAN:  The jury can hear you.

19                (Brief pause.)

20           THE COURT:  Well, you stipulate to whatever was

21  going on with sunrise on that date or I'm going to find it by

22  judicial notice.

23           MR. ZELMAN:  I think he can clear it up on --

24           THE COURT:  You can't clear up what time the sun

25  came up.  So I'm getting sick and tired of this, you know, the
```

SIDEBAR

```
 1   nonsense that I'm getting out of this witness.  You think I'm

 2   going to sit here all morning and listen to someone commit

 3   perjury?

 4            MR. ZELMAN:  Judge, can I say something?

 5            THE COURT:  You can't say anything about that.

 6            MR. ZELMAN:  Let me just say this.  Whether it was

 7   --

 8            THE COURT:  And I don't like these gestures.

 9   Gestures are not acceptable to me.

10            MR. ZELMAN:  Judge, I assure you, there was a piece

11   of dust in my face.

12            THE COURT:  Yes.  There's a piece of dust.

13            MR. ZELMAN:  And I didn't even think that you ruled

14   on my objection yet, that you were waiting for him to repeat

15   it.  I didn't think you had denied my objection.  You just

16   said -- you asked him to repeat the question and I was

17   waiting.  I see a piece of dust in my face and I went like

18   this.  (Gesturing.)

19            THE COURT:  Yes.  Right.

20            MR. ZELMAN:  I assure you --

21            THE COURT:  Your objection is overruled.

22            MR. ZELMAN:  All right.

23            THE COURT:  Let's finish.

24            (Sidebar concluded.)

25
```

ASHLEY/CROSS/HAIDER

```
 1                    (In open court.)
 2              THE COURT:  Go ahead.
 3              MR. HAIDER:  May I proceed, Your Honor.
 4              THE COURT:  Go ahead.
 5    BY MR. HAIDER:
 6    Q    So, we were just discussing the 11 court appearances you
 7    made when you were also facing charges to the unrelated
 8    criminal case.  Do you recall that?
 9    A    Say it again now?
10    Q    You appeared 11 times in criminal court to face the
11    charges for the April 19th arrest, as well as the unrelated
12    crack cocaine arrest, correct?
13    A    Yes.
14    Q    So even if you weren't arrested on April 19th by
15    Detective Mike Civil, you still would have had to appear in
16    court those 11 times?
17    A    No.
18    Q    Correct?
19    A    No.
20    Q    Is it your testimony today that you would have not shown
21    up to face charges in that criminal case?
22    A    Because the other two cases got dismissed.  I don't
23    understand how you're sitting here saying how I would have to
24    appear in court.  How would I have to appear in court?  The
25    case that you're talking about with the residue or -- that got
```

ASHLEY/CROSS/HAIDER

 1   dismissed.  All right?  That case got dismissed.

 2          The only case that they focus on was the case that I

 3   told you about when they came in the apartment and they found

 4   Charles Patrick and his two friends with the prescription

 5   drugs.

 6          The other charge got -- the case that you're talking

 7   about got dismissed.  That didn't even make it two months.

 8   All right?  I went to court two times for that case.  That

 9   case got then out.

10          So you keep talking about the residue.  I don't even

11   know what you're talking about.  They end up putting --

12   Q    For the purpose of this question, we'll ignore what that

13   separate arrest was for.  Let me just repeat.

14          For 11 of the times you appeared in criminal court

15   for your April 19th, 2013 arrest, you were also appearing for

16   an unrelated criminal case, correct?

17   A    Yes, sir.

18   Q    So even if on April 19th, 2013, you were not arrested by

19   Detective Mike Civil, you still would have been in court 11

20   times that year, correct?

21   A    I don't -- I don't -- not that I remember.  Not that I

22   know of.  They put that case and that case together.  That's

23   all I know.  They put one of those cases together with that

24   case.  All right?  That's what I know for a fact.

25   Q    You were here yesterday when your criminal defense --

ASHLEY/CROSS/HAIDER

```
1   A    Yes, I was.

2   Q    -- testified, right?

3            THE COURT:  Wait, wait, wait.  You can't start

4   answering a question until the question has been asked.  I've

5   asked you not to overspeak each other.  So, please, don't do

6   it.

7            THE WITNESS:  All right, sir.

8            THE COURT:  And speak slowly, please.

9            What is the question?

10           MR. HAIDER:  The question is --

11           THE COURT:  And how much more do you have for this

12  witness?

13           MR. HAIDER:  I have just a few more points, Your

14  Honor.

15           THE COURT:  Go ahead.

16  BY MR. HAIDER:

17  Q    You were here yesterday when your criminal defense

18  attorney testified here, right?

19  A    That's correct.

20  Q    And he stated unequivocally that your unrelated criminal

21  case existed before your April 19th arrest, correct?

22  A    Yes, sir.

23  Q    He also stated unequivocally that that unrelated case was

24  open while you were your April 19th arrest was open, correct?

25  A    Yes.
```

ASHLEY/CROSS/HAIDER

```
 1   Q    And he also stated unequivocally that after your
 2   April 19th arrest, charges were dismissed, you still had that
 3   other criminal court case, correct?
 4   A    Yes, sir.
 5   Q    I'm going to switch topics for a moment.  Mr. Ashley, you
 6   have a driver's license, correct?
 7   A    No.
 8   Q    No?  It's your testimony here that you do not have a
 9   driver's license?
10   A    I don't have a driver's license.
11             THE COURT:  You don't currently have a driver's
12   license?
13             THE WITNESS:  No, I don't.
14             THE COURT:  Go ahead.
15   BY MR. HAIDER:
16   Q    You do you have any form of ID that you got from the DMV?
17   A    Yes.  I got a nondriver's license ID.
18   Q    And -- but to get that ID, you still have to fill out an
19   application, correct?
20   A    Yes.
21   Q    And on that application, you write your name, correct?
22   A    Yes, sir.
23   Q    And you put the proper spelling of that name, correct?
24   A    Yes, sir.
25   Q    But that nondriver's ID that you had has an incorrect
```

LISA SCHMID, CCR, RMR

ASHLEY/CROSS/HAIDER

```
 1   spelling?
 2   A    Yes, sir.  They made a mistake at DMV.  Never went back
 3   to change it.  Up to now, I still got the same ID with the
 4   same spelling.  I never went and changed it.
 5   Q    And you noticed that mistake after you got the physical
 6   card, correct?
 7   A    Yes, I did.
 8   Q    And as you just stated, you didn't go back to change it,
 9   did you?
10   A    No, I didn't.
11   Q    The DMV never reached out to fix that mistake, correct?
12   A    Nope.
13   Q    Because sometimes mistakes happen on paperwork, correct?
14        MR. ZELMAN:  Objection, Your Honor.
15        THE COURT:  Sustained.
16   BY MR. HAIDER:
17   Q    It's clear that there was a mistake, correct?
18   A    It was a mistake they made.
19   Q    You didn't make that mistake, correct?
20   A    No, I didn't.
21        MR. HAIDER:  One moment, Your Honor.
22   BY MR. HAIDER:
23   Q    Now, Mr. Ashley, you stated at some point, you pleaded
24   guilty to a violation to that unrelated criminal case,
25   correct?
```

ASHLEY/CROSS/HAIDER

```
 1   A      Yes, sir.

 2   Q      You cut a deal with the DA's office, isn't that true?

 3          MR. ZELMAN:  Objection, Your Honor.

 4   A      No.

 5          THE COURT:  Overruled.

 6   BY MR. HAIDER:

 7   Q      There was a plea bargain, correct?

 8          THE COURT:  I'm sorry?

 9   BY MR. HAIDER:

10   Q      It was a plea bargain, correct?

11   A      Yeah.  I think it was a plea bargain.

12   Q      Meaning you didn't go to trial, correct?

13   A      Yes.

14   Q      And you just -- you pled guilty on your own, correct?

15   A      Yes.

16   Q      And that guilty plea was for this other criminal court

17   case, correct?

18   A      Yes.

19   Q      But you claim that it was not for the November 28th, 2012

20   arrest?

21   A      No, that was -- that was -- you're talking about the case

22   that they dismissed or the one that they gave me the violation

23   for?

24   Q      The one that you got --

25   A      The violation was the case that you're talking about.
```

LISA SCHMID, CCR, RMR

ASHLEY/CROSS/HAIDER

```
 1   Q     Which is the crack cocaine?
 2   A     No, not the crack -- the case where I told you.  I
 3   explained to you when they came in October or November.  I
 4   can't remember exactly what date.
 5              THE COURT:  You have to talk more slowly, so that
 6   the court reporter and I and the jury can understand what
 7   you're saying.
 8              THE WITNESS:  I'm sorry, Your Honor.  I'm just not
 9   used to this, man, you know.
10              THE COURT:  Look, I don't care what -- how you
11   normally speak.  Here, you have to speak slowly and clearly --
12              THE WITNESS:  All right.
13              THE COURT:  -- and answer the questions.  That's all
14   I'm asking you to do.
15              THE WITNESS:  All right, sir.
16              THE COURT:  So go ahead.
17              Did you want to restate the question?
18              MR. HAIDER:  Your Honor --
19   BY MR. HAIDER:
20   Q     So to be clear, this -- the case you took a violation, as
21   you've described, was not the crack cocaine arrest that your
22   criminal defense attorney testified to, correct?
23   A     Yes.
24              MR. HAIDER:  Your Honor, I would like to approach
25   the witness with a document that's not listed on the JPTO, but
```

ASHLEY/CROSS/HAIDER

 1   was produced during discovery.

 2          MR. ZELMAN:  I object.  I haven't seen it.  I don't

 3   know what they're trying to do.

 4          THE COURT:  Are you going to make a standing

 5   objection?  Don't do it.

 6          MR. ZELMAN:  Okay.

 7          THE COURT:  You want a sidebar?

 8          MR. ZELMAN:  Yes, Your Honor.

 9          THE COURT:  Sidebar.

10          MR. ZELMAN:  Thank you.

11          THE COURT:  In fact, why don't we do this?  Why

12   don't we take our morning break now, and I would take ten

13   minutes.

14          All rise for the jury.

15          (Jury exits.)

16          THE COURT:  Everyone may be seated.

17          Just explain to me what it is that you're proposing.

18          MR. HAIDER:  Judge, this is the certified copy of

19   the Criminal Court Complaint for this November arrest, which

20   is was discussed yesterday.

21          THE COURT:  Has this been provided to the other

22   side?

23          MR. HAIDER:  Bates stamped 278.  It was not listed

24   on our JPTO, as this was not anticipated impeachment.

25          THE COURT:  Well, let me see it.

1          MR. HAIDER:  I didn't think this would be an issue.

2          THE COURT:  Well, let me see it and show it to the

3   other side.

4          MR. HAIDER:  I do have a copy.

5          THE COURT:  (To the witness) You may stand down,

6   sir.

7          Are you using this for impeachment?

8          MR. HAIDER:  (Nods head affirmatively.)  Yes.

9          MR. ZELMAN:  Judge, number one, if you remember

10  about the motions in limine here, the City even agreed that

11  they would not bring out the fact that my client had

12  previously been arrested in the apartment for a drug offense.

13  They agreed to that.  And the reason was because there's law

14  on that, that that's particularly prejudicial when the reason

15  for the arrest is the same reason as the case at bar.  That's

16  number one.

17         Number two, this is not listed on the JPTO and it

18  should have been if they were going to use it for impeachment

19  material.

20         Number three, I don't think it impeaches.  I think

21  it's probably what they're trying to bring out is that this

22  document says defendant's own statement that the defendant

23  lives at the location.

24         No?  Is that the purpose?

25         MR. HAIDER:  Your Honor --

```
 1              MS. FUDIM:  Wait, wait.  Before.

 2              MR. HAIDER:  Just before we -- as far as the

 3    argument given that this questioning relates to plaintiff's

 4    testimony, while he's in mid-testimony, is it possible we

 5    could have this argument at sidebar or --

 6              THE COURT:  Well, he's the defendant -- he is the

 7    plaintiff, I mean, you know.  Let me see this document.

 8              MR. ZELMAN:  What page?

 9              MR. HAIDER:  278.

10              Your Honor, if could I just lay briefly -- Your

11    Honor, in the alternative, if plaintiff is willing to agree to

12    a stipulation that the unrelated case which his criminal

13    defense attorney testified to yesterday, the November

14    arrest -- you see it before you -- was for crack cocaine as

15    defense attorney testified to yesterday, then that's fine.  We

16    don't have to introduce this court certified document.

17              Plus plaintiff has already --

18              THE COURT:  I'm sorry.  (Perusing document.)  This is

19    in that the defendant knowingly and unlawfully possessed a

20    controlled substance.  I'm sorry.  And this is the complaint?

21    This is the criminal complaint?

22              MR. HAIDER:  Yes.

23              MR. ZELMAN:  For an unrelated arrest.

24              THE COURT:  For the unrelated arrest?

25              MR. ZELMAN:  (Nods head affirmatively.)
```

```
 1              THE COURT:  And the purpose is for impeachment?
 2              MR. HAIDER:  Correct, or you know, I think at this
 3   point, it's contradicting his own criminal defense attorney
 4   and it seems to be a question as to what this November arrest
 5   was for.
 6              THE COURT:  We'll take a break.
 7              (Recess.)
 8              THE COURT:  All right.  Hold on.  I'm waiting for
 9   plaintiff's counsel.
10              (Pause in proceedings.)
11              THE COURT:  All right.  You can take the stand, sir.
12   Thank you.
13              Okay.  All right.  You can show this to the witness
14   and ask him questions, and we'll take it from there.
15              MR. HAIDER:  (Nods head affirmatively.)
16              THE COURT:  The objection's overruled.
17              Let's bring in the jury.
18              How much more do you have for this witness?
19              MR. HAIDER:  I'm sorry?
20              THE COURT:  How much more do you have for this
21   witness?
22              MR. HAIDER:  I just have a few more questions.
23              THE COURT:  And then redirect?
24              MR. ZELMAN:  Not much.
25              THE COURT:  Okay.
```

ASHLEY/CROSS/HAIDER

```
 1                  (Jury enters.)
 2                  THE COURT:  Please be seated, everyone.
 3             You may continue your cross-examination.
 4             I remind the witness that he's still under oath.
 5                  MR. HAIDER:  And Your Honor, the document, where is
 6   it currently?
 7                  THE COURT:  Give it back to --
 8                  COURTROOM DEPUTY:  (Complies.)
 9                  MR. HAIDER:  One moment, Your Honor.
10             Your Honor, may I approach the witness with this
11   document?
12                  THE COURT:  Sure.
13   BY MR. HAIDER:
14   Q    (Handing document to witness.)
15   A    (Peruses document.)
16   Q    Mr. Ashley, I just handed you a one-page document before
17   you.  Are you able to read what's on there?
18   A    Yes.
19   Q    That is the -- a criminal court complaint, correct?
20   A    This is criminal court, yes.
21   Q    That's dated November 28th, 2012, correct?
22   A    Let me look at the date.  I can't really see.
23   November -- I see -- I can see.  Yeah, November 28th -- Uh-hum
24   (affirmative response) -- 2012 is here.
25   Q    And on the top left, you also see your name, Dushaine
```

ASHLEY/CROSS/HAIDER

```
 1   Ashley, correct?
 2   A    Yes, sir.
 3   Q    So this is a criminal court case for your arrest in
 4   November 18th, 2012, correct?
 5   A    Yes, I see it.
 6   Q    Then you can see that there's a charge for criminal
 7   possession of controlled substances, correct?
 8   A    Yes, I see it.
 9   Q    And then if you look down to the body of that paragraph,
10   it lists crack cocaine in there, correct?
11   A    Says controlled substances in the seventh degree.  I
12   don't see it.  All right.  Yeah, I see it.  Yes.  It's kind of
13   faded a little.  Yes, I see.
14   Q    So in the main body of the paragraph, it claims that you
15   possessed crack cocaine, correct?
16   A    That's what it says, yes.
17   Q    So earlier, you were mistaken when you said that November
18   arrest did not involve crack cocaine, correct?
19   A    Yes.
20   Q    You can put that document down, Mr. Ashley.  I just want
21   to talk to you about the damages you claimed in this case.
22            First, to be clear, as you stated on direct
23   examination, you were ROR'd correct?
24   A    What, in this case?
25   Q    Yes, on April 19th, 2013?
```

```
1   A    Yes.
2   Q    And ROR'd means you're released on your own recognizance,
3   correct?
4   A    Yes.
5   Q    Which means that no bail was set.  Isn't that true?
6   A    Yes.
7   Q    So after arraignment, you were able to just leave the
8   court on your own, correct?
9   A    Yes, sir.
10  Q    You didn't have any travel restrictions placed on you,
11  correct?
12  A    No.
13  Q    And you didn't have to go to jail after you were
14  arraigned, correct?
15  A    No.
16  Q    And then you were assigned a criminal defense attorney,
17  correct?
18  A    Yes, sir.
19  Q    You didn't have to pay that criminal defense attorney,
20  correct?
21  A    Nope.  Uh-uh (negative response).
22  Q    As you stated on direct, you had to pay for
23  transportation costs, correct?
24  A    Back and forth to court.
25  Q    And to go back and forth to court, you used the subway,
```

ASHLEY/CROSS/HAIDER

```
 1   correct?
 2   A    Yes, sir.
 3   Q    So your transportation cost was a Metrocard or a subway
 4   fare, correct?
 5   A    Yes, sir.
 6   Q    Other than that Metrocard, you didn't have to pay any
 7   out-of-pocket expenses to go to court, correct?
 8   A    What you mean, as far as coming here?
 9   Q    No, coming to court.
10   A    That's it.  My fare and then if I had to stay any longer,
11   just to eat.  That's it.
12   Q    So just to be clear, on the 14 court appearances you made
13   on that April 19, 2013, case, the only out-of-pocket expenses
14   you had was a Metrocard and if you wanted to eat, correct?
15   A    Yes, sir.
16   Q    Now, earlier, you stated that you were working off the
17   books at the time doing construction, correct?
18   A    Yes.
19   Q    And you would get paid approximately $80 a day?
20   A    Yes.
21   Q    By off the books, it means you didn't have a steady
22   schedule, correct?
23   A    No.  Off the books means that you don't get paid.  You
24   don't get a check.  You get paid in cash.  It's not like it's
25   on the books.  You don't get -- like I said, like a paycheck.
```

LISA SCHMID, CCR, RMR

```
1    You just get cash.  They pay you cash.  So you wouldn't get
2    income tax at the end of the year.  You wouldn't claim income
3    because you're off the books.
4    Q    So you didn't claim any income?
5    A    No.
6    Q    And you didn't work five days week, did you?
7    A    Yes.
8    Q    You did?  You had a set schedule?
9    A    Yeah, Monday through Friday.
10   Q    You had that schedule?
11   A    Yes.
12   Q    You have your schedule from the time period of 2013?
13   A    Not -- I can't remember exactly, but I know I worked five
14   days a week.
15   Q    And you didn't produce that schedule to your attorney,
16   did you?
17   A    No.
18   Q    So we're just supposed to take you by your word here
19   today?
20        MR. ZELMAN:  Objection, Your Honor.
21        THE COURT:  Sustained.
22   BY MR. HAIDER:
23   Q    So you didn't bring any proof that you actually missed
24   any scheduled days at work, correct?
25   A    How could I bring proof?  Like I said, it was off the
```

ASHLEY/CROSS/HAIDER

```
 1   books.  I couldn't bring a paystub.  So how am I supposed to
 2   bring proof if I'm working off the books.
 3   Q    You didn't bring proof of a schedule either, correct.
 4   A    How am I going to bring proof of a schedule?  It's off
 5   the books.
 6   Q    So you weren't even on the schedule?
 7   A    No.  What I'm trying to explain to you is that, you know,
 8   working off the books is not like I -- you know, I don't get a
 9   paystub.  I just come to work.  So there was no way I would be
10   able to prove that, you know, I was not getting a paystub.
11   Q    Just a moment ago, you said that you had -- there was a
12   schedule for your work.
13   A    I said I work from Monday to Friday.  That was my
14   schedule, Monday to Friday.
15   Q    But you implied that there was a written schedule?
16   A    I didn't never say that.  I never told you nothing about
17   no written schedule.
18   Q    So there's no documentation of any schedule that you were
19   supposed to work back in April 2013?
20   A    No, I never gave that to my lawyer.
21   Q    It didn't exist, correct?
22   A    It was not that it didn't exist.  How you saying, a
23   document like I put the document myself?  What do you mean by
24   that?  You confusing me.  You're telling me a document
25   schedule like I'm supposed to document every day that I work.
```

LISA SCHMID, CCR, RMR

ASHLEY/REDIRECT/ZELMAN

1    I just told you I worked off the books.  So there was no way

2    for me to document.  I couldn't -- I'm not getting a paystub.

3    So I couldn't get my lawyer a paystub to say, well, look, here

4    goes my paystub.  I didn't have that.

5    Q    Just to be clear, as you just stated, there was not way

6    to document it, correct?

7    A    Yes, sir.

8              MR. HAIDER:  No further questions.

9              THE COURT:  Redirect?

10                        REDIRECT EXAMINATION

11   BY MR. ZELMAN:

12   Q    Just a few things, Mr. Ashley.

13             We spoke a little bit about your work on

14   cross-examination, and the defendant read into the record some

15   of your deposition, correct?

16   A    Yes, sir.

17   Q    I would like to read a few more lines with the Court's

18   permission, and just ask you if you remember testifying

19   consistently with this.

20             Question:  "Were you employed?"

21             THE COURT:  I'm sorry.  Tell me where you're reading

22   from --

23             MR. ZELMAN:  Yes, Your Honor.

24             THE COURT:  -- so I can follow along, please.

25             MR. ZELMAN:  Judge, I'm going to start on page 23,

ASHLEY/REDIRECT/ZELMAN

```
 1   line 1, through 14, and also go to page 56, 11 through 24.
 2            THE COURT:  Hold on.  (Perusing document.)
 3            And this is -- what was the deposition?  This is
 4   Defense Exhibit E?  The deposition of September 11, 2015, of
 5   Mr. Ashley, is that right?
 6            MR. ZELMAN:  I don't know the letter.
 7            MR. HAIDER:  It is.  That is the correct letter.
 8            THE COURT:  Okay.  All right.  So all right.
 9            I'm on page 23.  Go ahead.
10            MR. ZELMAN:  Thank you, Your Honor.
11   BY MR. ZELMAN:
12   Q    Question:  "Were you employed on April 19, 2013?"
13            Answer:  "No."
14            "Prior to April 19, 2013, when was the last time you
15   were employed?"
16            Answer:  "Probably a year prior to that."
17            Question:  Where were you last employed?"
18            Answer:  "I was doing off the book works.  My friend
19   is a general contractor, so I was working with him."
20            Question:  "Construction?"
21            Answer:  "No.  Basically, he's a super general
22   contractor working with buildings."
23            Question:  "Why did you stop working there?"
24            Answer:  "When my son passed away, I was going
25   through emotional issues."
```

```
 1              Now, your son passed away approximately two weeks
 2   before this arrest, correct?
 3   A    Yes, sir.
 4   Q    All right.
 5              MR. ZELMAN:  And moving ahead to page 56, Judge,
 6   line 11.  Question.
 7              THE COURT:  Is there a question that you're going to
 8   ask him about this testimony?
 9              MR. ZELMAN:  Yes, that I'm going to ask him as soon
10   as I'm done about the inconstancy here.
11              THE COURT:  And where else?
12              MR. ZELMAN:  Page 56, line 11.
13              THE COURT:  Hold on.  (Perusing document.)
14              Go ahead.
15   BY MR. ZELMAN:
16   Q    Question:  "You mentioned that you stopped working after
17   the incident.  Prior to the incident, when was the last time
18   you were working?"
19              Answer:  "Like I said, I was doing -- my friend was
20   a general contractor.  I was working super work.  I was doing
21   basically working on the side with him."
22              Question:  "When the last time you were working with
23   him?"
24              Answer:  "Right before this incident happened.  I
25   was working from January all the way up to April of 2013,
```

1    before this incident happened."

2           Question:  "What was the name of the individual that

3    you were working with again?"

4           Answer:  "His name was Ronnie.  He's a general

5    contractor."

6           Now, did do you recall giving that testimony?

7    A    Yes.

8    Q    When they asked you prior to April 19, 2013, when was the

9    last time you were employed, at one point you said a year

10   prior, and at two other place, you said right before the

11   incident happened.

12          Do you know why that happened, what was the

13   confusion that was happening or something else?

14   A    I probably couldn't remember.  I know I was working.  I

15   stopped prior to work.  Like I said, after the incident with

16   my son, but I was like I said, I was working prior to that.  I

17   was working in November of last year, too.  I mean, prior to

18   that, too, a year prior to that, I was working.

19   Q    You're confident that you were working up until the point

20   where your son passed away?

21   A    Yes.

22   Q    Okay.  Now, the defense showed you the video that you

23   obtained, correct?

24   A    Yes.

25   Q    I'm going to ask you this.  Is it possible that all the

1    hours are off by one hour due to daylight savings time?  Is

2    that possible?

3    A    That could be possible.

4    Q    You're not a hundred percent sure that the daylight

5    savings time didn't affect that camera one way or another, is

6    that true?

7    A    I don't know.  I know --

8    Q    Okay.

9    A    I know.

10   Q    You remember -- well, withdrawn.

11          The camera still shows you got there before the

12   police?

13   A    Exactly, at night.

14   Q    You got there and it was dark.  When you were leaving, it

15   was light?

16   A    Yes.

17          THE COURT:  I'm sorry.  The question was, you got

18   there before the police?

19          MR. ZELMAN:  Yes.  I'm sorry?

20          THE COURT:  I think that's what you said.

21          MR. ZELMAN:  Maybe I --

22          THE COURT:  Just want to make sure.

23          MR. ZELMAN:  Yeah.  I probably got it wrong.

24   BY MR. ZELMAN:

25   Q    You got there after the police arrived, correct?

```
 1   A     Yes.

 2   Q     When you got there, it was dark outside, right?

 3   A     It was dark, yes.

 4   Q     By the time you got out, it was getting lighter?  Is that

 5   true?

 6   A     Yes, sir.

 7   Q     The clock may or may not have been off by an hour.  You

 8   don't know.  Is that true?

 9   A     I know when I came in, it was dark and when I left, it

10   was light.  It could have been -- like it could have been what

11   you're saying, but I know when I came in, it was dark and when

12   I left, the light was coming up.

13   Q     Okay.  Now, just -- defense counsel went over these other

14   arrests and about why you were arrested.

15         Now, just to clarify for the jury -- and I think

16   it's already before the jury -- these drug cases, how did they

17   resolve?

18   A     (No response.)

19   Q     You know what I mean by resolve?

20   A     Yeah.  I would have entered, as I said, it could -- what

21   I know one of the case got dismissed.  I know when I --

22         THE COURT:  Can we take these one at a time because

23   --

24         MR. ZELMAN:  Yes.

25         THE COURT:  -- these -- there are three different
```

ASHLEY/REDIRECT/ZELMAN

```
 1    cases that are the subject of the witness's testimony.
 2              MR. ZELMAN:  Right.
 3              THE COURT:  It would be helpful to the jury to
 4    delineate which case you're talking about.
 5    BY MR. ZELMAN:
 6    Q    To the best of your recollection, Dushaine, the
 7    November 2012 arrest, how did that resolve?
 8    A    I think that got -- I think that case -- one of the
 9    cases, I got a ACDC (sic).
10    Q    Okay.  One of the cases, you got a violation, right?
11    A    Yes.
12    Q    And you didn't have to --
13    A    Do nothing.
14    Q    Okay.
15    A    All right?  And then the other case, they dismissed.
16    Q    Right.  And the April 19 case?
17    A    They did -- I think they dismissed it.  They gave me a
18    violation.  I can't remember what case.  They gave me a
19    violation for one case and dismissed one case.  I know that
20    for a fact.
21    Q    Okay.  Well there was three cases, right?
22    A    Yes.
23    Q    Were two of them dismissed?
24    A    Two of them was dismissed and one I got a violation for.
25    I can't remember which ones -- two cases got dismissed and one
```

 1   case, I pleaded for a violation.

 2   Q     Thank you.

 3   A     I took a violation plea for.

 4              MR. ZELMAN:  Thank you.  Nothing further.

 5              THE COURT:  Anything else?

 6              MR. HAIDER:  Nothing further, Your Honor.

 7              THE COURT:  All right.  The witness may stand down.

 8   You're excused, sir.  You can leave it there.  Thank you.

 9              MR. ZELMAN:  Plaintiff will rest at this time, Your

10   Honor.

11              THE COURT:  Okay.  Let's take a quick sidebar.

12              (Sidebar.)

13

14

15

16

17

18

19

20

21

22

23

24

25

CIVIL/DIRECT/FUDIM

```
1   on it -- and then like weights and stuff in the corner.

2   Q    Now, on April 19th, why did you go to Apartment 5I?

3   A    I was conducting a search warrant.

4   Q    Now, this may be obvious to some, but perhaps not

5   everyone.  So can you explain to us what a search warrant is?

6   A    It's when the judge gives you permission to search a

7   location, to enter a location.

8   Q    How do you get a search warrant?

9   A    You have to demonstrate evidence, you know, that

10  there's -- for me, that there was narcotic sales or -- taking

11  place at the location.

12  Q    Did you do that here?

13  A    Yes, I did that.

14  Q    So presumably before April 19th, 2013, you had conducted

15  some sort of investigation into what was going on at Apartment

16  5I?

17  A    Correct.

18  Q    Can you take us back and tell the jury when that

19  investigation began?

20  A    The investigation began early April.

21       The way we work in -- when I was there in narcotics,

22  we would get complaints.  We would receive a complaint.  The

23  complaint could come from a neighbor, a super or what have

24  you, and they call into 911 or 311, and all those calls are

25  recorded.
```

CIVIL/DIRECT/FUDIM

```
 1              And then eventually, they would come down the
 2    pipeline to the investigators, and it went throughout the
 3    entire city.  That's how it goes, and they're just divided
 4    into the borough you work.  And I happened to get this one at
 5    125 East 18th Street.
 6    Q    Let me ask you this.  If somebody calls 911 to make a
 7    complaint, but it's not an emergency in that exact moment, do
 8    you know what happens to the call?  Does it get rerouted?
 9    A    It gets rerouted.
10    Q    To where?
11    A    To like 311 or Mayor's Hotline.
12    Q    Okay.  I'm going to show you what -- a document that's
13    been marked for identification as Defendant's Exhibit U.
14              MS. FUDIM:  Your Honor, it's in your binder.
15    Permission to approach the witness, Your Honor?
16              THE COURT:  Yes, you may.
17              MS. FUDIM:  Handing the witness what's been marked
18    as Defendant's Exhibit U.
19    BY MS. FUDIM:
20    Q    Take a minute, Detective, and let me know when you're
21    done reviewing that document.
22    A    (Perusing document.)
23              I'm done.
24    Q    Do you recognize Defendant's Exhibit U?
25    A    Yes.
```

CIVIL/DIRECT/FUDIM

```
 1    Q    How do you recognize Defendant's Exhibit U?

 2    A    It's the complaint report that I received.

 3    Q    Is this a document created and maintained in the general

 4    course of police business?

 5    A    It is.

 6    Q    Is this the type of document you would regularly see in

 7    the course of your work as a detective for the police

 8    department?

 9    A    It is.

10         MS. FUDIM:  Your Honor, I would like to submit

11    Defendant's Exhibit U for identification into evidence.

12         MR. ZELMAN:  May I voir dire on this, Your Honor?

13         THE COURT:  Go ahead.

14                   VOIR DIRE EXAMINATION

15    BY MR. ZELMAN:

16    Q    Mr. Civil, according to this document --

17    A    Uh-hum (affirmative response).

18    Q    -- it says it was called in, something was called in by

19    Charles Patrick, is that right?

20    A    Uh-hum (affirmative response).

21         THE COURT:  You have to answer yes or no.

22         THE WITNESS:  Yes.  I'm sorry.  Yes.  I'm sorry.

23    BY MR. ZELMAN:

24    Q    Do you have any information if it was, in fact, Charles

25    Patrick who called this in?
```

CIVIL/DIRECT/FUDIM

```
 1   A     I don't have any information, no.

 2   Q     Do you have any information as to who called it in?

 3   A     I do, actually.  It says male caller, Charles Patrick.

 4   Q     Right.  But there's no way for you to know that that is

 5   the caller, right?

 6   A     No.  It's just what the caller -- the caller told 911 who

 7   he was.

 8   Q     Right.  Did they take down a phone number for him?

 9   A     There's an ANI-ALI number.  There's a number that says a

10   212 number.

11   Q     Right.  That is the operator number, right?

12   A     Yes.  So I don't see a number for him, no.

13   Q     They don't take down the number it was called in from?

14   A     No.  I don't see a number there, no.

15   Q     Okay.  And the person says that -- describes somebody in

16   that document, right?

17   A     Correct.

18         MS. FUDIM:  Your Honor, I would object to this as

19   going beyond voir dire and going into cross.

20         THE COURT:  Sustained.

21   BY MR. ZELMAN:

22   Q     My question is this.  This person, Charles Patrick, does

23   not name my client in this document?

24         MS. FUDIM:  Same objection, Your Honor.

25         THE COURT:  Sustained.
```

CIVIL/DIRECT/FUDIM

```
 1              MR. ZELMAN:  I have nothing further on these
 2    documents, Your Honor.
 3              THE COURT:  All right.
 4              MS. FUDIM:  Your Honor, I'd renew my objection to
 5    submit Exhibit U into evidence.
 6              MR. ZELMAN:  I object, Your Honor.
 7              THE COURT:  All right.  Overruled.
 8              (Defense Exhibit U was received in evidence.)
 9              MS. FUDIM:  May I publish to the jury?
10              THE COURT:  Yes.
11              (Publishes exhibit to the jury.)
12              THE COURT:  Defense U is published to the jury.
13              MS. FUDIM:  Is there a button?  Okay.  Thank you.
14    BY MS. FUDIM:
15    Q    Can you tell us when -- is this the document that you
16    received in connection with your investigation of Apartment
17    5I?
18    A    It is.
19    Q    And do you know approximately when you received it?
20    A    I received it in the beginning of April.
21    Q    Okay.  And generally, what does this document communicate
22    to you with respect to what you're going to be investigating?
23    A    Well, you would read the details.  You'd read the name,
24    location, and the details.
25    Q    Are these -- what I just zoomed in on, are those the
```

CIVIL/DIRECT/FUDIM

```
1   details that you're referring to?

2   A      Correct.

3   Q      And are these details that you read towards the beginning

4   of April of 2013?

5   A      Correct.

6   Q      These are the details that caused you to commence your

7   investigation?

8   A      Correct.

9   Q      Can you please read out the substantive details to us --

10  and if there is an abbreviation and you know what the

11  abbreviation is for, you can tell the jury that.

12  A      Okay.  Incident.  Beginning at incident at the top left.

13  Q      Yeah.  You don't need to read the codes.  You can just

14  read the substantive words to us and any abbreviations that

15  you need to explain.

16  A      Okay.  At 1069 nautical sale in 125 East 18th Street,

17  tennis court to Albemarle Road.  That's the cross street.

18  "12:05 hours, drug sales in Apartment 5I.  The perp is a male

19  black, tall, muscular, dark-skinned.  Bald head.

20         Continues on, "Male caller, Charles Patrick states

21  male lives in his apartment and refuses to move out.  Male

22  caller then states he's not at location.  No further

23  information.  Call from 311."

24         That's it.

25  Q      Thank you.
```

LISA SCHMID, CCR, RMR

CIVIL/DIRECT/FUDIM

1           Now, when calls are made to 311, is there also a

2    record of the actual call that would go to 311?

3    A    Yes.

4    Q    Are you familiar with the term "Sprint report"?

5    A    Yes.

6    Q    What's a Sprint report?

7    A    The Sprint report is a -- reports -- it's generated every

8    time people call 911.  It's like an abbreviated report of what

9    the complaint or what the person's stating.

10   Q    And you've seen those types of reports before?

11   A    I have.

12          MS. FUDIM:  Your Honor, permission to approach the

13   witness and show him the document?

14          THE COURT:  Yes, you may.

15          MS. FUDIM:  Handing the witness what's been marked

16   for identification as Defendant's Exhibit R.

17          THE WITNESS:  All right.

18   BY MS. FUDIM:

19   Q    Detective Civil?

20   A    Yes?

21   Q    Do you recognize what I've handed to you as Defendant's

22   Exhibit R?

23   A    I do.

24   Q    How did you recognize it?

25   A    It's a Sprint report.

1   Q    Is this the document that is maintained and kept in the

2   normal course of police business?

3   A    Yes.  It's a 911 operator Sprint report.

4   Q    And does it relate to the events that we've discussed

5   specifically in this case?

6   A    They do.

7         MS. FUDIM:  Your Honor, I move to admit Defendant's

8   Exhibit R into evidence.

9         MR. ZELMAN:  Judge, I believe it's the same

10  document, so I have the same objection.

11        THE COURT:  All right.  Overruled.

12        (Defense Exhibit R was received in evidence.)

13        You may publish the document to the jury.

14        MS. FUDIM:  Thank you, Your Honor.

15  BY MS. FUDIM:

16  Q    Can you see that okay?

17  A    Yeah.  Yes, I can.

18  Q    What do you recognize this to be?

19  A    A Sprint report.

20        THE COURT:  Don't speak so close to the microphone.

21        THE WITNESS:  I'm sorry.  I will back up.

22        THE COURT:  Go ahead.

23        You can push the microphone forward a little, so

24  it's comfortable.

25        Go ahead.

CIVIL/DIRECT/FUDIM

1              THE WITNESS:  Yes, sir.

2    BY MS. FUDIM:

3    Q    Is this the Sprint -- is this a record of the call that

4    would have precipitated the complaint form that we just saw in

5    Defendant's Exhibit U?

6    A    It is.

7    Q    And does this contain substantially the same information

8    that was conveyed to you in the complaint report as you

9    received it?

10   A    Yes.

11   Q    Now, you mentioned the word ANI-ALI before and I see that

12   word written here.  Can you explain to the jury what an

13   ANI-ALI is?

14   A    It just determines where the call came from.

15   Q    So that's the phone number that originated the call?

16   A    Correct.

17   Q    And so here, where it says, 212-335-7600, that would have

18   been the call -- the phone number from which the call was

19   made?

20   A    Yes, it was referred -- a number was called and that

21   number -- this number, the Mayor's Hotline generated this

22   complaint.  So someone called the Mayor's Hotline, and the

23   Mayor's Hotline referred it.

24   Q    Okay.  So this would have been the number that the

25   referral came through then, not the number of the person who

LISA SCHMID, CCR, RMR

CIVIL/DIRECT/FUDIM

1    originated the call?

2    A    Yes.

3    Q    Okay.  Thank you for clarifying that.

4         Now, you had no idea whether or not the individual

5    who called was actually Charles Patrick?

6         MR. ZELMAN:  Objection to leading, Your Honor.

7         MS. FUDIM:  Your Honor, I'm just trying to clear up

8    --

9         THE COURT:  Just rephrase the question.  That will

10   do it.

11   BY MS. FUDIM:

12   Q    Did you know who actually placed this call?

13   A    No, I don't.  I can only go by what the Sprint ANI-ALI

14   says.

15   Q    Did it make any difference to you in terms of what you

16   would do in your investigation as to who actually placed this

17   call?

18   A    No.  And as you can see like at the bottom, at 12:55

19   hours, it says, "Refer to OCCB."

20   Q    What's OCCB?

21   A    Where I worked, the Organized Crime Control Bureau.

22   Q    Okay.  So regardless of who placed this call, you would

23   have had to commence an investigation?

24   A    Correct.

25        MR. ZELMAN:  Objection to the leading, Your Honor.

```
 1              THE WITNESS:  Sorry.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Correct.  Yes.

 4   BY MS. FUDIM:

 5   Q    What did you do to commence your investigation after you

 6   received this complaint?

 7   A    I conducted some checks.  I conferred with other

 8   detectives.  I spoke with them because we recently were at

 9   that apartment, and then I deployed an undercover police

10   officer to that location.

11   Q    Let me actually back up one second.  When you saw the

12   name "Charles Patrick' in the Defendant's Exhibit U, did you

13   recognize that name?

14   A    Yes.

15   Q    Did you recognize the address, Apartment 5I?

16   A    Yes.

17   Q    And did you recognize the description that the individual

18   who claimed to be Charles Patrick was giving of his roommate?

19   A    Yes.

20   Q    And did you have a belief as to who that description was

21   describing?

22   A    I did.

23   Q    What was that belief?

24   A    That the description in the Sprint and the complaint is

25   similar to that of Ashley Dushaine or Dushaine Ashley.
```

CIVIL/DIRECT/FUDIM

```
1   Q     How is it that you recognize the name Charles Patrick,

2   the Apartment 5I and that description?

3   A     From the previous search warrants.

4   Q     Okay.  And that goes to search warrants in November and

5   December you mentioned previously?

6   A     Correct.

7   Q     Now, you said you employed the services of an undercover.

8   What's an undercover?

9   A     It's a police officer that works for the New York City

10  Police Department, and they're just in an undercover capacity.

11  Q     Did you get that undercover any instructions?

12  A     Yes.

13  Q     What were the instructions?

14  A     I informed him that narcotics sales were taking place

15  inside of Apartment 5I, and his goal was to try to purchase

16  from that location.

17  Q     Did he report back to you?

18  A     He did.

19  Q     Did he communicate whether he was able to purchase

20  narcotics from that location?

21  A     He did.

22  Q     From whom did he say he purchased them?

23  A     Charles Patrick.

24  Q     And on how many occasions did he say he purchased

25  narcotics from that apartment, from Mr. Patrick?
```

CIVIL/DIRECT/FUDIM

1   A      Twice.

2   Q      What did you do with that information?

3   A      I then drafted up paperwork to bring it to a judge.

4   Q      What was the purpose of bringing paperwork to a judge?

5   A      For an application for a search warrant.

6   Q      So that you would have permission to go look in the

7   apartment?

8   A      Correct.

9   Q      Did the judge issue a warrant?

10  A      A warrant was issued.

11  Q      On April 19th, what time did you execute in the search

12  warrant at Apartment 5I?

13  A      It was 0600, 0605.

14  Q      And when you say 0600, is that six o'clock in the

15  morning?

16  A      That's six in the morning.

17  Q      Why did you execute the search warrant at that time?

18  A      Well, that's the time our warrants go from.  They're

19  no-knock warrants, from 06 to 9:00 p.m.

20  Q      What does that mean, no-knock warrants?

21  A      That we don't have to knock.

22  Q      They go from six to what time?

23  A      9:00 p.m., 2100 hours.

24  Q      And with respect to the other two warrants that you

25  mentioned that you executed at Apartment 5I, do you know what

SUMMATION/ZELMAN

```
 1    Your application is denied.  You have your exception.
 2              MR. ZELMAN:  Thank you.
 3              MR. HAIDER:  Your Honor, and is there a final
 4    version of the jury charge and the verdict sheet?
 5              THE COURT:  Yes, I put it up this morning, but we
 6    have copies for you.  We have copies for you.
 7              MR. HAIDER:  All right.
 8              THE COURT:  Let's distribute those now.
 9              All right.  Bring in the jury.
10              (Jury enters.)
11              THE COURT:  Please be seated, everyone.
12              Good morning, members of the jury.
13              JURORS:  (In unison) Good morning.
14              THE COURT:  At this time, we're going to have
15    closing arguments.  The plaintiff will close first, then we'll
16    have closing argument of the defense, and then the plaintiff
17    will have an opportunity to provide a rebuttal to the
18    defense's argument.
19              Mr. Zelman, you may proceed with your closing.
20              MR. ZELMAN:  Thank you, Your Honor.
21              Counsel, Mr. Ashley, ladies and gentlemen of the
22    jury, we have come a long way since jury selection, talking
23    about video games and fishing and all the -- just getting to
24    know each other, right?
25              You have heard the evidence now in the case, and I
```

1    feel that, in my humble, opinion, we have established what we

2    said we would establish.

3            Detective Civil got up on the stand yesterday, and

4    said, I signed a false document that I knew was false, and I

5    did it because I thought the ADA, the District Attorney,

6    wanted it done that way.  That's his testimony.

7            You'll see from the document itself that there's a

8    statement here.  It's under the penalties of perjury.  He

9    committed a crime.  He went against his own training to do it,

10   and he calls the plaintiff a major headache, which I'm going

11   to get into right now.

12           That's the gist of our claim is that lie, and what

13   it did to the plaintiff.

14           Now, I want to talk a few things about -- I think

15   it's important to keep in mind that there's two lies in the

16   case.  There's actually more, but there's two that are going

17   to be -- that you're going to decide, was that fabricated

18   criminal court complaint, where he says it's in the apartment,

19   which he admits to.  Is that fabricated?  Answer to me is

20   obvious.  Yes, it's fabricated.

21           The second question is as to that statement that my

22   client allegedly made:  "This is what happens when you let

23   strange people into your apartment."  Well, we'll get to that

24   in a minute, but my point is, both of those items help the

25   prosecution prove their case, helped the officer prove their

1    case against Mr. Ashley.  So if you say that they're innocent

2    mistakes, why is it that they just happened to help them?  And

3    I'll explain how they helped them.

4           One, when somebody is caught with drugs on their

5    person or in their immediate surrounding, there's no need to

6    show anything else in court.  That's it.  That's all you've

7    got to show.  They had it on their person.  It's in their

8    immediate vicinity.  It's theirs.  They have possession.  They

9    have control.

10          When you bring in somebody from outside on the

11   street and the drugs are in the house, guess what?  Now you

12   have a different burden in court.  You have to show that they

13   had constructive possession.  So that's what Defendant Civil

14   tried to do.  He said, hey, he lives here.  All his stuff is

15   here.  He must own the stuff because he's coming from the

16   street -- but he didn't have to show that originally.  He made

17   the case much easier for himself by lying.

18          Then when the lie became revealed because of the

19   video, the alleged statement, "This is what happens when you

20   let strange people into our apartment," also helps the

21   prosecution.  How?  Because he's saying "our apartment."  And

22   he's saying it's mine.  Everything in there is mine.

23          Now, one of the things that was entered into

24   evidence that you probably haven't read yet is Plaintiff's

25   5 -- and you're going to be able to read all this when you get

SUMMATION/ZELMAN

1    to the jury room.

2            This is the two -- minutes from the court proceeding

3    that dismissed the case against the plaintiff.  Okay?  Minutes

4    that were -- you had Chad LaVeglia come in and testify about

5    the criminal defense case, about the prosecution.

6            And the minutes that were used to dismiss the

7    case -- this is a court -- a reporter, just like her, taking

8    down what happened.  You will see in here that the District

9    Attorney specifically references that statement while arguing

10   to the judge about how to keep the case alive, why to keep the

11   case alive.

12           He says, "Yes, Judge.  The strangers in your

13   apartment, which corroborates the fact that defendant was

14   there at that scene when the police were there, which also

15   corroborates marijuana was recovered from the location."

16           The Court:  "No.  This is what you are not focusing

17   on."

18           (Off the record.)

19           Judge disagrees with the prosecutor, but the

20   prosecutor uses that very statement in court.  Okay?  Don't

21   think that these -- don't be tricked to think this is an

22   innocent mistake or that these things are not specifically

23   used against him in court.  They are.  Nothing innocent about

24   this.

25           Now, an important thing to keep in mind, you're

SUMMATION/ZELMAN

1    going to get a jury charge in this case.  The judge is going

2    to tell you, in essence, that whether he lived there or didn't

3    live there has nothing to do with this case.  The judge will

4    explain to you that probable cause is not an issue in this

5    case, and probable cause means whether or not the police could

6    have arrested him or could not have arrested him.  You heard

7    testimony about it.  Detective Civil says he wasn't going to

8    go looking for him if he didn't show up.  And in fact, he

9    couldn't even arrest him, he said at his deposition.

10          But it's irrelevant because the claim in the case is

11   whether or not the evidence was fabricated.  Doesn't matter.

12   And the Judge will tell you that.  So I want you to -- if you

13   think -- if you're thinking, well, you know, maybe he did

14   something wrong.  Maybe he should have been arrested and it's

15   okay.  Well, that's what I'm trying to work against.  You

16   can't fabricate evidence in a case, even if someone's guilty

17   of a crime, whatever the crime is.  You're not allowed to do

18   it.

19          It's one of those rules.  You can't fabricate

20   evidence against anybody.  Nobody.  Everybody knows that in

21   this business.  Everybody knows.  Every cop knows that.  Some

22   of them go to jail for it.  This one did not.

23          MR. HAIDER:  Objection.

24          THE COURT:  Sustained.

25          MR. ZELMAN:  Now, another thing to keep in mind, why

SUMMATION/ZELMAN

1    did this complaint get dismissed and the superseding get

2    replaced?  Because of the video.  Not because Civil went to

3    the DA's office and said, "I made a mistake."  But because the

4    video was right there, showing that my client comes in later,

5    he was then forced to change his story, which he did.  And

6    they brought in the superseding criminal court complaint that

7    says he comes in after.

8            Now, we got into this whole thing about, is it five

9    o'clock in the morning?  Six o'clock in the morning?  Makes no

10   difference.  Makes no difference.  The point was, my client

11   came later.  No one is disputing that.  Keep your eyes focused

12   on the ball.  Nobody's disputing that.

13           I don't know what time it was.  Maybe it was

14   daylight savings time.  It doesn't make a difference.  He came

15   in later.  They changed the superseding complaint to fit the

16   new facts.  You heard Chad LaVeglia, the defense counsel, say

17   it was strikingly resembling the facts in the case.  I didn't

18   say it right, but he's tailoring the subsequent criminal court

19   complaint to fit the new facts, to fit the reality.  Detective

20   Civil let that thing sit there for a year with false charges

21   against my client.  Completely unfair.  And that's why we're

22   here today.

23           Now, Civil not only lied in the criminal court

24   complaint.  He not only lied about the alleged statement that

25   my client made, "This is what happens when you let strange

SUMMATION/ZELMAN

1    people into our apartment."  Who's strange?  My client knows

2    everybody there.  There's no strangers there.  He wouldn't say

3    that.  It doesn't make any sense to him.

4         He knows Carlos.  He knows Patrick.  Patrick has his

5    phone number.  Those are his people.  There's no strangers

6    there.  He wouldn't say that.

7         But the third thing is, Civil got up on the stand

8    and said, I know everything in that apartment.  I saw a

9    picture of him and his girlfriend.  I saw the curtain.  I saw

10   the bed.  I saw everything.  And I know he lives there.  Okay?

11   But he also says, "I didn't see a dog."

12        Now, if there's anything that corroborates my client

13   being in that apartment, it's a dog.  A dog requires constant

14   care, not clothes.  My client says he had a cat.  He happened

15   to have a dog there, too, at the time.  It wasn't his dog.  He

16   gave it to his friend, but it was still, you know, it was

17   given to him by his brother-in-law.

18        Would you go into a house and would you remember the

19   curtain, the bed, all the clothes and the picture, but not the

20   dog?  Think about it.  Think about your experience in life.

21   Would you do that?  The reason you're not -- you wouldn't is

22   because you're being lied to.  He wants to get away from this

23   idea that he used a ruse, which he did, which we've shown.

24        What's the ruse?  The ruse was, he comes in.  He's

25   expecting Ashley to be there.  He's arrested Ashley there

1    before.  He believes Ashley lives there.  He asked Patrick,

2    "What's Ashley's number?"  That, he admits, and Patrick

3    doesn't know, so he doesn't call him.

4         Somehow, the plaintiff testified he gets the call.

5    His girlfriend comes in and says they get the call, and then

6    his neighbor takes the dog from him that day, as he's getting

7    arrested.  Do you want to believe everybody is lying to you or

8    only Civil?  Because the whole world has to be lying to you if

9    Civil isn't.

10        If Civil admitted to the ruse, he's admitting to

11   framing my client.  If he said, yeah, I called him to come and

12   then told the prosecutor he's sitting there with the drugs at

13   his feet, he's admitting to framing my client.  Whether he

14   brought in the drugs or brought in the client, it's the same

15   result.  I tell the prosecutor, he's there.  The drugs are in

16   front of him.  That's a frame.  He stayed as far away from

17   that as possible, but we have shown it by a preponderance of

18   the evidence.  And that's what the Judge is going to instruct

19   you.  Preponderance.  Not by a reasonable doubt.  It's more

20   likely than not.

21        You're soon going to retire to the deliberation room

22   and you're going to get this jury verdict sheet, and you're

23   going to get charged by the Judge on the law after the

24   closings.  You're going to get a jury verdict sheet.  The

25   first question is, "Has Mr. Ashley proven by a preponderance

SUMMATION/ZELMAN

1    of the credible evidence that he was denied the right to a

2    fair trial by defendant?"

3           Now, there's elements of this claim.  The Judge will

4    explain to you.  One, fabrication.  We have that.  He admitted

5    to it.  It's the criminal court complaint signed by him.  It's

6    not true.  I will also suggest to you very strongly that the

7    alleged statement was fabricated, but we don't even need it,

8    because you know that the criminal court complaint was

9    fabricated.  He admits to it.

10          The second element is that it was forwarded to

11   prosecutors.  Not an issue in this case.  We know it's in the

12   criminal court complaint.  We know from reading the minutes

13   that that information was transmitted to the prosecutors.

14   It's obvious.  They're not arguing.  It's an element of the

15   claim, though.

16          The third one is whether it was likely -- the

17   fabrication was likely to cause -- was likely to influence a

18   jury.  That's what the Judge will charge you.  So if the case

19   had gone to -- the Judge will tell you that it makes no

20   difference whether or not the case went to a trial in criminal

21   court or not.  But the claim is whether that information that

22   he was sitting -- standing -- sorry -- sitting with the drugs

23   in the room would be likely to influence a jury had the case

24   gone to a jury.

25          On that particular point, I want to address your

SUMMATION/ZELMAN

```
1    attention to an item that's in evidence, the criminal court

2    complaint.  And you heard Mr. LaVeglia explain the purpose of

3    a criminal court complaint.  It sets out the charges, and it

4    tells you -- it gives notice to the defendant about what they

5    did.  It gives you a time.  It gives you a place.

6            And it says, "The deponent states that at the above

7    time and place, the deponent observed the defendant in

8    possession of approximately two ounces of marijuana, in that

9    the defendant did recover said quantity of marijuana from the

10   floor inside a room in which the defendant was sitting -- the

11   defendants were sitting."  So that's the allegation in the

12   case.  It's the entire allegation in the case, and it wasn't

13   true.

14           So to say that the entire allegation in the case

15   somehow would not influence a jury boggles the mind, but it

16   needs to go to the jury.  And as jurors, it's your

17   determination whether that allegation, the only allegation in

18   the criminal court complaint would influence a jury.  I submit

19   to you, again, it's an obvious one.

20           The fact that there was a superseding and they took

21   out that allegation makes no difference.  None.  That

22   allegation is in the criminal court complaint, and it's

23   fabricated, and the question is whether that allegation would

24   influence a jury.  No question.  It's the only allegation

25   against him.
```

SUMMATION/ZELMAN

```
1              Now, the last element of fair trial claim, which is
2    the first question on this jury sheet is, whether the
3    plaintiff was deprived of his liberty.  The Judge, again, will
4    instruct you that the initial detention as well as his
5    requirement to appear in court is sufficient to establish a
6    deprivation of liberty.  More than sufficient.
7              Any time an officer puts somebody in cuffs, they
8    deprive them of their liberty.  Every time somebody goes in
9    front of a court and has to be there, they're deprived of
10   their liberty.  The Judge will instruct you that even one
11   court appearance is a deprivation of liberty.
12             MR. HAIDER:  Objection.
13             MR. ZELMAN:  It's in the charge.
14             THE COURT:  Objection noted.
15             MR. ZELMAN:  Even one.  In this case, there's no
16   argument that he went to four court appearances solely as a
17   result of this arrest.
18             Now, the City's going to come in and claim, oh, he
19   had another case and he would have had to gone any way and
20   therefore, there was no trouble, no problem, because he had to
21   be there anyway.  But they can't get around the four that he
22   had to attend, and that's more than enough to establish
23   deprivation of liberty.  I submit to you, it goes a little bit
24   deeper than that.
25             The plaintiff testified the DAs made a global
```

1   offer -- and you'll see that again in the minutes, that there

2   was an offer, but only if he pled guilty to both cases.  He

3   refused.

4           So the DA's office, they tie these cases together

5   and wrap them up and they say, we're not going to dismiss one

6   as opposed to the other.  You've got to plead to them both.

7   He said no.

8           And you heard that he actually had three cases, but

9   there was only two pending at the time, and one of them, he

10  was dismissed in this one.  He was dismissed in the other one,

11  and the other one, he got a traffic ticket, a noncriminal

12  disposition.

13          MR. HAIDER:  Objection.

14          MR. ZELMAN:  That's what the testimony is.

15          THE COURT:  Objection noted.

16          MR. ZELMAN:  Keep that in the back of your mind.  If

17  this case had not been brought or this case had been brought

18  accurately, the entire thing could have been wrapped up much

19  quicker.

20          Okay.  Now, I think it's important to state that the

21  claim that we're bringing, a fabrication of evidence, applies

22  to every member of our society.  Everybody:  Your family, my

23  family, judge's family --

24          MR. HAIDER:  Objection.

25          MR. ZELMAN:  -- everybody.

SUMMATION/ZELMAN

```
1                    THE COURT:  Sustained.
2                    Let's not bring everybody's family into this.
3                    MR. ZELMAN:  I apologize.
4                    THE COURT:  Let's talk about this case, the evidence
5        in this case --
6                    MR. ZELMAN:  Okay.
7                    THE COURT:  -- and not expend this to the entire
8        world.
9                    MR. ZELMAN:  Well, my point is --
10                   Thank you, Your Honor.
11                   My point is, the City's argument seems to be that my
12       client is a drug dealer.  He's a low life and that somehow,
13       the law doesn't apply to him as to fabricated evidence,
14       because he would have had to be in court anyway, and it's okay
15       to fabricate evidence against a guy who is involved with drugs
16       somehow, even though, like I said, the cases were dismissed.
17       He got a noncriminal disposition on one.  He's not a drug
18       dealer.
19                   I mean, think about it for a second.  He gets a call
20       in the morning to come to the house, where he knows the police
21       are there because they're going to impound his dog and he
22       says, I'm coming.  I'm coming to get my dog.  Does a drug
23       dealer do that?  I don't think so.  My client's not a drug
24       dealer.  But they want you to believe that.  They want you to
25       believe he's somehow a lowlife and therefore, not entitled to
```

SUMMATION/ZELMAN

1    the rights of everybody else in society.

2              Well, there used to be a time that woman couldn't

3    vote in this country.  We weren't around.  Right?  Used to be

4    a time when blacks were slaves.  We weren't around.

5              MR. HAIDER:  Objection.

6              MR. ZELMAN:  There used to be a time when

7    homosexuality was not criminal, but almost criminal.

8              THE COURT:  Mr. Zelman, none of that is an issue in

9    this case.

10             MR. ZELMAN:  That's exactly what I'm trying to say.

11             THE COURT:  Excuse me.  Don't say it.

12             MR. ZELMAN:  Okay.

13             My point is that I don't want you to be on the wrong

14   side of history here and think that a fabrication of evidence

15   claim only applies to certain people at certain times.  It

16   applies to everybody.  Everybody has that right to be free

17   from fabricated evidence.  Don't be on the wrong side of

18   history on that.

19             MR. HAIDER:  Objection.

20             THE COURT:  Objection noted.

21             MR. ZELMAN:  Now, an important point I make about

22   that alleged statement is that you heard that in criminal

23   court, there's rules about statements and when they're

24   supposed to be disclosed.  That initial statement, you'll see

25   as our exhibit -- let's find that.  Of course I don't have

SUMMATION/ZELMAN

 1   that.  (Peruses documents.)

 2           Yeah.  Plaintiff's 3 has that statement that he

 3   allegedly made:  "I'm tired of this shit."  Excuse my

 4   language.  That's what they provided him in court when he

 5   first went.

 6           Then the video comes out, then the second statement,

 7   "I'm tired of that shit, this shit," and, "This is what

 8   happens when you let strangers into our apartment."  Keep that

 9   in mind.  There was no notice of this statement, which is

10   required in court until the video becomes available.  Keep

11   that in the back of your mind.  If he said it, they're

12   supposed to bring it at the front end.  Why didn't they?

13           Okay.  Now, just going back to the next question

14   after that first and important question, has -- did he -- has

15   he proven by a preponderance of the evidence that he was

16   denied a right to a fair trial?  I submit to you the answer is

17   yes, because all the elements are met.

18           The next question is, what are his damages as a

19   result of that?  Well, that is solely in your province.  Now,

20   we know that he was in custody for the initial detention.

21   Maybe it was a day or a little bit more --

22           MR. HAIDER:  Objection.

23           MR. ZELMAN:  -- that he went in front of the judge

24   and the judge released him.

25           THE COURT:  Objection noted.

SUMMATION/ZELMAN

```
 1          MR. ZELMAN:  And thereafter, he appears in court
 2   several times related to this case.
 3          Now, I want you to try to think what it's like to be
 4   prosecuted for a crime you didn't commit, to have an officer
 5   come after you and say, "You did this," and you know you
 6   didn't.  And you're standing in court.  You don't have the
 7   resources for a lawyer, so the state hires a lawyer for you.
 8   And you're standing there saying, "What's next?  What is this
 9   guy going to fabricate against me next?  Am I going to go to
10   jail for this?"
11          Yes, I cannot work.  But it's more than that.  It's
12   more than that.  It's the toll that it takes on a person to
13   stand up in court, to be prosecuted for a crime they did not
14   commit.  That's not right.  That's not fair.  And you can
15   imagine what that might feel like.  Hasn't happened to me.
16   Maybe it hasn't happened to you.  But it's happening, and we
17   have to try to figure out how to compensate a person fairly
18   for it.  Fairly.
19          We know he was making $80 a day.  He's not a wealthy
20   man.  We know he lost at least four court appearances as for
21   this deprivation of liberty.  There was much more.  But if you
22   want to limit it to four.  We can limit it to four.  But there
23   was much more.
24          But to stand there and say I have to go back to
25   court now against this officer who's claiming things that I
```

LISA SCHMID, CCR, RMR

SUMMATION/ZELMAN

1    did not do, what is the toll that it take on a person?  The

2    judge doesn't know that what Civil is saying is not true.  The

3    judge is -- he got very fortunate to have a judge who

4    dismissed the case.  Did not have to happen that way.  Could

5    easily have gone to the jury, got convicted.  The video, no

6    video, went straight to the jury, convicted, jail.  And nobody

7    would have been sorry.  Nobody would have believed my client.

8    It was the video that brought this all about.

9           So I want you to think about that when considering

10   damages, what it's like to face charges in court, to not only

11   have to lose your days to have to appear in court, but what

12   it's like -- what it feels like for him to have to have go

13   through that.

14          It's not an easy one.  It's a task solely for the

15   jury.  I wish you luck with that.  But, it's your job and I'm

16   going to ask you to do it reasonably and do it fairly and do

17   it the best way you think you can.  I don't want to influence

18   you at all.  It's a tough one.

19          Okay.  There's also a question here as to nominal

20   damages.  That means if you find that they broke the law but

21   he didn't suffer at all, not one bit, you can award him one

22   dollar.  Doesn't apply here, in my humble opinion.  We know he

23   missed at least those four court appearances.  We know he was

24   in cuffs for a period of time.  There's some type of

25   compensatory damages available there -- but you're allowed

1    under the law to find that they brought broke the law and

2    there was no damages.  I submit to you that that's not the

3    facts here.

4           Lastly, you will be asked about punitive damages.

5    Punitive damages are designed to punish and deter a defendant

6    from taking the action that they took.  Again, it's solely in

7    your province as to what you want to do with that.

8           I do believe that in this particular case because my

9    client was lied about and that Detective Civil got up on the

10   stand and lied to you and admitted that he lied about my

11   client, that punitive damages are appropriate in this case, to

12   send that message that this is not okay.

13          It's not okay.  Let him know that what you think he

14   did was wrong, and they can't just pay for the trouble and

15   walk away because, you know, think about it for a second.  If

16   you caused damage and it's unintentional, of course, you pay

17   the damage.  You say I'm sorry, and you pay the damage, and

18   you move on, if it was an accident.

19          But you've got a little problem here.  It's not an

20   accident.  What happened was intentional and what's happening

21   is intentional.  He has not apologized for this.  He said he

22   did it all right.  The DA messed up.  The DA wanted my

23   fabricated complaint.  And when you have that, you have to

24   send a message back and say, we don't buy it.

25          Now, the City got up at the beginning and said, oh,

```
 1   all my client wants --
 2              MR. HAIDER:  Objection.
 3              THE COURT:  Let's stick to the evidence.
 4              MR. ZELMAN:  Well, I am.
 5              The City -- I apologize -- defense counsel --
 6   defense counsel got up.  Defense counsel got up at the
 7   beginning and said all my client wants is money.
 8              I'll tell you something.  We actually want a lot
 9   more than that, a lot more than what money can give us.  We
10   want a determination from you that what happened here is
11   wrong.  We never got that.  We never got an apology.
12              The only thing that happened after my client's case
13   in criminal court got dismissed was that it got dismissed, and
14   he gets a piece of paper, which you can look at, which says
15   that the case is dismissed.  We got nothing else.
16              And there is no other avenue, no other mechanism
17   other than this jury for my client to seek any type of
18   understanding, reprieve, anyway to get Civil to stand up for
19   what he did other than to bring a civil case.  That's the only
20   way to do it.
21              So we don't just want money.  We want more than
22   that.  We want an apology which we didn't get.  We want a
23   determination that what happened was wrong.  That means a lot
24   more to me and my client than anything else.  Money is going
25   to help because he did go through a lot for this, but an
```

1    important principal here is what happened was wrong.

2    Shouldn't happen to anybody, no matter who you are.

3            Now, you're going to retire to the jury room soon.

4    You're going to go through -- everybody's going to have to

5    participate.  What do you think?  What do you think?  What do

6    you think?  What do you think?

7            Don't just accept what the person next to you says,

8    and say okay.  Do justice to this case.  Do justice.  Make the

9    most of this experience.  You sat through here.  You gave us

10   your time.  You gave us -- you couldn't work.  You could have

11   been with your family.  You spent a lot of time here.  We

12   really appreciate that.  I can speak on behalf of the Court

13   and counsel and my client.  You have been a great jury.

14   Fantastic, really.

15           And to do this the right way, you don't walk in the

16   room and say, okay.  Let's vote.  No.  Talk about it.  Look at

17   the paperwork.  Look at the evidence.  You can have anything

18   read back to you that you want, any testimony.  You write a

19   note.  You tell the judge, I want to have this testimony read

20   back.  I want to have that testimony read back.  I want to

21   have -- anything -- the charge.  It doesn't matter.  You could

22   have access to it all.  I want you to do that.  I want you to

23   make the most of this experience.  Don't have done such an

24   incredible job and then just drop it.  Take the time to think

25   about it.  Discuss it.  Play the points.

```
 1              And then when you really feel that you know this
 2     case, take your vote.  But not before at least -- at least an
 3     hour or two to debate it back and forth.
 4              MR. HAIDER:  Objection.
 5              THE COURT:  Sustained.
 6              MR. ZELMAN:  Okay.  With that, I will close, and
 7     again, I want to thank you for your time and effort, and I
 8     will be back in a minute after the City presents its case.
 9     Thank you.
10              THE COURT:  We'll take -- we're just going to take a
11     brief recess.  We'll take a brief recess just for a moment or
12     two.
13              All rise for the jury.
14              (Jury exits.)
15              THE COURT:  Please be seated.
16              So you were talking about damages, Mr. Zelman, and
17     you mentioned the City.
18              MR. ZELMAN:  Right.
19              THE COURT:  I mean, that couldn't be unintentional.
20              MR. ZELMAN:  It was.
21              THE COURT:  I mean, the word "City" has not been
22     mentioned one time in the last three days, and then, your
23     closing, talking about the damages you want and you say, "the
24     City," and we have an understanding that the City is not to be
25     mentioned here.
```

PROCEEDINGS

```
 1              What's your wish?
 2              MR. HAIDER:  Your Honor, this was one of our -- ties
 3    to a couple of our motions in limine, one that we not be
 4    referred to as City attorneys, that no mention of
 5    indemnification was made, which that statement actually
 6    inferred that the City is on the hook for the damages here.
 7              In plaintiff's response, plaintiff's counsel said he
 8    had no intention of doing either, but he did exactly that here
 9    in the closing argument, in the exact moment when he was
10    discussing money.  (Confers with Ms. Fudim.)
11              Judge -- Your Honor, any type of curative
12    instruction, I think, would draw even further attention to
13    this fact.
14              THE COURT:  I tend to believe that.  Let's see what
15    the jury does here.  You know, I'm willing to set aside a
16    verdict because -- a large verdict, damages verdict against
17    the defense.  You can make a post-trial motion.
18              MR. HAIDER:  Yes, Your Honor.
19              THE COURT:  I'm just letting you know now that I
20    don't want to hear the word "City" from this point forward.
21              I really don't believe you, Mr. Zelman.  It was just
22    so perfect.  It was so perfect that the only time you
23    mentioned the City was when you were talking about money
24    damages for your client.  And that's really a big problem for
25    me.
```

PROCEEDINGS

1          MR. ZELMAN:  Can I say something?

2          THE COURT:  Can you say something?  You already said

3     it.  What more do you want to say?

4          MR. ZELMAN:  I just want to say, number one, it was

5     intentional -- unintentional, okay?  It was a passing

6     reference, and I said it not in the context of money.  I just

7     want to -- please.  I said it in the context of the City is

8     arguing that my client wants money.  That's what --

9          THE COURT:  Well, why would the City be arguing

10    anything?  The City is not in this case.

11         MR. ZELMAN:  You're a hundred percent correct.  What

12    I meant to say is defense counsel.

13         THE COURT:  Well, you didn't say.  Sir, you didn't

14    say defense counsel.

15         MR. ZELMAN:  I should have.

16         THE COURT:  Well, yes.  You should have done that.

17    That's true.

18         MR. ZELMAN:  I just want to point out that I'm not

19    the monster that you think that I am.

20         THE COURT:  I'm not saying you're a monster.  I'm

21    saying you've done something that's going to be prejudicial to

22    the defense in -- when the jury retires to consider its

23    verdict.  That's all I'm saying.

24         And you're not a monster.  You're a plaintiff's

25    lawyer --

PROCEEDINGS

```
 1                MR. ZELMAN:  I would never, Judge --
 2                THE COURT:  -- in a money damages case.
 3                MR. ZELMAN:  You have to understand something about
 4    me.  I would not --
 5                THE COURT:  I don't care.  I don't need to
 6    understand anything about you.  I only need to understand this
 7    is what you said in the context of the damages section of your
 8    closing statement.  That's all.  That's all.
 9                MR. ZELMAN:  It wasn't in a damages context.
10                THE COURT:  And so it creates a problem for the
11    Court, obviously.
12                MR. ZELMAN:  Understood.
13                THE COURT:  That's all I'm saying.
14                MR. ZELMAN:  I agree it was an error, but I'm
15    saying --
16                THE COURT:  Well, it was an error.
17                MR. ZELMAN:  I agree it was an error.  What I'm
18    saying, Judge, number one, it was intentional; number two, it
19    was a passing reference; and number three, it was in the
20    context of what the City was arguing, not how much money to
21    award my client.
22                That's the -- if you look at the whole sentence from
23    the court reporter, you'll see.  I was saying, the City argued
24    that my client only wants money.
25                THE COURT:  It's -- the point is not that your
```

PROCEEDINGS

```
 1   client wants money.

 2              MR. ZELMAN:  Not the point --

 3              THE COURT:  The point is that it's the City which is

 4   the defendant.

 5              MR. ZELMAN:  Right.

 6              THE COURT:  You're implying that the City is, in

 7   effect, the defendant, and is going to pay if you win.  That's

 8   the point of all of this.

 9              So please.  You know, the nuances get right -- they

10   fly right past me.  The fact that you discussed that the City

11   has a position on damages or if the City's going to argue

12   about damages means that the City is on the hook in the minds

13   of the jurors.

14              MR. ZELMAN:  What I'm asking --

15              THE COURT:  I don't want to talk about it anymore.

16              I want the closing statement of the defense, then I

17   want your rebuttal and I don't want any mention of the City,

18   and we'll see what happens with the jury.

19              I'm not going to presuppose that they're going to

20   find for one side or the other side or how much they're going

21   to award if they find for the plaintiff.  You know, we can get

22   there when we get there.

23              All I'm saying is that it's potentially prejudicial,

24   if the jury sees it as the defendant is the City.  That's all

25   I'm saying.
```

PROCEEDINGS

```
 1              MR. ZELMAN:  Judge, I would propose a curative
 2   instruction.
 3              THE COURT:  No.
 4              MR. ZELMAN:  Can I just put on the record --
 5              THE COURT:  There's no curative instruction -- all
 6   it will do -- and I agree with the defense.  The only thing it
 7   will do is raise the issue again.  I don't want to -- maybe it
 8   went right by them.  Hopefully, that happened, and so we'll
 9   get a fair -- a fair outcome here, so --
10              MR. ZELMAN:  If I can, Judge, I understand your
11   point, but I just think that if you want to solve the problem,
12   you could say, plaintiff's counsel mistakenly said the word
13   "City," as opposed to defense counsel.  The City has no
14   bearing in this case whatsoever.
15              THE COURT:  Can you bring the New York City flag in
16   here so while I'm telling them that, you can wave the flag
17   that they're the City?
18              That's preposterous.  That's the most preposterous
19   suggestion.  The only way to make it worse is to talk about
20   the City.  What am I going to do with that?  I'm not doing it.
21              I'm just going to let it lie for now, but I wanted
22   to make a point.
23              Did you want to make another point?  Because I
24   really want this over.
25              MR. HAIDER:  I was going to wait until after
```

PROCEEDINGS

1   closings.

2           It's just briefly, there was another misstatement,

3   which is on page 12 of your final jury charge.  Plaintiff's

4   counsel numerous times mentioned being placed in handcuffs and

5   in custody as part of the deprivation of liberty.

6           THE COURT:  That's right.  And the jury instruction

7   makes it clear what can be considered by the jury, and I'll

8   say it.  That's all.  And you can make whatever point you want

9   to make about the limitations of what they consider.

10          MR. ZELMAN:  What page is that?

11          MR. HAIDER:  Twelve.

12          MR. ZELMAN:  Judge, I did submit cases on that point

13  that the initial deprivation is part of a denial of fair trial

14  claim.

15          THE COURT:  You have your exception.

16          MR. ZELMAN:  Okay.

17          THE COURT:  Let's get the jury in here.  Thank you.

18          MR. ZELMAN:  Note for the record I do apologize to

19  the City and the Court for that statement.

20          THE COURT:  What's done is done.

21          (Jury enters.)

22          THE COURT:  All right.  Please be seated.

23          All right, Mr. Haider.  You may close for the

24  defendant.

25          MR. HAIDER:  May I proceed, Your Honor?

LISA SCHMID, CCR, RMR

1           THE COURT:  Yes, you may.

2           MR. HAIDER:  In just a moment, you're going to be

3    able to look at this verdict sheet, but you're only going to

4    have to answer one question:  Has Mr. Ashley proven by a

5    preponderance of the credible evidence that he was denied a

6    right to a fair trial by defendant?  The answer to that

7    question is no.

8           Plaintiff wants you to believe that just because

9    there was a mistake in the paperwork, his constitutional

10   rights were violated, but that's not true.  In a moment, the

11   Judge will tell you that paperwork errors or mere mistakes by

12   a police officer in making a written record is not a basis for

13   finding a constitutional violation.

14          In fact, the plaintiff has to prove to you four

15   elements:  One that defendant fabricated evidence; two, that

16   the fabricated evidence is likely to influence a jury's

17   decision; three, that he provided that information to

18   prosecutors; and four, that he suffered a deprivation of

19   liberty as the result.  And it is the plaintiff's burden to

20   prove each and every one of those claims.  If you find that he

21   has not proved just one of these elements, his entire case

22   falls.  Just one.

23          Now, let's discuss some of these elements.  The

24   first we're going to want to discuss is the one second, that

25   plaintiff must prove that the fabrication is likely to

SUMMATION/HAIDER

1   influence a jury's decision.  So what does that mean in this

2   case?  That means that the plaintiff has to prove that the

3   misstatement in the criminal court complaint would have

4   influenced a criminal court jury if that case had actually

5   gone to trial.

6           Now, this may seem a little confusing because as we

7   know, this criminal case never actually went to trial.  But we

8   did hear from a criminal defense attorney and Detective Civil.

9   Both of them explained that these documents -- the criminal

10  court complaint and the superseding information -- are never

11  used in criminal trials.  These are just the documents that

12  lay out what plaintiff was accused of.

13          Detective Civil explained when he was on the stand

14  that he has testified over a hundred times in his career and

15  he has never presented those documents to a criminal jury.

16          MR. ZELMAN:  Objection, Your Honor.

17          THE COURT:  Objection noted.

18          MR. HAIDER:  And plaintiff's own witness, his

19  criminal defense attorney -- who actually happened to also be

20  a prosecutor -- said the same thing.

21          Now, this point is so important and his testimony --

22  the criminal defense attorney's testimony -- is so important

23  that I'm going to show you the minutes of his testimony and

24  I'm going to read along with you.

25          And for the record, this is on page 150 of Monday's

SUMMATION/HAIDER

```
 1   transcript.
 2            Question -- for those who don't recall, I was the
 3   one answering the questions.
 4            THE COURT:  Asking.
 5            MR. HAIDER:  Asking the questions and the criminal
 6   defense attorney was the one answering.
 7            Question:  "Now I want to talk to you about the
 8   criminal court complaint document itself and the superseding
 9   information.  You just stated that as a criminal defense
10   attorney, you conduct trials, correct?
11            MR. ZELMAN:  Judge I object to this line.
12            THE COURT:  Objection overruled.
13            MR. HAIDER:  Answer: "Yes."
14            Question:  "And also the prosecutor, correct?"
15            Answer:  "Correct."
16            Question:  "Now at these trials, as a prosecutor,
17   these documents don't go into evidence, correct?"
18            Answer:  "Correct."
19            Question:  "What matters is what the witness
20   actually states, correct?"
21            Answer:  "Yes."
22            Without realizing, what just happened on Monday was
23   that the plaintiff's own criminal defense attorney ended his
24   client's claims in just 13 lines.
25            He admitted that the allegedly fabricated documents
```

LISA SCHMID, CCR, RMR

1   that are at issue at this trial do not go into evidence.  This

2   means that these documents would never be seen by a criminal

3   court jury.  And I agree with plaintiff's counsel about this

4   element.  He said it's obvious.  Yes.  It is obvious.  It is

5   obvious that these documents could never influence a criminal

6   court jury.

7          But for the sake of argument, I'll just go forward

8   and tell you why he has not proved the other things, either.

9          And this leads to an important question, actually.

10  Had plaintiff's criminal case gone to trial, what would that

11  criminal jury have heard?  Well, they would have heard exactly

12  what you heard yesterday when my client, Detective Mike Civil,

13  took the stand.  And what did he tell you?  That these 18 bags

14  of marijuana (indicating) was found in plaintiff's apartment,

15  in his room.

16         And you heard that someone can be charged with

17  possession of drugs if they exercise dominion and control over

18  the area where the drugs are found; therefore, it doesn't

19  matter whether the plaintiff was there when the drugs are

20  discovered or whether he walked in after the fact.  It also

21  doesn't matter what he said as he was getting arrested,

22  because the marijuana was found in his room, which is why

23  plaintiff is now here, trying to convince you that he wasn't

24  living in Apartment 5I in April of 2013, because if he admits

25  that he lived there that day, he knows that those two

SUMMATION/HAIDER

1  documents, the criminal court complaint and the superseding

2  information, mean absolutely nothing.

3          And just so we're clear, yesterday, the Judge

4  instructed you, "The Court has determined prior to your

5  getting here, as a matter of law, that the detective had

6  probable cause to arrest the defendant.  That is not an issue

7  in this case.  That's not what you have to consider."

8          But let's go through all the reasons why Detective

9  Civil knew that plaintiff lived in Apartment 5I.

10          First, Detective Civil told you that he was in

11  plaintiff's apartment just several months prior, in November

12  and December of 2012.  And on one of those occasions, he had

13  found plaintiff asleep in his bed.  In fact, when plaintiff

14  was on the stand, he admitted this himself.  He stated that

15  one time, cops came to the apartment and he was asleep in his

16  room, in his bed.

17          The second reason why you know it's his apartment is

18  that that few weeks before -- or before plaintiff was arrested

19  in April 2013, Detective Mike Civil started his investigation

20  after he received a complaint from a man who identified

21  himself as plaintiff's roommate, Charles Patrick.  The person

22  making the complaint stated that his roommate was selling

23  drugs from their apartment, and was refusing to move out.

24          And while this complaint did not actually name

25  plaintiff, Detective Civil was provided with the description

1    that perfectly matched plaintiff as he sits here today:  Tall,

2    muscular, dark-skinned, black male with a shaved head.  And

3    you will be able to see that -- that document, as it's in

4    evidence.  So it makes sense that Detective Mike Civil thought

5    this complaint was referring to plaintiff.

6         Third reason:  Plaintiff's room had not changed from

7    December 2012 to when he was arrested five months later, in

8    April of 2013.  He had his clothes in the bedroom.  He had the

9    metal rod that he talked about, plaintiff talked about with

10   his clothes hanging on there.  He had his dresser.  He had his

11   weights.  He had a TV.  He had a framed picture of himself and

12   a woman.  Plaintiff even admitted to you that he kept his

13   own -- his own air bed in Apartment 5I after he moved out.

14        The fourth reason you know that plaintiff was still

15   living in Apartment 5I is because he admitted to you on the

16   stand that his two pets, his cat and his dog, both still lived

17   at Apartment 5I.  Now, plaintiff tried to claim yesterday and

18   his attorney today that that dog, that wasn't really his.

19        He just gotten this dog from his brother-in-law as a

20   gift.  He went all the way to Jersey to get that gift.  But

21   instead, he just immediately passed it off to someone he knew

22   who loved dogs, and the person who loved dogs just happened to

23   live in Apartment 5I, the apartment where all of his personal

24   belongings were.  This story just doesn't add up.  Plaintiff's

25   testimony is simply not credible.

```
 1            And what's worse is the story that plaintiff told
 2    you about his cat, the pet he actually admitting to owning.
 3    Plaintiff actually wants you to believe that when he moved out
 4    of Apartment 5I, he continued to pay rent, $80 a week, $320 a
 5    month, just for his cat to live there.  He stated, though,
 6    that he would visit his cat multiple times a day, and would
 7    take care of him.  He would feed him.  He would clean his
 8    litter box.
 9            But let's be honest.  If you spend every day in an
10    apartment and you pay rent in that apartment, you live there.
11            These claims by plaintiff regarding his pet -- both
12    pets -- show that he is willing to say anything, no matter how
13    far-fetched it sounds, to have you believe that he did
14    actually live in Apartment 5I.
15            And finally, the testimony that was most damning to
16    plaintiff's claim that he didn't live there came from his own
17    girlfriend, Tammy Harris, because you see, plaintiff has told
18    us the story that he lived with her in April of 2019(sic).
19            So he called her to the stand to back up his story.
20    But to her credit, when she took the stand on Monday, she told
21    the truth about where plaintiff lived.  Numerous times on the
22    stand, she stated that plaintiff lived at 125 East 18th
23    Street, Apartment 5I.
24            She knew the layout of the plaintiff's makeshift
25    bedroom.  She knew plaintiff's roommates.  She knew
```

1    plaintiff's pets lived in that apartment.  In fact, his

2    girlfriend even admitted that one time after plaintiff claimed

3    he moved out of Apartment 5I, she had to call the cops on him

4    because he attempted to break into her apartment -- to be

5    clear:  Not the apartment she shared with plaintiff.  Her own

6    apartment.

7              It is clear that plaintiff did not live with his

8    girlfriend in April of 2019 (sic).  Sure, he may have slept

9    over his girlfriend's place a couple of times?

10             THE COURT:  I'm sorry, April 20 --

11             MR. HAIDER:  Excuse me, April 19, 2013.

12             THE COURT:  Okay.

13             MR. HAIDER:  Yeah.  He may have stayed at his

14   girlfriend's place a few nights, but on April 19th, 2013,

15   plaintiff's residence was 125 East 18th Street, Apartment 5I.

16             Now, I want to go over another element of the claim

17   that plaintiff has failed to prove.  Plaintiff has failed to

18   prove that he suffered a deprivation of liberty as a result of

19   the alleged fabrication of evidence.  But it's clear in the

20   testimony you heard during this trial that plaintiff's case

21   related to his April 19th arrest did not deprive him of

22   anything.

23             And before I discuss that, I just want to note that

24   while plaintiff's counsel is claiming that he was deprived and

25   he was placed in handcuffs and waiting to see the judge at

```
 1     first, the Judge is going to instruct you later that that does
 2     not count.  The time he spent in handcuffs is not something
 3     you can get damages for in a fair trial claim, and the Judge
 4     will explain that to you further.
 5            What the Judge will also instruct you is that if you
 6     find that plaintiff would have otherwise been required to
 7     appear in court on separate unrelated charges, that you may
 8     consider that fact in determining whether or not he suffered a
 9     deprivation of liberty.
10            Now, even though when plaintiff was on the stand, he
11     had a lot of trouble keeping track of which arrest was what.
12     Couldn't keep his facts straight.  But eventually, he admitted
13     that prior to April 2013, plaintiff already had an open
14     criminal court case for possession of a controlled substance,
15     crack cocaine that was found in Apartment 5I.
16            Plaintiff admitted that while his April 19th
17     criminal court case was pending for over a year, plaintiff was
18     still appearing in court for that unrelated crack cocaine
19     case.  And plaintiff also admitted that once his April 19th
20     arrest charges were dismissed, he still had to go back to
21     court for that crack cocaine arrest.
22            In fact, he cut a deal and pleaded guilty to a
23     violation.  Now, plaintiff's counsel called it a traffic
24     infraction, but there's no evidence that it was a traffic
25     infraction.  That was never said.  That's something that
```

SUMMATION/HAIDER

1  plaintiff counsel just decided to say right now.  The truth

2  is, his crack cocaine case ended after he pleaded guilty.

3           So what does this mean?  This means that even if

4  Mike Civil hadn't arrested plaintiff in April of 2013,

5  plaintiff still would have been required to show up to

6  criminal court to face those charges for crack cocaine.  In

7  fact, plaintiff admitted that on 11 of the 14 times he had to

8  appear in criminal court after his arraignment for the

9  April 19th arrest, he was also there for this unrelated drug

10  case.

11           And to be clear, plaintiff's counsel said there was

12  four court appearances.  That's not what was said during this

13  trial.  Yes, when he was arraigned, meaning when he first had

14  the charges, he was only appearing for that case.  But the

15  Judge will explain how you look at that.  But after that

16  arraignment, he appeared 14 times.  And on 11 of those court

17  appearances, he was also appearing for that crack cocaine

18  case.

19           Plaintiff has not and cannot show that the

20  April 2013 arrest caused him any deprivation of liberty for

21  those 11 court appearances.  This leaves plaintiff with three

22  criminal court appearances that related only to his April 13

23  arrest.

24           But remember, his defense attorney told you --

25  excuse me, his defense attorney stated that for each of these

1   appearances, his case was only on the record for approximately

2   five minutes.  So that's three court appearances, five minutes

3   each.  We are talking about a grand total of 15 minutes.

4         Now, plaintiff may claim or has claimed that he had

5   to wait in courtroom -- wait in the courtroom for his case to

6   be called.  But you heard from the criminal defense attorney.

7   The reason plaintiff had to wait is because his own attorney

8   had other clients, and that there was a backlog in the court.

9   He was only in front of the judge for approximately five

10   minutes at a time.

11         And you also heard plaintiff's counsel talking about

12   his client not being able to work when he had to go to court.

13   But the Judge will also instruct you that damages cannot be

14   based on speculative evidence.

15         You saw no documents that proved he missed work.  No

16   schedule.  No time sheets.  No emails saying, hey come to

17   work.  No text messages or phone calls saying, hey, you have

18   work.  Only thing you can rely on was his say-so.  But we know

19   his testimony was not credible.  That is a perfect example of

20   what speculative damages are, and should just be completed

21   disregarded.

22         So that leaves us with 15 minutes.  He's asking you

23   to award him money for 15 minutes.  But that's not really

24   working.  And even if somehow, someone actually believes that

25   plaintiff is entitled to money in this case, the Judge will

1    talk to you about nominal damages, which means plaintiff can

2    be awarded up to a dollar, which is really the only amount

3    that could possibly account for a 15 minute deprivation.

4         But ladies and gentlemen of the jury, even one

5    dollar or one penny is too much.  Plaintiff is entitled to

6    nothing.

7         Now, you're going to be asked to decide this case

8    using common sense, and common sense tells you that a person

9    does not leave their bed, their clothes, their personal

10   belongings, their dog, their cat, in an apartment they no

11   longer live in.  And common sense tells you that a person

12   doesn't continue to pay rent in an apartment they no longer

13   live in.

14        Therefore, the only answer you have to give on the

15   verdict sheet is to that first question, and that answer is

16   no.  Thank you.

17             THE COURT:  All right.

18             Rebuttal?

19             MR. ZELMAN:  Thank you, Your Honor.

20             Just a few more points to clarify.

21             Defense counsel is correct on one point, which I

22   didn't accurately state to you.  My client is not entitled to

23   compensation for the initial time in cuffs.  He's entitled to

24   compensation for the time after.  I didn't think that was the

25   case, but I was mistaken.

REBUTTAL SUMMATION/ZELMAN

```
 1              Everything else, that he's arguing to you, is
 2    absurd.  Thank you.
 3              You're going to be told two very important points in
 4    the jury in charge:  One, it is irrelevant whether the
 5    criminal case was tried by a jury, period.  Irrelevant.
 6              So he spent about five, ten minutes explaining to
 7    you that these particular documents won't go in front of the
 8    jury and therefore -- therefore, it couldn't influence the
 9    jury because it didn't get in front of the jury.  That's not
10    the case.  That's not the law.  That's not the claim.
11              The case doesn't have to go in front of a jury.
12    Okay?  The Judge will tell you that.  The point is that the
13    information in the criminal court complaint that my client was
14    standing there or sitting there when the drugs were in front
15    of him is the fabricated evidence that would influence a
16    prosecutor.
17              Doesn't have to go to a jury.  There's no jury --
18    it's right here in black and white.  I don't know why he's
19    arguing it.  It is irrelevant whether the criminal case was
20    tried by a jury.  Fabricated evidence, not permitted in our
21    society.  Whether it goes to a jury or not, whether it's in a
22    document or not.
23              Another important point he spent about five minutes
24    explaining that my client must have lived in 125 East 18th
25    Street.  Did we even deny that?  He was staying with his
```

1    girlfriend.  He has his belongings over there.  It makes no

2    difference in this case, because the Judge is going to tell

3    you probable cause to arrest the plaintiff is not an issue in

4    this case.  Right there, in black in white.  I don't know why

5    he is trying to prove to you things that make no difference to

6    this case.

7           Whether or not the -- whether or not the police had

8    probable cause makes no difference.  Whether or not he was

9    living there or not makes no difference, because they

10   fabricated evidence against him.

11          Now, defense counsel takes the time to say that I

12   said traffic infraction.  My point was, what my client pled to

13   on the other case was not a crime -- the same type of thing

14   that you would get for litter or a parking ticket, or you name

15   it.  Maybe even spitting on the street.  Was not an offense.

16   Whether it's a parking or traffic or something else, makes no

17   difference.

18          He says now that there was only three court

19   appearances that my client had to appear for five minutes

20   each, and you shouldn't award him any money because it was

21   only fives minutes -- because it was defense counsel who was

22   so busy, because the court was backlogged.

23          Everybody who goes through that criminal court

24   system -- and I hope you don't have to -- knows.  And I'm

25   there frequently and I see it happening.  The person has to be

1   there at 9:30, and if they get out by lunch, they're lucky.

2        Because there's hundreds of people there, and every

3   single one of them has to go in front of the judge.  Has

4   nothing to do with the -- when you finally get in front of the

5   judge, great.  You're almost done.  Because the judge only has

6   five minutes for each person.  But there's literally hundreds

7   of people there.  So you have to wait your turn and it takes a

8   day.  You can't work.  And you're waiting there for hours.

9   And that's the testimony straight from defense counsel.  It

10   has to nothing to do with the five minutes.  The five minutes

11   is like finally, you know?

12        I think one thing that you learned from defense

13   counsel's closing is that there's really no dispute that my

14   client suffered as a result of this.  I think you can read

15   between the lines on that.

16        And again, it's in your province to determine how to

17   handle this case.  I want you to do the best that you can.

18   Keep your eye on the ball.  And I, again, thank you for your

19   time and attention in this case.

20        THE COURT:  Thank you.

21        That completes closing arguments and at this point,

22   members of the jury, I'm going to give you the charge as to

23   the law.  Each of you will get a copy of the charge.  You

24   don't have to write anything down.  Just listen and -- to the

25   charges as I give it to you, and when I've completed giving

 1    you the charge as to the law, you're going to retire to

 2    consider your verdict, and you'll have a copy of the charge.

 3    Each of you will have a copy of the verdict sheet to consult,

 4    and you'll receive all of the evidence that's been admitted

 5    during the trial.

 6              (Continued on the next page.)